ACCEPTED
03-14-00725-CV
4240941
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/22/2015 3:49:29 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00725-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 12:00:00 AM
JEFFREY D. KYLE
Clerk

In the Third Court of Appeals
Austin, Texas

GEORGE GREEN AND GARLAN GREEN (DECEASED),
*Appellants*

**v.**

PORT OF CALL HOMEOWNERS ASSOCIATION
*Appellee*

APPEAL FROM CAUSE NO. 18314
33RD JUDICIAL DISTRICT COURT OF LLANO COUNTY, TEXAS
HON. ALLAN GARRETT, PRESIDING

**APPELLANTS' RESPONSE TO APPLLELLEE'S MOTION TO DISMISS
AND REQUEST FOR ADDITIONAL TIME TO SUPPLEMENT
RESPONSE IN ORDER TO COMPLETE THE RECORD**

David Junkin
State Bar No. 11058020
Law Office of David Junkin
P.O. Box 2910
Wimberley, Texas 78676
512/847-8600
512/847-8604 (fax)
david@junkinlawoffice.com
*Attorney for Appellants*

# TABLE OF CONTENTS

**Index of Authorities** ................................................................ ii

**Brief Statement of the Case** ...................................................... 1

**Request for Additional Time to Supplement This Response** ..................... 3

**Issue Presented**

> DID THE TRIAL COURT'S VACATING THE SECOND ORDER (THE ORDER ON WHICH THE APPEAL IS BASED) CONFER ON IT THE JURISDICTION TO ENTER THE "DISCOVERY ORDER" (A NEW ORDER COVERING THE SAME SUBJECT MATTER) AND MOOT THIS APPEAL? ........................ 3

**Summary of the Response** ........................................................ 4

**Argument** ...................................................................... 4

**Prayer** ........................................................................ 8

**Certificate of Service** ........................................................ 9

**Appendix**

> Appellee's Request for Clerk's Record and Reporter's Record ... Tab 1
>
> Second Order (order on which the appeal is based) ...................... Tab 2
>
> Vacating Order ........................................................ Tab 3
>
> "Discovery Order" ..................................................... Tab 4
>
> Cases ................................................................. Tab 5
>
> Rules ................................................................. Tab 6

# INDEX OF AUTHORITIES

**Case Law**                                                                 **Page(s)**

*Ahmed v. Shimi Ventures, LP*,
     99 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ............. 5

*Burton v. Cravey*,
     759 S.W.2d 160 (Tex. App.—Houston [1st Dist.] 1988, no writ) ........... 7

*Episcopal Diocese of Fort Worth v. Episcopal Church*,
     422 S.W.3d 646 (Tex. 2013), cert. denied, 135 S.Ct. 431 (2014) ........... 6

*Parsons v. Galveston County Employees Credit Union*,
     576 S.W.2d 99 (Tex. Civ. App.—Houston [1st Dist.] 1987, no writ) ...... 4

*Qwest Communications Corp. v. AT&T Corp.*,
     24 S.W.3d 334 (Tex. 2000). .................................................................. 6

*Reeves v. City of Dallas,*
     68 S.W.3d 58 (Tex. App.—Dallas 2001, pet. denied) ......................... 4, 5

*Tanguy v. Laux,*
     259 S.W.3d 851 (Tex. App.—Houston [1st Dist.] 1988, no pet). ........... 5

*Texas Health and Human Services Commission v Advocates for Patient Access, Inc.,*
     399 S.W.3d 615 (Tex. App.—Austin 2013, no pet.) ......................... 5, 6

*Texas Workers' Compensation Commission v. Garcia,*
     817 S.W.2d 60 (Tex. 1991) .................................................................. 6

**Rules**

Tex. R. App. P. 29 ............................................................................... 4

TO THE HONORABLE THIRD COURT OF APPEALS:

Appellants, George Green and Garlan Green (now deceased) file this response to the Appellee's Motion to Dismiss Appellant's Appeal Because of Mootness and respectfully request additional time to respond as follows:

## BRIEF STATEMENT OF THE CASE

1. The nature of this case is described in more detail in the Appellants' Brief previously filed with this Court. Appellants brought claims against Port of Call Homeowners Association ("POC") and individual members of its board of directors in connection with the mismanagement of POC funds. The primary issue in the underlying suit that is also at issue in this interlocutory appeal, is the Appellants' access to the books and records of POC.

2. The suit was filed on February 5, 2013. CR 8. In connection with discovery issues, both parties filed Motions to Compel. CR 89 and CR 100. A hearing was held on those motions on August 14, 2014. The Trial Court summarized its findings (RR, Vol. 2, page 52, line 9 - page 62, line 11) and an Order was entered (the "Initial Order"). CR 131. The Initial Order was an attempt by the Court to fashion a compromise between the broad rights of access to POC's records under the Texas Property Code (and the POC governing documents) and the discovery obligations imposed on litigants, by

ordering the automatic production of POC records every forty-five (45) days. No objection was made to the Initial Order by any party.

3.     POC subsequently served Defendants' Motion to Enforce Protective Order.  CR 153.  The motion was generally based on letter requests for records and information  made by Appellants after the Initial Order.  A non-evidentiary was conducted.   After the hearing, POC filed Defendants' Supplemental Motion to Enforce Protective Order.  CR 169.

4.     On October 21, 2014, the Trial Court entered an Order Granting Motion for Enforcement (the "Second Order") which modified the Initial Order "nunc pro tunc" and imposed injunctive relief against Appellants relating to communications of any kind between Appellants and Appellees to include, but is not limited to, requesting documents pursuant to document production requirements under the Texas Property Code and the Texas Business Organizations Code and POC governing documents.  CR 175.  It is the Second Order that formed the basis of the Appellants' interlocutory appeal.

5.     On January 30, 2015, after Appellants had already filed their brief in this Court, the Trial Court entered another Order vacating the Second Order, without prejudice to Appellees seeking the relief granted in the Second Order (the "Vacating Order").  Supp. CR 4.  However, on the same day, the Trial Court entered a "Discovery Order" [1] again purporting to prohibit oral or written

---

[1] The Court changed the caption from "Amended Order" to "Discovery Order."  Supp. CR 5.

requests for documents by Appellants except through counsel and which also vacated the Second Order. Supp. CR 5 - 6.

## REQUEST FOR ADDITONAL TIME TO RESPOND

6. The Appellants respectfully request that the Court extend the time for them to respond to the Motion to Dismiss until a reasonable time after the Supplemental Reporter's Record is filed. The Order Appellees claim moots this interlocutory appeal was signed by the Court on January 30, 2015. On or about February 6, 2015, the Appellees requested that the reporter's record be supplemented with the transcript from the January 30, 2015 hearing and the Clerk's Record be supplemented with the two (2) orders issued that day. See Exhibit A which is incorporated by reference. The Supplemental Clerk's Record was filed with the Court on February 10, 2015. The Supplemental Reporter's Record has not been filed. That record contains statements from Appellees' counsel reflecting the injunctive nature and purpose of the "Discovery Order."

7. Accordingly, Appellants respectfully request the opportunity to supplement this response when the Supplemental Reporter's Record is filed. Subject to this request for additional time to supplement this response, the Appellants respond to Appellees' Motion to Dismiss.

## ISSUE PRESENTED

A. Did the Trial Court's vacating the Second Order confer on it the jurisdiction to enter the "Discovery Order" and moot this appeal?

## SUMMARY OF THE RESPONSE

8. The Vacating Order did not moot the appeal, because, while the Trial Court could vacate the Second Order, it lost jurisdiction to modify the injunction by way of the Discovery Order issued the same day. The Trial Court did not have jurisdiction to issue the "Discovery Order" and oust this Court of jurisdiction by vacating the order on appeal and issuing a new one purporting to cover the same subject matter. Tex. R. App. P. 29.5.

## ARGUMENT

9. The appeal of a temporary injunction terminates the jurisdiction of the trial court as to the merits of a temporary injunction. *See e.g., Reeves v. City of Dallas*, 68 S.W.3d 58, 60 (Tex. App.—Dallas 2001, pet. denied), *citing Parsons v. Galveston County Employees Credit Union*, 576 S.W.2d 99, 100 (Tex. Civ. App.—Houston [1st. Dist.] 1978, no writ) ("An amended temporary injunction entered after an appeal has been perfected will be stricken."). While an interlocutory appeal is pending, the trial court retains jurisdiction to dissolve or vacate the order appealed and to proceed to trial on the merits. "But a trial court cannot make any order which 'interferes with or impairs the jurisdiction of the appellate court or the effectiveness or any relief sought or that may be granted on appeal' while the interlocutory appeal is pending." Tex. R. App. P. 29.5; *Reeves*, 68 S.W.3d at 60.

10. In *Reeves*, the trial court entered a temporary injunction in February, but in March vacated the February injunction, but entered a new order that granted basically the same relief, and in April entered another order allowing a payout of the bond. The Court held:

> we conclude that March injunction, except for the first paragraph, and the April order are determinations of the merits of the temporary injunction while the February injunction was pending on appeal. Thus we conclude that March injunction, except the first paragraph that vacated the February injunction, and the April order were issued without authority and must be stricken. Additionally, we conclude the March injunction, again except for the first paragraph, and the April order interferes with or impairs our jurisdiction and the effectiveness of any relief sought from, or that may have been granted, by this Court.

*Reeves*, 68 S.W.3d at 60; *see also Texas Health and Human Services Commission v. Advocates for Patient Access, Inc.*, 399 S.W.3d 615 (Tex. App.—Austin 2013, no pet.) ("In accordance with TRAP 29.5, the trial court had authority to modify or amend the May injunction order to (1) grant identical substantive relief, (2) grant additional substantive relief, and (3) bring the injunction into compliance with Civil Procedure Rules 683 and 684 as long as those actions did not interfere with or impair this Court's jurisdiction or the effectiveness of the relief HHSC seeks on appeal from the May injunction order."); *see also Tanguy v. Laux*, 259 S.W.3d 851, 855 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (concerning a dissolved order replaced with new order that concerned exactly the same subject matter), *citing, Ahmed v. Shimi Ventures, LP*, 99 S.W.3d 682, 689-90 (Tex. App.—Houston [1st Dist.] 2003, no pet.) (modified temporary injunction order).

A trial court should not be allowed to frustrate a party's right to appellate review. *Texas Health and Human Services Commission,* 399 S.W.3d at 624.

11.     The Vacating Order (Supp. CR 4) and "Discovery Order" (Supp. CR 5) vacated the order that is the basis of this appeal.  Without more, the Appellants agree the Trial Court had jurisdiction to vacate the Second Order and that the appeal would be moot.  However, the same day and in connection with the same hearing, the Court signed a second order styled as a "Discovery Order."  Supp. CR. 5.  As noted above, the caption of the Order was changed from "Amended Order" to Discovery Order, but in determining whether there is jurisdiction over the interlocutory appeal, it is the actual substance of the trial court's ruling, not the title of the order that decides the issue. *See Episcopal Diocese of Fort Worth v. Episcopal Church*, 422 S.W.3d 646, 649-50 (Tex. 2013) ("The effect of the trial court's order . . . is what determines this Court's direct appeal jurisdiction."), *cert. denied,* 135 S.Ct. 435 (2014), *citing, Texas Workers' Compensation Commission v. Garcia*, 817 S.W.2d 60, 61-62 (Tex. 1991); *Qwest Communications Corp. v. AT&T Corp*., 24 S.W.3d 334, 336 (Tex. 2000) ("We hold that, in character and function, the trial court's order grants a temporary injunction . . . .").

12.     The third paragraph of the Discovery Order again purports to prohibit any oral or written request for documents by Appellants.  Supp. CR 5. This covers the same subject matter as the injunctive relief granted by the Second Order.  The Supplemental Reporter's record is expected to confirm the Trial

Court initially intended to delete at least the third paragraph of the Discovery Order, but was asked by Appellees' counsel to leave it in to prohibit the conduct alleged to have given rise to the Second Order – the order purportedly vacated.

13. Further, to the extent that the "Discovery Order" is being used to prevent the Appellants from requesting documents under the Texas Property Code, Texas Business Organizations Code (or, for example, the POC bylaws) then the "Discovery Order" is an improperly broad preemptive injunctive order extending beyond discovery requests and requiring Appellants to only exercise their statutory and contractual rights through counsel. *See generally*, *Burton v. Cravey*, 759 S.W.2d 160, 162 (Tex. App.—Houston [1st Dist.] 1988, no writ) ("Again, we note that appellants are attempting to engraft notions borrowed from Texas discovery practice onto a statutory right to inspect. Article 1396-2.23 contains no limitations on the members right to inspect as long as the books and records are those of the non-profit corporation and the inspection is for "any proper purpose.").

14. The Vacating Order did not moot the appeal, because the Trial Court issued an order the same day effectively granting injunctive relief that was also part of the injunctive relief granted in the Second Order. The Trial Court did not have jurisdiction to issue the "Discovery Order" and cannot oust this Court of

jurisdiction by vacating the order on appeal and issuing a new one purporting to cover the same subject matter – even though arguably narrower in scope.[2]

## PRAYER

Appellants move that the Appellees' Motion to Dismiss be denied and that Appellants be awarded all such other and further relief, including general relief, to which they might be entitled.

Respectfully submitted,

Law Office of David Junkin

_____
David Junkin
State Bar No. 11058020
P.O. Box 2910
Wimberley, Texas 78676
512/847-8600
512/847-8604 (fax)
david@junkinlawoffice.com

Attorney for Appellants
George and Garlan Green

---

[2] While the "Discovery Order" purports to allow communication (just no requests for "documents") it arguably then includes a prohibition on requests for information if the information would be provided in documentary form. For example, the Discovery Order purports to prohibit Appellants from obtaining a simple accounting from POC for Appellants' payments to POC unless the request is made through counsel.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this response brief was served on the following counsel of record and in the manner indicated on February 22, 2015.

**VIA FAX OR AND/OR ESERVE**

Brantley Ross Pringle, Jr.
Heidi Coughlin
Wright & Greenhill, PC
221 West 6th Street, Suite 1800
Austin, TX  78701

**VIA FAX AND/OR ESERVE**

L. Hayes Fuller, III
Naman, Howell, Smith, & Lee, PLLC
P.O. Box 1470
Waco, TX  76703-1470

_____
David Junkin

# WRIGHT & GREENHILL, P.C.
## Attorneys at Law

221 West 6th Street, Suite 1800
Austin, Texas 78701

Telephone (512) 476-4600
Facsimile (512) 476-5382

# FACSIMILE COVER SHEET

## Date:  February 6, 2015

| TO:  NAME | FAX NUMBER | PHONE NUMBER |
|---|---|---|
| David Junkin | 512-847-8604 | |
| L. Hayes Fuller | 254-754-6331 | |

**TOTAL NUMBER OF PAGES
INCLUDING THIS COVER SHEET:** 3

C/M #: 9792-43682  MT/SCB

FROM: EXT.:  239

CONFIDENTIALITY NOTICE:  Unless otherwise indicated or obvious from the nature of the transmittal, the information contained in this facsimile message is attorney privileged and confidential information intended for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify the sender immediately by telephone and return the original message to Wright & Greenhill, P.C. at the above address via the U.S. Postal Service at our expense.  Thank you.

**COMMENTS:  Please see attached correspondence from Mr. Thompson.**

WRIGHT & GREENHILL, P.C.

ATTORNEYS AT LAW

221 WEST 6TH STREET, SUITE 1800
AUSTIN, TEXAS 78701-3495
P.O. BOX 2166 • 78768

MIKE THOMPSON, JR.
BOARD CERTIFIED
CIVIL APPELLATE LAW

TELEPHONE 512/476-4600
FACSIMILE 512/476-5382
DIRECT DIAL 512/708-5368

INTERNET MTHOMPSON@W-G.COM

February 6, 2015

Joyce Gillow
Llano County District Clerk
832 Ford Street
Llano, Texas 78643

RE:   **REQUEST FOR SUPPLEMENTAL CLERK'S RECORD**
      Cause No. 18,314; *George Green v. Port of Call Homeowners Association,*
      *Randolph Harig, Nancy Carothers, and Philip Jacobs*; In the District Court of
      Llano County, Texas 33rd Judicial District
      Our File No. 9792-43682

Dear Ms. Gillow:

Please allow this letter to serve as our request for preparation of a supplemental transcript
in this case for the ongoing appeal to include copies of the following documents:

1.    The February 5, 2015 Order vacating the early October 21, 2014 court order;
      and

2.    The Discovery Order of February 5, 2015.

Once you have prepared this supplemental transcript, if you would please file it with the
Third Court of Appeals for George Green vs. Port of Call Homeowners' Association, et al, Cause
No. 03-14-00725-CV and advise us as to the amount of cost for creating this supplemental record.

Sincerely,

WRIGHT & GREENHILL, P.C.

By: _____
      Mike Thompson, Jr.

MT/jcj

cc:    David Junkin – via facsimile
       L. Hayes Fuller, III – via facsimile

WRIGHT & GREENHILL, P.C.
ATTORNEYS AT LAW

221 WEST 6TH STREET, SUITE 1800
AUSTIN, TEXAS 78701-3495
P.O. BOX 2166 • 78768

MIKE THOMPSON, JR.
BOARD CERTIFIED
CIVIL APPELLATE LAW

TELEPHONE 512/476-4600
FACSIMILE 512/476-5382
DIRECT DIAL 512/708-5368

INTERNET MTHOMPSON@W-G.COM

February 6, 2015

VIA EMAIL: 33reporter@dcourttexas.org
Stephanie Larsen
Llano County Court Reporter
P.O. Box 554
Marble Falls, Texas 78654

RE:     SUPPLEMENTAL REPORTER'S RECORD FOR THE APPEAL
        Cause No. 18,314; *George Green v. Port of Call Homeowners Association, Randolph Harig, Nancy Carothers, and Philip Jacobs*; In the District Court of Llano County, Texas 33rd Judicial District
        Our File No. 9792-43682

Dear Stephanie:

Please allow this letter to serve as a request for a Supplemental Reporter's Record for the ongoing appeal in this case. To that end, if you would please prepare a record of the court hearing on January 30, 2015. Please advise us of the cost of preparation of that Reporter's Record, and we will promptly make payment of same. Then, please file that with the Third Court of Appeals in Austin for the ongoing interlocutory appeal in this case.

If you have any questions, please do not hesitate to call.

Sincerely,

WRIGHT & GREENHILL, P.C.

*Mike Thompson*

By:_____
        Mike Thompson, Jr.

MT/jcj

cc:     David Junkin – via facsimile
        L. Hayes Fuller, III – via facsimile

NO. 18314

| | | |
|---|---|---|
| GEORGE GREEN, | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| | § | |
| v. | § | 33RD JUDICIAL DISTRICT |
| | § | |
| PORT OF CALL HOMEOWNERS | § | |
| ASSOCIATION, RANDOLPH HARIG, | § | |
| NANCY CAROTHERS, AND PHILLIP | § | |
| JACOBS, JOHN ROSS BUCHHOLTZ, | § | |
| AND RICHARD PAT MCELROY | § | LLANO COUNTY, TEXAS |



FILED
JOYCE GILLOW
CLERK DISTRICT COURT, LLANO COUNTY, TEXAS
OCT 21 2014
AT 2:34 O'CLOCK ___ P.M
BY _____ DEPUTY

## ORDER GRANTING MOTION FOR ENFORCEMENT

On the 14th day of October, 2014, the Court heard Movants' Motion for Enforcement of Protective Order. Having considered the Motion, the evidence and the arguments of counsel, the Court finds and concludes that the Motion should be, and it hereby is, GRANTED.

IT IS FURTHER ORDERED, that all communication between the parties be had through attorneys of record, and that George Green and Garlan Green, and any of their agents, assigns, officers, executors or any person acting or working on their behalf in any way, other than their attorney(s) of record, shall make no communication to Defendants during this litigation.

IT IS FURTHER ORDERED, that Defendants only need to supplement documents from previous discovery requests and information requests made by Plaintiff every sixty (60) days beginning on November 15, 2014. Such supplementation shall occur without prompting or request by Plaintiff (as the same is expressly prohibited by this Order), and shall include any POA-related documents that members may lawfully request due to their status as POA members.

IT IS FURTHER ORDERED, that Plaintiff pay to Defendants the sum of $500.00 as reasonable and necessary attorneys fees incurred in bringing the said Motion For Enforcement.

175

IT IS FURTHER ORDERED, that any violation of this Order is subject to a sanction/fine of up to $1,500.00 per occurrence, and the award of reasonable and necessary attorney's fees to the prevailing party in a Motion to Enforce this Order.

Notwithstanding the efficacy of this Order in granting Defendant's Motion For Enforcement of Protective Order, it is the express intent of the Court that this Order act as a clarification to the August 14, 2014 Order Granting Defendants' Motion To Compel and Protective Order nunc pro tunc.

SIGNED this ____21ˢᵗ____ day of ____October____, 2014.

_____
Presiding Judge

2

CAUSE NO. 18314

| GEORGE GREEN | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | |
| | § | |
| PORT OF CALL HOMEOWNERS | § | LLANO COUNTY, TEXAS |
| ASSOCIATION, RANDOLPH HARIG, | § | |
| NANCY CAROTHERS, AND PHILIP | § | |
| JACOBS, JOHN ROSS BUCHHOLTZ, | § | |
| AND RICHARD PAT MCELROY | § | 33RD JUDICIAL DISTRICT |

## ORDER

CAME ON to be considered the motion of Defendants to vacate the Order of October 21, 2014 in the above-captioned cause. The Court having considered the motion, the evidence and arguments of counsel, hereby finds that the motion should be and is hereby GRANTED.

It is hereby ORDERED that the Court's Order dated October 21, 2014 in this matter is VACATED without prejudice to seek the relief granted in the October 21, 2014 Order if George Green acquires standing to prosecute this lawsuit.

SIGNED this _30th_ of _January_____, 2015.

JOYCE GILLOW
CLERK DISTRICT COURT, LLANO COUNTY, TEXAS
**FILED**

FEB 05 2015

AT_9:23___ O'CLOCK _A_ M
BY_____DEPUTY

_____
JUDGE PRESIDING

4

CAUSE NO. 18314

| | | |
|---|---|---|
| GEORGE GREEN | § | IN THE DISTRICT COURT OF |
| | § | |
| V. | § | |
| | § | |
| PORT OF CALL HOMEOWNERS | § | LLANO COUNTY, TEXAS |
| ASSOCIATION, RANDOLPH HARIG, | § | |
| NANCY CAROTHERS, AND PHILIP | § | |
| JACOBS, JOHN ROSS BUCHHOLTZ, | § | |
| AND RICHARD PAT MCELROY | § | 33RD JUDICIAL DISTRICT |

## DISCOVERY ~~AMENDED~~ ORDER

The Court ORDERS that Defendants supplement documents responsive to Plaintiff's previous discovery requests made by Plaintiff every sixty (60) days beginning on November 15, 2014. Such supplementation shall occur without prompting or request by Plaintiff, and shall include any Port of Call Homeowners Association-related documents that members may lawfully request due to their status as HOA members.

It is further, ORDERED that Defendants are excused from producing documents or information requested directly by or on behalf of Plaintiff during the pendency of this litigation except as expressly provided in the immediately preceding paragraph.

While Defendants are under the duty to produce documents to Plaintiff under this Amended Order, Plaintiff's requests, oral or written, for documents addressed in this Order or previously produced by Defendants will be viewed as a abuse of discovery and subject to sanctions. *Discovery motions or requests from Plaintiff's attorney are explicitly excluded from this paragraph/order.* (initials)

It is further ORDERED that Plaintiff pay to Defendants the sum of Five Hundred and 00/100 Dollars ($500.00) as reasonable and necessary attorneys fees under Texas Rules of Civil Procedure 215.

JOYCE GILLOW
CLERK DISTRICT COURT, LLANO COUNTY, TEXAS
FILED
FEB 0 5 2015
AT 9:23 O'CLOCK A M
BY _____ DEPUTY

This Court's Order Granting Motion for Enforcement is VACATED.

SIGNED this 30 of January, 2015.

_____
JUDGE PRESIDING

6

**99 S.W.3d 682 (Tex.App.—Houston [1st Dist.] 2003)**

**Mohammed Atique AHMED, Appellant,** [1]

**v.**

**SHIMI VENTURES, L.P. and Beltway Insurance Agency, Inc., Appellees.**

**No. 01-02-00914-CV.**

**Court of Appeals of Texas, First District, Houston.**

**January 31, 2003.**

[Copyrighted Material Omitted]

John H. Thomisee Jr., Houston, for Appellant.

John H. Sklar, Houston, for Appellee.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

### OPINION

TIM TAFT, Justice.

Appellant, Mohammed Atique Ahmed, takes this interlocutory appeal from the granting of a temporary injunction. *See* TEX. CIV. PRAC. & REM.CODE ANN.§ 51.014(a)(4) (Vernon Supp.2003). We determine (1) whether the trial court could enter, and whether we may review in this interlocutory appeal, a modified temporary injunction order that was entered after Ahmed had appealed the original temporary injunction order; (2) whether we must vacate the injunction in part because it requires some acts violating the Insurance Code; and (3) whether the trial court abused its discretion in determining that appellees, Beltway Insurance Agency, Inc. ("Beltway") and Shimi Ventures, L.P. ("Shimi"), carried their burden of showing a probable right of recovery and irreparable injury. We modify the temporary injunction order in part, to vacate certain of its provisions, and affirm it as so modified.

### Background

The following background facts come from evidence presented at the temporary injunction hearing and from two affidavits, which the trial court considered without objection, that were attached to Beltway and Shimi's petition. [2]

Beltway incorporated in October 2000 and is the managing general partner of Shimi, which was formed the same month. Shortly after Shimi's formation, Shimi purchased the assets, goodwill, and books of business of the Houston offices of Amco Insurance Agencies, Inc. ("Amco").

The undisputed evidence shows that, through the date of the temporary injunction hearing, Beltway had never been licensed as an insurance agency by the Texas Department of Insurance, even though Beltway's petition admitted that, since the purchase of Amco's business, Beltway had been "in the business of selling Texas personal automobile liability insurance." In contrast, Ahmed--originally the president, board member, employee, and shareholder of Beltway and also a limited partner in Shimi--had been a licensed, limited lines agent since 1999. There was testimony that Beltway had wanted Ahmed to get an insurance license in Beltway's name and that Ahmed could have obtained that license in as few as six weeks.

Starting sometime in late 2000, Ahmed began entering into producer agreements in his own name with insurers or their agents with whom Beltway did business. Ahmed received commission checks pursuant to these agreements. Through July 23, 2002, when he left Beltway, Ahmed endorsed his commission checks earned under any of these producer agreements to Beltway and deposited them in Beltway's account.

Ahmed signed one such producer agreement in early 2002 with Logic Underwriters, Inc. ("Logic"), an insurance agency with which Beltway did business. As with his other producer agreements, Ahmed signed the agreement in his own name, not expressly as agent of Beltway. Logic generally issued commission checks either in Ahmed's name or jointly in his and Beltway's name, showing Beltway's address under the payee line. [3] However, Logic mailed these checks to the addresses of Ahmed's personal stores, not to Beltway's address. Following the usual procedure, Ahmed endorsed the Logic commission checks to Beltway.

On July 23, 2002, Beltway's shareholders and board members met and removed Ahmed as a board member, president, and employee of Beltway. The board removed Ahmed because he had not obtained the licenses required for Beltway to act as a limited lines agency. According to Beltway and Shimi's evidence, Ahmed promised at that meeting not to interfere with Beltway's operations or relations with insurers after his removal. Nonetheless, Ahmed thereafter instructed Logic to issue commission checks solely in his name and to send them to him.

This dispute concerns who is entitled to the

commission checks issued after Ahmed's removal for insurance policies that Ahmed wrote before his removal. In a nutshell, the parties dispute the capacity in which Ahmed acted under the producer

**Page 686**

agreements and, thus, the ownership of his commissions. Ahmed testified that he entered into the producer agreements on his own behalf, not as Beltway's agent; that the commissions earned pursuant to his producer agreements were his alone; and that the commission checks that he endorsed to Beltway were loans, although he admitted that no loan documents existed. Beltway and Shimi presented evidence that Ahmed acted as Beltway's agent under the producer agreements through July 23, 2002; that Ahmed knew that the commissions he earned on policies written before that date belonged to Beltway; and that no loan existed.

Shimi and Beltway sued Ahmed for fraud and conversion, seeking a temporary restraining order ("TRO") and temporary and permanent injunctions and damages. [4] The ancillary judge granted an ex parte TRO that restrained Ahmed, his wife, and those acting for or with them from "directly or indirectly removing, transferring, wiring, spending, investing, secreting, or ... disposing" of funds belonging to Beltway and Shimi, whether from Logic or otherwise. The TRO also restrained the same people from contacting any insurers with whom Beltway and Shimi conducted business.

Ahmed answered, seeking to dissolve the TRO, counter-claiming for contract breach and conversion, and seeking a TRO and temporary and permanent injunctions against Beltway and Shimi. On August 19, 2002, the trial court held an evidentiary hearing on the applications for temporary injunction. The trial court orally granted Beltway and Shimi's application and denied Ahmed's. [5] On August 23 2002, the trial court signed a temporary injunction order, which provided in pertinent part as follows:

IT IS THEREFORE ORDERED that Mohammed Atique Ahmed and all persons acting on behalf of or in concert with him, and all persons with actual notice of this Order, are temporarily enjoined from directly or indirectly removing, transferring, wiring, spending, investing, secreting, or in any manner whatsoever disposing of the commissions from Logic Underwriters, Inc. or the commissions paid by any insurer, or any other funds that belong to [Shimi] or [Beltway].

IT IS FURTHER ORDERED that Mohammed Atique Ahmed *shall remit to [Beltway] the proceeds from all commission checks* that have been deposited to accounts under his control *for commissions earned on policies written through July 23, 2002* (approx.$47,325.00) from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway]

conduct business and shall deliver such proceeds to [Shimi and Beltway's] counsel....

IT IS FURTHER ORDERED that Mohammed Atique Ahmed shall deliver to [Shimi and Beltway's] counsel a photocopy of each commission check that has been deposited to accounts under his control for commissions earned on policies written through July 23, 2002 from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway] conduct business and shall deliver such photocopies to [Shimi and Beltway's] counsel....

**Page 687**

IT IS FURTHER ORDERED that Mohammed Atique Ahmed shall *endorse and make payable to the order of [Beltway] all checks* from Logic Underwriters, Inc. or paid by any insurer with whom [Shimi] or [Beltway] conduct business *for commissions earned on policies written through July 23, 2002* and shall deliver within forty-eight (48) hours after his receipt of all such checks to [Shimi and Beltway's] counsel.

IT IS FURTHER ORDERED that [Shimi and Beltway] and Mohammed Atique Ahmed shall photocopy each commission check that comes into their respective possession for commissions earned on policies written through July 23, 2002 from Logic Underwriters, Inc. or any other insurer with whom [Shimi] or [Beltway] conduct business and shall make such photocopies available to opposing counsel upon request.

IT IS FURTHER ORDERED that Mohammed Atique Ahmed, his family members, agents, servants, employees, attorneys and all other persons or entities in active concert or participation with him are enjoined from directly or indirectly contacting Logic Underwriters, Inc. or any insurer with whom [Shimi] or [Beltway] conduct business for any purpose related to insurance policies written or commissions earned on insurance policies written through July 23, 2002 and claiming that they represent the interests of [Shimi and Beltway].

(Emphasis added.)

Ahmed appealed the temporary injunction order three days later. He then left the country, reportedly to visit a sick family member. In September 2002, Beltway and Shimi moved to modify the temporary injunction order because Ahmed had allegedly failed to remit the commissions that he had already deposited (about $47,000), to endorse further commission checks to Beltway, and to provide Beltway and Shimi with copies of further commission checks. Beltway and Shimi claimed that Ahmed had not returned to the country. After holding a non-evidentiary hearing on the modification motion, the trial court entered a modified temporary injunction order, which was substantively similar to the first order except that it lowered Shimi and Beltway's bond and also ordered all insurers doing

business with Shimi or Beltway to reissue any commission checks issued to Ahmed or Ahmed and Beltway jointly since August 2002, making them payable solely to Beltway, and to make all future commissions checks on policies written through July 23, 2002 payable solely to Beltway.

### Effect of Temporary Injunction's Modification After Perfection of Appeal

While this interlocutory appeal was pending, and after Ahmed had filed his brief, the trial court entered an order modifying the appealed temporary injunction order. Citing Rule of Appellate Procedure 29.6, Ahmed has moved this Court to review the modified temporary injunction order in this appeal. *See* TEX.R.APP. P. 29.6.

The second temporary injunction order was entitled "order modifying temporary injunction," not "amended order," and it did not expressly vacate the first order. However, other than adding a provision applicable to insurers, reducing Beltway and Shimi's bond, and changing some compliance dates, the modified order was identical to the first order. Moreover, the modified order concerned exactly what the earlier order had, and it did not incorporate by reference any terms from the first order or state that it merely supplemented the first order--that is, the second order was a complete temporary injunction in itself concerning exactly the same subject matter. The modified order thus implicitly

### Page 688

superseded the earlier order. [6] *Cf.Anderson v. Teco Pipeline Co.,* 985 S.W.2d 559, 562 (Tex.App.-San Antonio 1998, pet. denied) (holding that later judgment, styled "amended final judgment," implicitly vacated earlier judgment, styled "final judgment").

Neither party questions whether we may consider the modified order in an interlocutory appeal from the superseded order, or whether the modified order is void in whole or in part, or whether the interlocutory appeal is somehow moot because it was taken from a now-superseded injunction order. We note, however, that these questions concern either our own jurisdiction over this appeal, which we must consider even if the parties do not, [7] or the trial court's jurisdiction to modify its injunction, which will affect which order we review, a matter we must decide anyway to review Ahmed's issues. Accordingly, we examine the effect of the modified order.

### A. Our Jurisdiction Over the Modified Temporary Injunction Order

Rule of Appellate Procedure 29.6 governs our jurisdiction to review, in an interlocutory appeal, a trial court order entered after the appeal's perfection:

While an appeal from an interlocutory order is pending, on a party's motion or on the appellate court's own initiative, the appellate court may review the following: (1) *a further appealable interlocutory order concerning the same subject matter;* and (2) any interlocutory order that interferes with or impairs the effectiveness of the relief sought or that may be granted on appeal.

TEX.R.APP. P. 29.6(a) (emphasis added).

The modified temporary injunction order clearly "concern[s] the same subject matter" as the earlier order that was appealed. *See* TEX.R.APP. P. 29.6(a)(1). Therefore, we may review the modified order in this interlocutory appeal as long as it is itself an "appealable interlocutory order." [8] *See id.*

Generally, we have jurisdiction to hear an appeal from an interlocutory order only if a statute explicitly makes the order appealable. *SeeStary v. DeBord,* 967 S.W.2d 352, 352-53 (Tex.1998). "A person may appeal from an interlocutory order of a district court ... that: ... grants or refuses a temporary injunction or grants or overrules a motion to dissolve a temporary injunction as provided by Chapter 65." [9] TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2003).

We must strictly construe section 51.014's grant of interlocutory jurisdiction because the Legislature intended it to be a narrow exception to the general rule that only final judgments are appealable. *SeeBally Total Fitness Corp. v. Jackson,* 53 S.W.3d 352, 355 (Tex.2001); *Baylor Coll. of Med. v. Tate,* 77 S.W.3d 467, 469-70 (Tex.App.-Houston [1st Dist.] 2002, no writ). An order *modifying* a temporary injunction order is not exactly an order that "grants or refuses a temporary injunction

### Page 689

or grants or overrules a motion to dissolve a temporary injunction." *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4). Nonetheless, this Court has construed section 51.014(a)(4) to grant interlocutory review of an order modifying a temporary injunction, given the similarity of that order to the orders listed in section 51.014(a)(4). *SeeToby Martin Oilfield Trucking, Inc. v. Martin,* 640 S.W.2d 352, 354-55 (Tex.App.-Houston [1st Dist.] 1982, no writ). [10] Allowing an interlocutory appeal of such an order is especially appropriate when, as here, the modified order implicitly vacates and then replaces the original one: that situation is very much like a dissolution, followed by a granting, over both of which rulings section 51.014(a)(4) expressly allows an interlocutory appeal. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4).

Consistent with *Martin,* we hold that we have jurisdiction to review an order modifying a temporary injunction by interlocutory appeal. *SeeMartin,* 640 S.W.2d at 354-55; *see alsoCurrie v. Int'l Telecharge, Inc.,* 722 S.W.2d 471, 472-73 (Tex.App.-Dallas 1986, no

writ). Accordingly, we further hold that we have jurisdiction to review the modified temporary injunction order in this interlocutory appeal from the now-superseded temporary injunction order. *See* TEX.R.APP. P. 29.6(a)(1).

We grant Ahmed's motion to review the modified temporary injunction order. *See id.*

### B. The Trial Court's Jurisdiction to Enter the Modified Temporary Injunction Order

That does not end our inquiry. Our holding that we may review the modified temporary injunction order in this interlocutory appeal is not the same as holding that the modified order itself is valid.

The modified order is valid if the trial court had jurisdiction to enter it during the interlocutory appeal. Rule of Appellate Procedure 29.5 sets out the trial court's jurisdiction after an interlocutory appeal is filed. *See* TEX.R.APP. P. 29.5. Rule 29.5 provides that, during the pendency of an interlocutory appeal, the trial court retains subject-matter jurisdiction of the case and may make "further orders, including one dissolving the order appealed from, and if permitted by law, may proceed with a trial on the merits." *Id.* [11] The rule expressly prohibits the trial court from making an order that is inconsistent with any temporary orders of the appellate court or that "interferes with or impairs" the appellate court's jurisdiction or the effectiveness of the relief that a party

#### Page 690

seeks or that the appellate court may grant. TEX.R.APP. P. 29.5(a), (b).

We have already held that we have interlocutory jurisdiction to review the modified order under statute and rule; therefore, the fact that the modified order implicitly supplanted the earlier, appealed order does not in itself interfere with our interlocutory jurisdiction in violation of rule 29.5. Additionally, to the extent that the modified order's content does not materially differ from that of the superseded order, the modified order neither prevents our review of Ahmed's issues nor affects the relief that he requests or that we could grant him. Finally, we note that the modified temporary injunction order's additional provisions do not adversely affect the relief that Ahmed requests or that we could grant him. *Compare, e.g.,McAllen Med. Ctr., Inc. v. Cortez,* 66 S.W.3d 227, 238 (Tex.2001) (holding that severance order, entered after defendant appealed class-action certification, violated rule 29.5(b) because it severed out what had been the class-action claims against appealing defendant and because, although appellant could have intervened in severed suit, deadline for appealing class-certification order in that suit had already expired). Therefore, under the plain language of rule 29.5, the trial court had jurisdiction to enter the modified temporary

injunction order.

There is case law that appears to be contrary, but because of amendments to the applicable rules, it does not control. For example, at common law, before the Supreme Court adopted the predecessor to these rules, some courts had held that the interlocutory appeal of an order deprived the trial court of jurisdiction over the subject matter of the appealed order, so that all subsequent trial court orders on the same subject were void. *SeeParsons v. Galveston County Employees Credit Union,* 576 S.W.2d 99, 100 (Tex.Civ.App.-Houston [1st Dist.] 1978, order granting stay) (in vacating amended order entered after interlocutory appeal taken, holding, "The perfection of an appeal from an order granting a temporary injunction terminates the jurisdiction of the trial court insofar as the temporary injunction is concerned."). [12] Under the pre-rules common law, the modified temporary injunction order here would have been void, and only the original temporary injunction order would have remained in effect. *SeeHumble Exploration Co. v. Fairway Land Co.,* 641 S.W.2d 934, 940 (Tex.App.-Dallas 1982, writ ref'd n r.e.) (considering merits of original receivership order on interlocutory appeal, while vacating order modifying receivership after appeal for lack of jurisdiction in trial court).

But the Supreme Court's adoption of Rule of Civil Procedure 385b in 1983, and its adoption of substantively similar Rule of Appellate Procedure 43(d) in 1986, changed that common law rule. *See* TEX.R. CIV. P. 385b(d), *Order of the Supreme Court, Adopting Rules of Civil Procedure* (Dec. 5, 1983, eff.Apr.1, 1984), TEXAS CASES, 661-62 S.W.2d XXIX, XCIII (West 1984), *superseded by* TEX.R.APP. P. 43(d), *Order of the Supreme Court and the*

#### Page 691

*Texas Court of Criminal Appeals, Promulgating New Rules of Appellate Procedure* (Apr. 10, 1986, eff. Sept. 1, 1986, superseded eff. Sept. 1, 1997), TEXAS CASES, 707-08 S.W.2d XXIX, LV (West 1986). Former rules 385b(d) and 43(d) provided that the trial court retained jurisdiction to "issue further orders, including dissolution of the order appealed from," but expressly prohibited orders "granting substantially the same relief as that granted by the order appealed from," those contrary to temporary appellate orders, or those interfering with or impairing the effectiveness of relief on appeal. *See id.* Under either former rule 385b(d) or former rule 43(d), the modified order would have been void for granting substantially the same relief as the original order, and we would have reviewed only the original temporary injunction order. *SeeSt. Louis S.W. Ry. Co. v. Voluntary Purchasing Groups, Inc.,* 929 S.W.2d 25, 33 (Tex.App.-Texarkana 1996, no writ); *Cobb v. Thurmond,* 899 S.W.2d 18, 19 (Tex.App.-San Antonio 1995, writ denied); *Hopper v. Safeguard Bus. Sys., Inc.,* 787 S.W.2d

624, 626-27 (Tex.App.-San Antonio 1990, no writ).

Once again, however, the Supreme Court substantively amended the rules in 1997 by adopting rule 29.5, quoted above. *See Order of the Supreme Court and the Texas Court of Criminal Appeals, Final Approval of Revisions to the Texas Rules of Appellate Procedure* (Aug. 15, 1997, eff.Sept.1, 1997), TEXAS CASES, 948-49 S.W.2d LXI, C (West 1997). Importantly, the revision omitted the prohibition against entering an order granting substantially the same relief as that granted by the appealed order--which change was made, according to the comments, because the former prohibition was too broad. *See* TEX.R.APP. P. 29.5 & cmt. Therefore, the case law interpreting the "substantially similar" prohibition of former rules 43(d) and 385b(d) is not binding under rule 29.5. Neither is the pre-rules common law prohibition against any further orders viable under rule 29.5. [13]

We hold that the trial court had jurisdiction to enter the modified temporary injunction order. *See* TEX.R.APP. P. 29.6. We also hold that we may review that modified order in this interlocutory appeal. *See* TEX.R.APP. P. 29.5.

**Page 692**

**The Merits of the Modified Temporary Injunction Order**

**A. Standard of Review and Burden of Proof**

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending trial. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). We may not review the merits of the applicant's case in an interlocutory appeal from a temporary injunction order. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 607 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

To obtain a temporary injunction, an applicant must plead and prove (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru,* 84 S.W.3d at 204. In establishing a probable right to the relief sought, the applicant need not establish that it will prevail at trial. *SeeCity of Friendswood v. Registered Nurse Care Home,* 965 S.W.2d 705, 707 (Tex.App.-Houston [1st Dist.] 1998, no pet.). To establish an irreparable injury, the injured applicant must show that it "cannot be adequately compensated in damages or ... the damages cannot be measured by any certain pecuniary standard." *Butnaru,* 84 S.W.3d at 204. That is, the applicant must establish that there is no adequate remedy at law for damages. *SeeSurko Enters., Inc. v. Borg-Warner Acceptance Corp.,* 782 S.W.2d 223, 225 (Tex.App.-Houston [1st Dist.] 1989, no writ). An adequate remedy at law is one that is as complete, practical, and efficient to the ends of justice

and its prompt administration as is equitable relief. *Id.*

Whether to grant a temporary injunction lies within the trial court's sound discretion. *Tel. Equip. Network,* 80 S.W.3d at 607. We will thus not reverse the trial court's order unless the trial court's action was "so arbitrary that it exceeded the bounds of reasonable discretion." *Id.* One way that a trial court abuses its discretion is to apply the law erroneously to undisputed facts. *Id.* A trial court also abuses its discretion when it issues an injunction that orders an illegal act, even when done in the name of preserving the status quo. *SeeRegistered Nurse Care Home,* 965 S.W.2d at 708 (vacating temporary injunction order granted in favor of plaintiffs/appellees because trial court abused discretion by issuing injunction that preserved status quo by allowing plaintiffs to continue operating facilities under conditions violating law); *see alsoDeNoie v. Bd. of Regents of Univ. of Tex. Sys.,* 609 S.W.2d 601, 603 (Tex.Civ.App.-Austin 1980, no writ) ("Status quo can never be a course of conduct which is a prima facie violation of law."). We view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor. *Amalgamated Acme Affiliates, Inc. v. Minton,* 33 S.W.3d 387, 392 (Tex.App.-Austin 2000, no pet.); *Tel. Equip. Network,* 80 S.W.3d at 607.

**B. Violation of Law**

**1. Whether the Modified Temporary Injunction Order Requires Acts Violating Statute**

In issue four, Ahmed argues that the modified temporary injunction order is void to the extent that it compels him and third parties to violate the Insurance Code.

The Insurance Code prohibits an insurer or insurance agent engaged in the business of insurance in Texas from "pay[ing], directly or indirectly, ... any commission or other valuable consideration to ... any person for services performed by that person as an insurance agent in this state" unless the person holds an insurance license.

**Page 693**

TEX. INS.CODE ANN. art. 21.01-2, § 2A(b) (Vernon Supp.2003). [14] The Insurance Code also prohibits "any person to act, as an agent or otherwise, in soliciting or receiving applications for insurance of any kind whatever" in Texas and from "in any manner" aiding "in the transaction of the business of any insurance company" without "first procuring a license or certificate of authority...." TEX. INS.CODE ANN. art. 21.01, § 2 (Vernon Supp.2003). [15] The Code defines an "agent" as

[a]ny person who solicits insurance on behalf of any insurance company, ... or who takes or transmits other than for himself any application for insurance or any policy of insurance to or from such company, ... or who

shall receive or deliver a policy of insurance of any such company, or who shall ... receive, or collect, or transmit any premium of insurance, ... or do or perform any other act or thing in the making or consummating of any contract of insurance for or with any such insurance company other than for himself, ... whether any of such acts shall be done at the instance or request, or by the employment of such insurance company, or of, or by, any broker or other person....

TEX. INS.CODE ANN. art. 21.02, § (a) (Vernon Supp.2003). [16]

The quoted prohibitions apply to persons licensed as, among other things, property and casualty insurance agents. *See* TEX. INS.CODE ANN. art. 21.01,§ 3(16) (Vernon Supp.2003). The undisputed evidence showed that Ahmed was at all pertinent times such an agent, specifically, a licensed limited lines agent for automobile insurance.

The Insurance Code defines "person" for purposes of the above-quoted statutes to include corporations and partnerships. *See* TEX. INS.CODE ANN. art. 21.07, § 1A(8) (Vernon Supp.2003). [17] The Code further

### Page 694

defines a "corporation" to be "a legal entity that is organized under the business corporations laws or limited liability company laws of this state, another state, or a territory of the United States and that has as one of its purposes the authority to act as an insurance agent." TEX. INS.CODE ANN. art. 21.07,§ 1A(3) (Vernon Supp.2003). It was undisputed that Beltway was a Texas corporation and that, through the time of the temporary injunction hearing, Beltway was not a licensed insurance agency. Therefore, the statutes prohibiting commission-sharing and insurance solicitation applied to Beltway to the extent that it wrote insurance policies or otherwise acted as an insurance agent, which Beltway admitted here and below that it did.

The modified temporary injunction order requires Ahmed, a licensed insurance agent, to remit his commissions and to endorse his commission checks to Beltway, a corporation that is not a licensed insurance agency. The order also requires third-party insurers or their managing agents to make commission payments directly to Beltway, which again is unlicensed. The Insurance Code clearly prohibits such actions. The modified temporary injunction order thus requires illegal acts, even if the trial court merely intended to keep the status quo by ordering them. [18] *SeeRegistered Nurse Care Home,* 965 S.W.2d at 708.

Beltway and Shimi do not argue that an unlicensed corporation performing insurance agent services can legally share a licensed agent's commissions. Rather, they respond that they never contracted to share Ahmed's commissions, but sought merely to preserve by the injunction the amount of revenues that would have flowed to Beltway had Ahmed obtained Beltway's license. That is, the protected funds represent the damages that Beltway and Shimi hope to collect under their fraud claim. However, that theory of the injunction's purpose has nothing to do with the fact that the mechanism that the injunction uses to carry out that purpose requires licensed agents and insurers to pay commissions directly to an unlicensed corporation performing insurance services, contrary to the law.

Accordingly, we must vacate those portions of the modified temporary injunction order that require Ahmed's commissions to be paid, directly or indirectly, to Beltway. *SeeRegistered Nurse Care Home,* 965 S.W.2d at 708. We thus sustain issue four. [19]

### Page 695

### 2. Whether Beltway and Shimi Showed a Probable Right of Recovery

In issue one, Ahmed argues that Beltway and Shimi did not establish a probable right of recovery on their conversion or fraud claims because those claims were allegedly based on Ahmed's payment of commissions to them, an act that we have held would violate the Insurance Code. With respect to the fraud claim, Ahmed also argues that there was no evidence that he misrepresented anything.

Courts have long refused to enforce contracts that called for paying or sharing insurance commissions in violation of the Insurance Code provisions discussed above. *SeeBenefits Admin. Corp. v. Rearick,* 705 S.W.2d 234, 235-36 (Tex.App.-Texarkana 1986, no writ); *Perkins v. Lambert,* 325 S.W.2d 436, 440 (Tex.Civ.App.-Austin 1959, writ dism'd); *Stone v. Sterling Mut. Life Ins. Co.,* 127 S.W.2d 345, 347-48 (Tex.Civ.App.-Galveston 1939, no writ); *Employers Cas. Co. v. Mitchell, Gartner & Walton,* 84 S.W.2d 862, 864 (Tex.Civ.App.-Fort Worth 1935, no writ); *see alsoIns. Co. of N. Am. v. Morris,* 981 S.W.2d 667, 681-82 (Tex.1998); *Tidelands Life Ins. Co. v. Armstrong,* 414 S.W.2d 196, 198 (Tex.Civ.App.-Austin 1967, no writ). Ahmed relies on this line of cases. However, Ahmed overlooks that at least one cause of action that Beltway and Shimi pled--that for fraud--does not seek to enforce an agreement to share commissions. To the contrary, as Beltway and Shimi explain on appeal, that cause of action assumes that Beltway *could not* legally share Ahmed's commissions. Instead, the cause of action relies on their allegation that Ahmed did not obtain Beltway's license after having been charged with doing so specifically so that he could keep the commissions from Beltway, allegedly contrary to the parties' arrangement. [20] That theory of recovery is not based on enforcement of an illegal arrangement to share commissions.

Fraud requires " 'a material misrepresentation, which

was false, and which was either known to be false when made or was asserted without knowledge of its truth, which was intended to be acted upon, which was relied upon, and which caused injury.' " *Formosa Plastics Corp. USA v. Presidio Engs. & Contractors, Inc.,* 960 S.W.2d 41, 47-48 (Tex.1998) (quoting *Sears, Roebuck & Co. v. Meadows,* 877 S.W.2d 281, 282 (Tex.1994)). Ahmed relies on *Armstrong v. Tidelands Life Insurance Co.* to argue that no reliance existed as a matter of law. 466 S.W.2d 407 (Tex.Civ.App.-Corpus Christi 1971, no writ). The *Armstrong* court considered, among other things, summary judgments in favor of the defendant insurer on the contract-breach and fraud claims of an insurance agent. *See id.* at 408. The agent based his fraud claim on the insurer's having misrepresented that it would obtain the proper license for him to act as an agent. *See id.* The damages that the agent sought were the commissions that he would have received had the

**Page 696**

insurer obtained the license. *See id.* at 409. After holding that the contract between the agent and the insurer was void and unenforceable because the agent was not properly licensed, the *Armstrong* court affirmed the summary judgment rendered on the fraud claim. *See id.* The court noted that the statute placed the responsibility on the agent to obtain the license *before* acting as an insurance agent. *See id.* Based on this statutory requirement, the *Armstrong* court held that the agent could not rely on the insurer's promise to get a license for him. *See id.* at 409-10, 411.

We distinguish *Armstrong* for two reasons. First, in *Armstrong,* it was the *insurance agent* who performed the services requiring a license, yet he relied on another entity first to obtain that license for him. Put another way, one party took responsibility for obtaining the insurance agent's license, while the other party took responsibility for acting as the insurance agent. Under that arrangement, the individual began acting as an insurance agent without having first confirmed that the insurer, a separate entity, had gotten the license that was a prerequisite to the individual's acting. Here, in contrast, viewed in the appropriate light and indulging all reasonable inferences in Beltway and Shimi's favor, one party (Ahmed) took responsibility *both* for obtaining the license, which the evidence shows might have been done quickly, *and* for earning the disputed commissions. Ahmed determined both when Beltway would be licensed and when he would start earning commissions on Beltway's behalf. The individual in *Armstrong* could not rely on another to obtain his license before acting as an agent, which arrangement might (and did) end up violating the statute; in contrast, nothing prevented Ahmed from procuring a license for his corporation before acting as an agent.

Second, the individual in *Armstrong* relied on a separate entity to obtain his license. In contrast, viewed in the right light, Ahmed, as Beltway's president, was acting *as Beltway's officer and employee* for the purpose of obtaining Beltway's license. This means that Beltway (through its corporate representative, Ahmed) was *itself* taking responsibility for getting its own license before allowing Ahmed (as its employee) to earn commissions. The fact that Ahmed never got that license might show that Ahmed failed his corporate principal, but it does not necessarily demonstrate that Beltway was not entitled to rely on him as its own corporate officer. Therefore, *Armstrong* does not as a matter of law defeat the reliance needed for Beltway and Shimi's fraud claim.

Ahmed also argues that the trial court abused its discretion because there was no evidence that Ahmed had misrepresented anything. However, there was evidence that Ahmed had been charged with obtaining a license for Beltway and that he could have done so in as few as six weeks, but that he did not. The law prevented unlicensed Beltway from sharing Ahmed's commissions, yet Beltway still collected commissions. Additionally, Beltway did not remove Ahmed for failure to obtain Beltway's license until mid-2002, close to two years after he earned his first commissions. Viewed in the required light, these facts raise reasonable inferences that Ahmed hid his failure to get the license and that Beltway relied on that misrepresentation.

Accordingly, we hold that the trial court did not abuse its discretion if it concluded that Beltway and Shimi showed a probable right of recovery on at least their fraud cause of action.

We overrule issue one. [21]

**Page 697**

### C. Irreparable Injury

In issue two, Ahmed argues that Beltway and Shimi presented no evidence that injury was imminent or irreparable or that Beltway and Shimi had no adequate legal remedy absent the temporary injunction.

The modified temporary injunction order recited that Ahmed's possession of commission checks would irreparably harm Beltway and Shimi by making them experience "an immediate, and if not addressed, ongoing, shortfall in operating revenues resulting in disruption of business operations, including the inability to provide insurance services to its customers." The order also recited that Beltway and Shimi had no adequate remedy at law to compensate them for these damages.

We hold that evidence supported the trial court's determination on both grounds. Regarding irreparable harm, Ahmed testified that, through July 23, 2002--that is, for over 20 months--he had deposited all his commission checks into Beltway's account. Ahmed testified that he had loaned these sums to Beltway to pay for Beltway's operating expenses: "I was trying to keep the money [sic] afloat. Without my loaning this money,

*the company would have gone under and the investment my partners would have [sic] made would have physically vanished.* " (Emphasis added.) The temporary injunction hearing was held only 29 days after Ahmed had left Beltway and stopped depositing commissions into Beltway's account. Given Ahmed's own testimony that Beltway had depended on these sums for survival for almost two years, the trial court could reasonably have inferred that Beltway's needs had not changed substantially in 29 days.

Moreover, there was evidence from which the trial court could reasonably have concluded that Beltway and Shimi had no adequate remedy at law. Ahmed admitted that, although he considered the commissions that he had earned since the beginning to be his personal property, he had not paid any income taxes on them to date. Ahmed's counterclaim alleged that the amount of commissions he had loaned to Beltway was $1,500,000 over the 22 months preceding the suit's filing; he also testified that, at least at the time of the hearing, his commissions were about $300,000 a year. One could thus reasonably infer that, under Ahmed's theory of the case, he could have potential, outstanding tax liability on a substantial income. Additionally, Ahmed testified that he no longer had errors and omissions coverage for himself individually, from which one could reasonably infer possible personal liability if Ahmed were sued. Finally, two days after the original temporary injunction hearing, Ahmed went to Pakistan. The next day, Ahmed's counsel filed a motion to extend the temporary injunction's deadlines, which motion attached a family member's affidavit estimating that Ahmed would return from Pakistan in three weeks. However, as of the date of the injunction-modification hearing held about two months later--and as was clear from counsels' discussion at that second hearing--Ahmed had not yet returned from Pakistan. The trial court thus knew of Ahmed's continued absence when it signed the modified temporary injunction order. That order carried forth the same inadequate-remedy recital that had appeared in the original order.

Based on this evidence, we hold that the trial court did not abuse its discretion in concluding that Beltway and Shimi would suffer irreparable harm and had no adequate remedy at law.

We overrule issue two.

**Page 698**

### Conclusion

We modify the modified temporary injunction order by vacating those portions of that order that require Ahmed to relinquish or to sign over commissions to Beltway or that require licensed insurers or their agents to pay commissions directly to Beltway. We affirm the modified temporary injunction order as so modified.

---------

Notes:

[1] Mohammed Atique Ahmed and his wife, Farheen Ahmed, were both defendants below. However, only Mohammed Atique Ahmed filed a notice of interlocutory appeal, and appellees state in their brief that they nonsuited Farheen Ahmed during the pendency of this interlocutory appeal.

[2] Ahmed argues that we may not consider the affidavits because they are not evidence and because the parties did not agree to treat them as evidence. Ahmed is correct that, absent the parties' agreement, affidavits attached to pleadings and not admitted into evidence do not constitute evidence. *See Millwrights Local Union No. 2484 v. Rust Eng'g Co.,* 433 S.W.2d 683, 685-86 (Tex.1968) (holding that, absent parties' agreement, proof required for temporary injunction cannot be made by affidavit attached to injunction application); *Letson v. Barnes,* 979 S.W.2d 414, 417, 418-19 (Tex.App.-Amarillo 1998, pet. denied) (same). However, we disagree with Ahmed that we may not consider these affidavits under the circumstances present here. Here, the trial court announced during the hearing that it could base its decision on the exhibits and testimony from the hearing and also on "affidavits filed with the petition" and on "evidence [sic] provided in [Ahmed's] answer." No one objected to this stated procedure. The trial court was the fact finder; therefore, its declaring during the evidentiary hearing that it could consider the affidavits was tantamount to its having--rightly or wrongly--admitted those affidavits into evidence. Ahmed's counsel, who now argues that the affidavits did not constitute evidence, implicitly acquiesced in this procedure below when, after the trial court's quoted statement, he questioned his own client based on the affidavits attached to Beltway and Shimi's petition. *Cf. Millwrights,* 433 S.W.2d at 686 (holding that parties may agree to allow temporary injunction proof by affidavit). In any event, Ahmed cannot now complain about the trial court's having considered these affidavits when, after having been advised that the trial court would do so, Ahmed did not complain below. *See* TEX.R.APP. P. 33.1(a)(1); *cf. Tigua Gen. Hosp., Inc. v. Feuerberg,* 645 S.W.2d 575, 576 (Tex.App.-El Paso 1982, no writ) (treating affidavits as sufficient temporary injunction proof, despite lack of parties' agreement to do so below, when opposing party did not complain of deficiency of affidavits on appeal).

[3] There were some exceptions. In June 2002, at Ahmed's request while he was out of town, Logic issued commission checks jointly to Ahmed and a company called BW Insurance Agency, Inc. ("BWI"). BWI was formed by Beltway's board of directors in March 2002. BWI had obtained assumed-name certificates to do business as "Beltway Insurance" and was actually operating Beltway's stores by the time of the temporary

injunction hearing. It appears to be for these reasons, among others, that Ahmed requested that Logic issue the commission checks for June in his absence to BWI, rather than to Beltway.

[4] Beltway and Shimi also pled conspiracy between Ahmed and his wife, Farheen Ahmed. However, during the appeal, Beltway and Shimi non-suited Ahmed's wife without prejudice, and they admit in their brief that the non-suit vitiates their conspiracy claim.

[5] Ahmed does not complain on appeal of the denial of his temporary injunction application.

[6] We note that, even if the modified temporary injunction order had not supplanted the original order in its entirety, our disposition would have been the same for the reasons discussed below.

[7] *SeeBrown v. Herman,* 852 S.W.2d 91, 93 (Tex.App.-Austin 1993, orig. proceeding) (holding that court of potential jurisdiction has jurisdiction to determine its jurisdiction).

[8] For reasons discussed further below, only subsection (a)(1) of rule 29.6 concerns us here.

[9] TEX. CIV. PRAC. & REM.CODE ANN. §§ 65.001-.045 (Vernon 1997 & Supp.2003) (concerning injunctions).

[10] *AccordBarrier v. Little,* No. 01-98-01361-CV, slip op. at 2, 1999 WL 439011 (Tex.App.-Houston [1st Dist.] June 17, 1999, no pet.) (not designated for publication) (quoting *Martin* ); *Currie v. Int'l Telecharge, Inc.,* 722 S.W.2d 471, 472-73 (Tex.App.-Dallas 1986, no writ) (relying on *Martin* ); *seeArrechea v. Plantowsky,* 705 S.W.2d 186, 187, 188-89 (Tex.App.-Houston [14th Dist.] 1985, no writ) (without discussing jurisdictional issue, reviewing by interlocutory appeal order modifying temporary injunction); *Pierce Mortuary Colls., Inc. v. Bjerke,* 841 S.W.2d 878, 880 (Tex.App.-Dallas 1992, writ denied) (in dicta, explaining why *Currie's* holding was correct for orders modifying temporary injunctions, but did not apply to amended class certification order that expanded class). *But seeLudewig v. Houston Pipeline Co.,* 737 S.W.2d 15, 16 (Tex.App.-Corpus Christi 1987, no writ) (holding that order amending temporary injunction order was not appealable).

[11] The trial court issued both temporary injunction orders before rule 29.5 was modified effective January 1, 2003. *See Order of the Supreme Court, Final Approval of Amendments to the Texas Rules of Appellate Procedure,* Misc. Docket No. 02-9237 (Dec. 23, 2002, eff.Jan.1, 2003). Because the 2003 amendment does not affect the disposition of this appeal, however, we quote the current version of the rule. *See id.*

[12] *AccordBoynton v. Brown,* 164 S.W. 897, 897 (Tex.Civ.App.-San Antonio 1914, writ ref'd); *Humble*

*Exploration Co. v. Fairway Land Co.,* 641 S.W.2d 934, 936, 940 (Tex.App.-Dallas 1982, writ ref'd n.r.e.); *Holst v. Newsletters, Inc.,* 578 S.W.2d 420, 421 (Tex.Civ.App.-Houston [1st Dist.] 1979, writ ref'd n r.e.); *Caldwell v. Meyers,* 446 S.W.2d 709, 710 (Tex.Civ.App.-Austin, orig.proceeding); *City of Corpus Christi v. Lone Star Fish & Oyster Co.,* 335 S.W.2d 621, 622 (Tex.Civ.App.-San Antonio 1960, no writ); *Hyatt v. Mercury Life & Health Co.,* 202 S.W.2d 325, 327 (Tex.Civ.App.-San Antonio 1947, orig. proceeding).

[13] Only one case is to the contrary. In *Reeves v. City of Dallas,* after a temporary injunction order had been appealed, the trial court entered a second temporary injunction order (1) that expressly vacated the first injunction order and (2) that granted essentially the same relief as had the first. *Seeid.,* 68 S.W.3d 58, 60 (Tex.App.-Dallas 2001, pet. denied). Relying on rule 29.5's express grant of jurisdiction to dissolve an appealed temporary injunction, the *Reeves* court first held that the trial court had jurisdiction to enter the second temporary injunction order *to the extent that the second order vacated the first order,* further holding that the vacating of the first order rendered the appeal from the first order moot. *See id.* With this holding we do not necessarily disagree. The *Reeves* court also held that the remainder of the second temporary injunction order--which apparently added a trial date that the first order did not have (*see* TEX.R. CIV. P. 683, requiring temporary injunction order to set trial date)--interfered with its appellate jurisdiction and the relief that it could grant and so violated rule 29.5(b). *SeeReeves,* 68 S.W.3d at 60. Neither do we disagree with this holding, and we distinguish *Reeves* on this basis. However, the *Reeves* court alternatively held that the trial court had no jurisdiction to enter the second temporary injunction order to the extent that it did anything but vacate the first order. *See id.* In this holding, the *Reeves* court relied solely on pre-rules authority--now superseded by rule--that the trial court loses jurisdiction completely over the merits of the injunction order once interlocutory appeal is perfected. *See id.* Because this holding of the *Reeves* court is based on superseded law, we respectfully disagree with it.

[14] The parties began their business arrangement before article 21.01-2, section 2A(b)'s effective date of September 1, 2001. *See* Act of May 18, 2001, 77th Leg., R.S., ch. 703, §§ 1.04, 10.01, 2001 Tex. Gen. Laws 1348, 1354, 1401 (now codified at TEX. INS.CODE ANN. art. 21.01-2, § 2A(b) (Vernon Supp.2003)). However, article 21.01-2A(b) merely recodified prior law (1) that was in effect at all times pertinent to this case and (2) that contained a prohibition not materially different in any way pertinent to this appeal from the prohibition in the current law. *See* Act of May 25, 1979, 66th Leg., R.S., ch. 404, § 1, 1979 Tex. Gen. Laws 884, 885 (eff. June 6, 1979) (first adding this prohibition to Insurance Code, prohibiting commission payment to unlicensed "person or corporation" for insurance-agent services), *amended by*

Act of May 23, 1997, 75th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083, 2083-84, *recodified at current code section by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, §§ 1.04, 1.09, 10.01, 2001 Tex. Gen. Laws 1348, 1354, 1357-58, 1401 (now codified at TEX. INS.CODE ANN. art. 21.01-2, § 2A(b) (Vernon Supp.2003)). Accordingly, for simplicity's sake, we refer only to current statute.

[15] Again, because the 2001 amendment to this statute did not change the preexisting law in any way material to this appeal, we refer only to the current statute. *See* (Act of 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1061, *title heading added by* Act of April 23, 1999, 76th Leg., R.S., ch. 101, § 2, 1999 Tex. Gen. Laws 486, 534, *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, § 1.01, 2001 Tex. Gen. Laws 1348, 1349) (now codified at TEX. INS.CODE ANN. art. 21.01, § 2 (Vernon Supp.2003)).

[16] The definition of an agent was substantively similar at all times pertinent to this appeal. *See* Act of 1951, 52nd Leg., R.S., ch. 491, 1951 Tex. Gen. Laws 868, 1061-62, *amended by* Act of May 13, 1985, 69th Leg., R.S., ch. 203, § 1, 1985 Tex. Gen. Laws 790, 790, *amended by* Act of May 18, 2001, 77th Leg., R.S., ch. 703, § 1.07, 2001 Tex. Gen. Laws 1348, 1357 (now codified at TEX. INS.CODE ANN. art. 21.02, § (a) (Vernon Supp.2003)).

[17] At all times pertinent to this appeal, persons and corporations both were prohibited from sharing commissions and acting as an agent without a license. *See* Act of May 26, 1977, 65th Leg., R.S., ch. 579, § 2, 1977 Tex. Gen. Laws 1421, 1421-22 (adopting "person or corporation" language), *amended by* Act of May 25, 1979, 66th Leg., R.S., ch. 404, § 1, 1979 Tex. Gen. Laws 884, 884-85, *amended by* Act of May 23, 1997, 75th Leg., R.S., ch. 596, § 1, 1997 Tex. Gen. Laws 2083, 2083-84, *amended by* Act of May 18, 2001, 77th Leg., ch. 703, § 1.09, 2001 Tex. Gen. Laws 1357, 1357-58 (now codified at TEX. INS.CODE ANN. art. 21.07, § 1A(8) (Vernon Supp.2003)).

[18] Sometime in the summer of 2002, BWI (not Beltway) obtained the license and registrations needed to act as a limited lines agency. Although BWI was actually operating Beltway's stores by the time of the temporary injunction hearing, the undisputed evidence showed that BWI and Beltway were separate corporate entities and that BWI was not Beltway's corporate successor. Moreover, the modified temporary injunction order did not order Ahmed's commissions paid to BWI, but to Beltway. BWI's relationship with Beltway, and the fact that BWI was licensed, are thus immaterial to our holding under issue four.

[19] Our holding on this issue obviates the need to reach Ahmed's issue three, which argues that the trial court exceeded its jurisdiction in issuing the temporary injunction because the order to turn over and endorse all commission checks to Beltway (1) granted all the relief to which Beltway and Shimi would be entitled on final trial and (2) granted more relief than that for which Beltway and Shimi pled. Because our holding on issue four does not require vacating the entire modified temporary injunction order, our holding does not moot Ahmed's issue one (whether Beltway and Shimi showed a probable right of recovery on their two claims), his issue two (whether Beltway and Shimi proved a probable, imminent, and irreparable injury), or his issue five (whether the trial court abused its discretion by allegedly relying on a finding of breach of fiduciary duty in granting the temporary injunction).

[20] This theory of Beltway and Shimi's fraud cause of action was not precisely the theory that they pled below. Rather, their petition alleged that Ahmed had committed fraud by allegedly falsely claiming that he would not interfere with Beltway's business after his removal. However, the fraud theory on which Beltway and Shimi rely on appeal was supported by the temporary-injunction evidence, when viewed in the light most favorable to the ruling, and Ahmed has not claimed surprise at the assertion of this theory on appeal.

[21] Our holding on issue one moots Ahmed's issue five--whether the trial court abused its discretion by allegedly relying on a finding of breach of fiduciary duty in granting the temporary injunction: even if the trial court erred in finding this, a claim for fraud does not require a breach of fiduciary duty.

---------

**Page 160**

**759 S.W.2d 160 (Tex.App. —Houston [1 Dist.] 1988)**

**Lou W. BURTON and Galleria Diplomat Association, Inc., Appellants,**

**v.**

**Jeffrey M. CRAVEY, et al., Appellees.**

**No. 01-88-00270-CV.**

**Court of Appeals of Texas, First District, Houston**

**August 18, 1988**

Rehearing Denied Sept. 8, 1988.

Wade B. Reese, Houston, for appellants.

Lou W. Burton, Houston, pro se.

John K. Grubb, Houston, for appellees.

Before SAM BASS, DUGGAN and LEVY, JJ.

OPINION

DUGGAN, Justice.

This appeal involves the right to inspect records and books of a condominium association. Appellees, a group of dissident owners, filed a petition for writs of mandamus and injunction because of the appellant Galleria Diplomat Association's board of directors' refusal to allow the inspection of records. In a corrected order dated March 2, 1988, the trial court granted the writ of

**Page 161**

mandamus, ordering the Association to maintain its books and records at its offices and make these records available for inspection and copying. The trial court also enjoined appellants from interfering with appellees' right to inspect these books and records. The court further ordered the delay of the annual election by the Association's members.

All of the points of error attack the ordered production of records in the possession of appellant Burton, the attorney for the appellant Association. The trial court entered a finding of fact that the Association's Board of Directors hired Burton "to handle numerous matters for the Association and that records of Lou W. Burton relating to Association matters are part of the books and records of the Galleria Diplomat Townhomes Homeowner's Association, Inc. a/k/a the Galleria Diplomat Association, Inc." This finding of fact is not

challenged by point of error and is therefore binding on appeal. *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ.App.--Beaumont 1980, writ ref'd n.r.e.). The court ordered the production of "all of Lou W. Burton's records and files in any way related to his representation" of the Association.

In their first of three points of error, appellants contend that the trial court erred in ordering the production of Burton's records because the application and proof fail to establish a cause of action or a probable right and a probable injury.

Appellants mischaracterize the nature of the trial court proceedings. For example, they argue that appellees have other adequate remedies under Tex.R.Civ.P. 167, 168 and 737 to pursue inspection. This assertion ignores the fact that a writ of mandamus is the proper remedy to enforce the right of inspection. See 20 R. Hamilton, Texas Business Organizations § 801 (1973). Appellees did not have to establish an independent cause of action; they merely had to establish their statutory right to inspect.

Tex.Prop.Code Ann. § 81.209 (Vernon 1984) provides the following for condominium records:

(a) The administrator or board of administration of a condominium regime or a person appointed by the bylaws of the regime shall keep a detailed written account of the receipts and expenditures related to the building and its administration that specifies the expenses incurred by the regime.

(b) The accounts and supporting vouchers of a condominium regime shall be made available to the apartment owners for examination on working days at convenient, established, and publicly announced hours.

(c) The books and records of a condominium regime must comply with good accounting procedures and must be audited at least once each year by an auditor who is not associated with the condominium regime.

(Emphasis added.)

The Texas Non-Profit Corporation Act, Tex.Rev.Civ.Stat.Ann. art. 1396-2.23 (Vernon 1980), additionally provides:

A. Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors, and committees having any authority of the board of directors and shall keep at its registered office or principal office in this State a record of the names and addresses of its members entitled to vote.

B. All books and records of a corporation may be

inspected by any member, or his agent or attorney, for any proper purpose at any reasonable time.

(Emphasis added.)

In their application for writ of mandamus, appellees were attempting to enforce their statutory rights as condominium apartment owners to inspect the "accounts and supporting vouchers of a condominium regime" under Property Code § 81.209, and as corporation members to inspect "all books and records" of a non-profit corporation under article 1396-2.23. The trial court did not err in ordering the production of Burton's records.

Appellants' first point of error is overruled.

**Page 162**

Appellants contend in their second point of error that the trial court erred in ordering production of the records and files of the attorney for the condominium association because the order is overly broad, unduly burdensome, and requires the production of irrelevant information.

Appellees sought the production of records that they were statutorily entitled to inspect. Appellants' complaints about the order appear to be an attempt to engraft discovery notions upon the appellees' statutory right of inspection, which is independent of any right of discovery in litigation. See *San Antonio Models, Inc. v. Peeples,* 686 S.W.2d 666 (Tex.App.--San Antonio 1985, orig. proceeding). The right to inspect under article 1396-2.23 encompasses "all books and records." The trial court found that Burton's files and records relating to the Association were the "books and records" of the Association. This finding is not challenged on appeal. This right of condominium owners to inspect the books and records, like the comparable right to inspect granted shareholders in corporations, is limited by the requirement that the inspection be for any "proper purpose." See R. Hamilton, Texas Business Organizations § 804 (1973); see also Annotation, What Corporate Documents Are Subject to Shareholder's Right to Inspection 88 A.L.R.3d 663 (1978).

Once the trial court found that Burton's files and records relating to the Association were part of the books and records of the Association, appellees were entitled to inspect them for any "proper purpose." Appellants, however, do not contend that the intended inspection is for an improper purpose. There was testimony by appellees that they were concerned about the "substantial" and "inordinate" fees paid to Burton by the Association. Although the parties have presented no cases squarely on point, it would appear that it was the appellant Association's burden of proof to establish the absence of proper purpose. *Uvalde Rock Asphalt Co. v. Loughridge,* 425 S.W.2d 818 (Tex.1968); *Moore v. Rock Creek Oil Corp.,* 59 S.W.2d 815 (Tex.Comm'n App.1933, holding approved); see also, 5A Fletcher, Cyclopedia of the Law of Private Corporations § 2253.1 (1987). The trial court, however, sustained appellees' objections to appellants' attempted inquiries about ulterior or vindictive motives for the inspection of records. Appellants do not complain about the exclusion of this testimony.

Appellants' second point of error is overruled.

Appellants contend in their third point of error that the trial court erred in granting the production order because it requires the inspection of privileged documents.

Again, we note that appellants are attempting to engraft notions borrowed from Texas discovery practice onto a statutory right to inspect. Article 1396-2.23 contains no limitations on the member's right to inspect as long as the books and records are those of the non-profit corporation and the inspection is for "any proper purpose." The trial court found that Burton's records and files relating to the Association were part of the Association's books and records, and appellants have not contended that the intended inspection is for an improper purpose. The only limitation under article 1396-2.23 is "proper purpose." Appellants have failed to prove that the purpose of the inspection was improper.

Moreover, if the attorney-client privilege did apply, we would hold that the trial court did not abuse its discretion in ordering the inspection of Burton's records. The attorney-client privilege is not absolute; appellants' interest in the nondisclosure of communications protected by the privilege would have to be balanced against the inspection rights of the members of the non-profit corporation. See In re LTV Securities Litigation, 89 F.R.D. 595, 609-611 (N.D.Tex.1981). Under the facts of this case, the trial court did not abuse its discretion in ordering the inspection of Burton's records.

Appellants' third point of error is overruled.

The judgment is affirmed.

**422 S.W.3d 646 (Tex. 2013)**

**THE EPISCOPAL DIOCESE OF FORT WORTH, ET AL, PETITIONERS,**

**v.**

**THE EPISCOPAL CHURCH, ET AL., RESPONDENTS**

**No. 11-0265**

**Supreme Court of Texas**

**August 30, 2013**

Argued October 16, 2012.

Released for Publication March 21, 2014.

ON DIRECT APPEAL FROM THE 141ST DISTRICT COURT, TARRANT COUNTY, TEXAS.

Amicus Curiae for Liberty Institute: Kelly J. Shackelford, Liberty Legal Institute, Plano, TX.

Eprhaim Radner, Pro se.

For The Episcopal Diocese of Fort Worth, Appellant: J. Shelby Sharpe, Sharpe & Rector, Fort Worth, TX; Kendall M. Gray, Andrews Kurth LLP, Houston, TX; R. David Weaver, The Weaver Law Firm PC, Arlington, TX; Scott A. Brister, Andrews Kurth LLP, Austin, TX.

For Local Episcopal Congregations, Appellee: Frank Gilstrap, Frank Hill, Hill Gilstrap, P.C., Arlington, TX.

For Local Episcopal Parties, Appellee: Jonathan D.F. Nelson, Jonathan D. F. Nelson PC, Arlington, TX; Kathleen Wells, Taylor Olson Adkins Sralla & Elam LLP, Fort Worth, TX; Thomas S. Leatherbury, William D. Sims Jr., Vinson & Elkins LLP, Dallas, TX.

For The Episcopal Church, Appellee: David Beers, Mary Kostel, Goodwin Proctor LLP, Washington, DC; Sandra Cockran Liser, Naman Howell Smith & Lee PLLC, Fort Worth, TX.

JUSTICE JOHNSON delivered the opinion of the Court, in which JUSTICE HECHT, JUSTICE GREEN, and JUSTICE GUZMAN joined, and in Parts I, II, III, and IV-A of which CHIEF JUSTICE JEFFERSON joined. JUSTICE WILLETT filed a dissenting opinion, in which JUSTICE LEHRMANN, JUSTICE BOYD, and JUSTICE DEVINE joined.

**OPINION**

Phil Johnson, Justice.

This direct appeal involves the same principal issue we addressed in *Masterson v. Diocese of Northwest Texas*, __ S.W.3d __, (Tex. 2013): what methodology is to be used when Texas courts decide which faction is entitled to a religious organization's property following a split or schism? In *Masterson* we held that the methodology referred to as " neutral principles of law" must be used. But, in this case the trial court granted summary judgment on the basis of the " deference" or " identity" methodology, and the record does not warrant rendition of judgment to either party based on neutral principles of law.

We reverse and remand to the trial court for further proceedings.

### I. Background

The Episcopal Church (TEC) is a religious organization founded in 1789. It has three structural tiers. The first and highest is the General Convention. The General Convention consists of representatives from each diocese and most of TEC's bishops. It adopts and amends TEC's constitution and canons. The second tier is comprised of regional, geographically defined dioceses. Dioceses are governed by their own conventions. Each diocese's convention adopts and amends its own constitution and canons, but must accede to

TEC's constitution and canons. The third tier is comprised of local congregations. Local congregations are classified as parishes, missions, or congregations. In order to be accepted into union with TEC, missions and congregations must subscribe to and accede to the constitutions and canons of both TEC and the Diocese in which they are located.

In 1982 the Episcopal Diocese of Fort Worth (the Diocese or Fort Worth Diocese) was formed after the Episcopal Diocese of Dallas voted to divide into two parts. The Fort Worth Diocese was organized " pursuant to the Constitution and Canons of the Episcopal Church" and its convention adopted a constitution and canons. The Diocese's constitution provided that all property acquired for the Church and the Diocese " shall be vested in [the] Corporation of the Episcopal Diocese of Fort Worth." The canons of the Diocese provided that management of the affairs of the corporation " shall be conducted and administered by a Board of Trustees of five (5) elected members, all of whom are either Lay persons in good standing of a parish or mission in the Diocese, or

members of the Clergy canonically resident in the Diocese." The Bishop of the Diocese was designated to serve as chair of the board of the corporation. After adopting its constitution and canons the Diocese was admitted into union with TEC at TEC's December 1982 General Convention.

In February 1983, the Fort Worth Diocese filed articles of incorporation for the Fort Worth Corporation. That same year the Dallas and Fort Worth Dioceses filed suit in Dallas County and obtained a judgment transferring part of the Dallas Diocese's real and personal property to the Fort Worth Diocese. The 1984 judgment vested legal title of the transferred property in the Fort Worth Corporation, except for certain assets for which the presiding Bishop of the Dallas Diocese and his successors in office had been designated as trustee. The judgment transferred the latter assets to the Bishop of the Fort Worth Diocese and his successor in office as trustee.

Doctrinal controversy arose within TEC, leading the Fort Worth Corporation to file amendments to its articles of incorporation in 2006 to, in part, remove all references to TEC. The corporate bylaws were similarly amended. The 2007 and 2008 conventions of the Fort Worth Diocese voted to withdraw from TEC, enter into membership with the Anglican Province of the Southern Cone, and adopt amendments to the Diocese's constitution removing references to TEC.[1]

**Page 649**

TEC responded. It accepted the renunciation of Jack Iker, Bishop of the Fort Worth Diocese, and TEC's Presiding Bishop removed Iker from all positions of authority within TEC. In February 2009, TEC's Presiding Bishop convened a " special meeting of Convention" for members of the Fort Worth Diocese who remained loyal to TEC. Those present at the meeting elected Edwin Gulick as Provisional Bishop of the Diocese and Chair of the Board of Trustees for the Fort Worth Corporation. The 2009 Convention also voted to reverse the constitutional amendments adopted at the 2007 and 2008 Conventions and declared all relevant offices of the Diocese to be vacant. Bishop Gulick then appointed replacements to the offices declared vacant, including the offices of the Trustees of the Corporation. TEC recognized the persons elected at the 2009 Convention as the duly constituted leadership of the Diocese.

TEC, Rev. C. Wallis Ohls, who succeeded Bishop Gulick as Provisional Bishop of the Episcopal Diocese of Fort Worth, and clergy and lay individuals loyal to TEC (collectively, TEC) filed suit against The Episcopal Diocese of Fort Worth, the Fort Worth Corporation, Bishop Iker, the 2006 trustees of the corporation, and former TEC members (collectively, the Diocese), seeking title to and possession of the property held in the name of the Diocese and the Fort Worth Corporation.[2] Both TEC and the Diocese moved for summary judgment. A

significant disagreement between the parties was whether the " deference" (also sometimes referred to as the " identity" ) or " neutral principles of law" methodology should be applied to resolve the property issue. TEC contended that pursuant to this Court's decision in *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (Tex. 1909), the deference methodology has been applied in Texas for over a century and should continue to be applied. Under that methodology, it argued, TEC was entitled to summary judgment because it recognized Bishops Gulick and Ohls, the leaders elected at the 2009 convention, and the appointees of the Bishops as the true and continuing Episcopal Diocese. TEC also contended that even if the neutral principles methodology were applied, it would be entitled to summary judgment. The Diocese, on the other hand, contended that in *Brown* this Court effectively applied the neutral principles methodology without specifically calling it by that name, and Texas courts have continued to substantively apply that methodology to resolve property issues arising when churches split. Under the neutral principles methodology, the Diocese argued, it was entitled to summary judgment affirming its right to the property. The Diocese also maintained that even if the deference methodology were applied, it would still be entitled to summary judgment.[3]

The trial court agreed with TEC that deference principles should apply, applied them, and granted summary judgment for TEC. The Diocese sought direct appeal to this Court and we noted probable jurisdiction. We had previously granted the petition for review in *Masterson*, and we heard oral arguments for both cases on the same day.

## II. Jurisdiction

The Government Code provides that " [a]n appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." Tex. Gov't Code § 22.001(c). The trial court granted summary judgment and issued injunctions ordering the defendants to surrender all Diocesan property and control of the Diocesan Corporation to the Episcopal Diocese of Fort Worth, and ordering the defendants to desist from holding themselves out as leaders of the Diocese. While the trial court order did not

**Page 650**

explicitly address the constitutionality of a statute, " [t]he effect of the trial court's order . . . is what determines this Court's direct appeal jurisdiction." *Tex. Workers' Compensation Comm'n v. Garcia*, 817 S.W.2d 60, 61 (Tex. 1991).

In its motion for summary judgment TEC argued, in part, that the actions of the Board of Trustees in amending the Fort Worth Corporation's articles of

incorporation were void because the actions went beyond the authority of the corporation, which was created and existed as an entity subordinate to a Diocese of TEC. TEC argued that " [t]he secular act of incorporation does not alter the relationship between a hierarchical church and one of its subordinate units" and that finding otherwise " would risk First Amendment implications." The Diocese, on the other hand, argued that the case was governed by the Texas Non-Profit Corporation Act[4] and the Texas Uniform Unincorporated Nonprofit Association Act[5]; under those statutes a corporation may amend its articles of incorporation and bylaws; and TEC had no power to limit or disregard amendments to the Corporation's articles and bylaws.

In its summary judgment order the trial court cited cases it said recognized " that a local faction of a hierarchical church may not avoid the local church's obligations to the larger church by amending corporate documents or otherwise invoking nonprofit corporations law." The trial court substantively ruled that because the First Amendment to the United States Constitution deprived it of jurisdiction to apply Texas nonprofit corporation statutes, applying them to determine the parties' rights would violate Constitutional provisions. The court's injunction requiring defendants to surrender control of the Fort Worth Corporation to the Episcopal Diocese of Fort Worth was based on that determination. The effect of the trial court's order and injunction was a ruling that the Non-Profit Corporation Act would violate the First Amendment if it were applied in this case. Accordingly, we have jurisdiction to address the merits of the appeal.

### III. " Deference" and " Neutral Principles"

In *Masterson* we addressed the deference and neutral principles methodologies for deciding property issues when religious organizations split. __ S.W.3d at __. Without repeating that discussion in full, suffice it to say that generally courts applying the deference approach to church property disputes utilize neutral principles of law to determine where the religious organization has placed authority to make decisions about church property. *See Jones v. Wolf*, 443 U.S. 595, 603-04, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979). Once a court has made this determination, it defers to and enforces the decision of the religious authority if the dispute has been decided within that authority structure. *Id*. But courts applying the neutral principles methodology defer to religious entities' decisions on ecclesiastical and church polity issues such as who may be members of the entities and whether to remove a bishop or pastor, while they decide non-ecclesiastical issues such as property ownership and whether trusts exist based on the same neutral principles of secular law that apply to other entities. *See Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 708-09, 96 S.Ct. 2372, 49 L.Ed.2d 151 (1976). We concluded in *Masterson* that the neutral principles methodology was the substantive basis

of our decision in

*Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (Tex. 1909), and that Texas courts should utilize that methodology in determining which faction of a religious organization is entitled to the property when the organization splits. __ S.W.3d at __. We also concluded that even though both the deference and neutral principles methodologies are constitutionally permissible, Texas courts should use only the neutral principles methodology in order to avoid confusion in deciding this type of controversy. *Id*.

### IV. Application

### A. Summary Judgment--Deference

Based on our decision in *Masterson*, we hold that the trial court erred by granting summary judgment to TEC on the basis of deference principles. __ S.W.3d at —.

### B. Summary Judgment--Neutral Principles

TEC asserts that application of neutral principles may violate free-exercise protections if, for example, the Diocese is permitted to void its commitments to church laws because the specific formalities of Texas law governing trusts were not followed or if they are applied retroactively. *See Jones*, 443 U.S. at 606 (noting that the case did not " involve a claim that retroactive application of a neutral-principles approach infringes free exercise rights" ). But TEC recognizes that whether application of the neutral principles approach is unconstitutional depends on how it is applied. *See id*. at 606 (" It remains to be determined whether the Georgia neutral-principles analysis was constitutionally applied on the facts of this case." ). Because neutral principles have yet to be applied in this case, we cannot determine the constitutionality of their application. Further, TEC does not argue that application of procedural matters such as summary judgment procedures and burdens of proof are unconstitutional. Thus, we address the arguments of the parties regarding who is entitled to summary judgment pursuant to neutral principles and conclude that neither TEC nor the Diocese is. *See Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex. 2010) (noting that when both parties move for summary judgment and the trial court grants one motion and denies the other, appellate courts consider the summary-judgment evidence, determine all questions presented, and render the judgment the trial court should have rendered).

Under the neutral principles methodology, ownership of disputed property is to be determined by considering evidence such as deeds to the properties, terms of the local church charter (including articles of incorporation and bylaws, if any), and relevant provisions of governing documents of the general church. *E.g.,*

*Jones*, 443 U.S. at 602-03; *see Presbyterian Church v. E. Heights*, 225 Ga. 259, 167 S.E.2d 658, 659-60 (Ga. 1969). TEC points out that deeds to the properties involved were not part of the summary judgment record when the trial court ruled. Thus, TEC argues, if we do not sustain the summary judgment in its favor, we should remand the case so the trial court may consider the record on the basis of neutral principles and the four factors referenced in *Jones* : (1) governing documents of the general church, (2) governing documents of the local church entities, (3) deeds, and (4) state statutes governing church property. *See Jones*, 443 U.S. at 602-03. We agree that the case must be remanded for further proceedings under neutral principles.

Although deeds to the numerous properties involved were not before the trial court when it granted summary judgment, the Diocese asserts that there is no dispute

**Page 652**

about its holding title to and having control of the properties. But TEC disagrees with that position. And absent agreement or conclusive proof of title to the individual properties and the capacities in which the titles were taken, fact questions exist under neutral principles of law, at a minimum, about who holds title to each property and in what capacity.[6] Accordingly, we cannot render judgment on the basis of neutral principles.

### C. Remand

Because the trial court must apply neutral principles on remand, for its guidance we address certain arguments made by the parties relating to that methodology. *See Edinburg Hosp. Auth. v. Trevino* , 941 S.W.2d 76, 81 (Tex. 1997) (" Although resolution of this issue is not essential to our disposition of this case, we address it to provide the trial court with guidance in the retrial . . . ." ).

We first note that on remand the trial court is not limited to considering only the four factors listed in *Jones* . As we said in *Masterson, Jones* did not purport to establish a federal common law of neutral principles to be applied in this type of case. __ S.W.3d at __. Rather, the elements listed in *Jones* are illustrative. If it were otherwise and courts were limited to applying some, but not all, of a state's neutral principles of law in resolving non-ecclesiastical questions, religious entities would not receive equal treatment with secular entities. We do not believe the Supreme Court intended to say or imply that should be the case.

Next we address the Diocese's argument that under neutral principles courts do not defer to TEC's decisions about non-ecclesiastical matters such as the identity of the trustees of the Fort Worth Corporation. The Diocese argues that under the Non-Profit Corporation Act the trustees are the 2006 trustees who are named as defendants in this suit. TEC responds that the trustees are

required by the corporate bylaws to be lay persons in " good standing," the Diocese rules require them to be loyal Episcopalians, and the bylaws provide that trustees do not serve once they become disqualified. Those determinations, TEC argues, were made by Bishops Gulick and Ohls and the 2009 convention, and courts must defer to those determinations because they are ecclesiastical decisions.

While we agree that determination of who is or can be a member in good standing of TEC or a diocese is an ecclesiastical decision, the decisions by Bishops Gulick and Ohls and the 2009 convention do not necessarily determine whether the earlier actions of the corporate trustees were invalid under Texas law. The corporation was incorporated pursuant to Texas corporation law and that law dictates how the corporation can be operated, including determining the terms of office of corporate directors, the circumstances under which articles and bylaws can be amended, and the effect of the amendments. *See* Tex. Bus. Org. Code § § 22.001-.409. We conclude that this record fails to show that, as a matter of law, the trustees had been disqualified from serving as corporate trustees at the relevant times. Nor does the record conclusively show whether the 2009 appointments to the corporation board by Bishop Ohl were valid or invalid under Texas law, or whether, under Texas law, the actions taken by the trustees appointed

**Page 653**

by Bishop Ohl in 2009 were valid or invalid.

Third, the Diocese argues that TEC has no trust interest in the property. TEC Canon I.7.4, also known as the Dennis Canon, provides:

All real and personal property held by or for the benefit of any Parish, Mission or Congregation is held in trust for this Church and the Diocese thereof in which such Parish, Mission or Congregation is located. The existence of this trust, however, shall in no way limit the power and authority of the Parish, Mission or Congregation otherwise existing over such property so long as the particular Parish, Mission or Congregation remains a part of, and subject this Church and its Constitution and Canons.

The Diocese asserts that this canon does not create a trust under Texas law, but that even if it does, it was revocable and the Diocese revoked it when the Diocesan canons were amended to state:

Property held by the Corporation for the use of a Parish, Mission or Diocesan School belongs beneficially to such Parish, Mission or Diocesan School only. No adverse claim to such beneficial interest by the Corporation, by the Diocese, or by The Episcopal Church of the United States of America is acknowledged, but rather is expressly denied.

TEC counters that the Dennis Canon creates a trust because the corporation acceded to it and the Diocese could not have adopted a canon revoking the trust. TEC also asserts that the statutes applicable to charitable trusts apply, but if they do not, a resulting trust or other trust may be applied here because the history, organization, and governing documents of the Church, the Diocese, and the parish support implication of a trust. The Diocese responds to TEC's arguments by referencing Texas statutory law requiring a trust to be in writing and providing that trusts are revocable unless they are expressly made irrevocable. *See* Tex. Prop. Code § 112.004, .051. These issues were not addressed by the trial court because it granted summary judgment based on deference principles. Upon remand the parties will have the opportunity to develop the record as necessary and present these arguments for the trial court to consider in determining the rights of the parties according to neutral principles of law. But regarding the trial court's consideration of the issue, we note that in *Masterson* we addressed the Dennis Canon and Texas law. There we said that even assuming a trust was created as to parish property by the Dennis Canon and the bylaws and actions of a parish nonprofit corporation holding title to the property, the Dennis Canon " simply does not contain language making the trust *expressly* irrevocable...Even if the Canon could be read to imply the trust was irrevocable, that is not good enough under Texas law. [Texas Property Code § 112.051] requires express terms making it irrevocable." *Masterson*, __ S.W.3d at __.

Finally, as to the argument that application of neutral principles may pose constitutional questions if they are retroactively applied, we note that over a century ago in *Brown v. Clark*, 102 Tex. 323, 116 S.W. 360 (Tex. 1909), our analysis and holding substantively reflected the neutral principles methodology.

### V. Conclusion

We reverse the judgment of the trial court and remand the case to that court for further proceedings consistent with this opinion.

### DISSENT

**Page 654**

Justice Willett, joined by Justice Lehrmann, Justice Boyd and Justice Devine, dissenting.

Until 1940, when Texans amended their constitution, the Supreme Court of Texas lacked any authority to decide direct appeals (i.e., appeals that leapfrog the court of appeals and pass directly to this Court). Four years later, the Legislature first exercised its new power to permit direct appeals, and in the sixty-nine years since, this Court has exercised that jurisdiction sparingly, only forty-three times. The reason is simply stated: Our direct-appeal jurisdiction is exceedingly narrow and only proper if the trial court granted or denied

an injunction " on the ground of the constitutionality of a statute of this state." [1]

Today's direct appeal is directly unappealable. The trial court's order nowhere mentions any constitution or statute, much less the constitutionality of a statute. Indeed, the trial court stated verbally that it was not pivoting on the constitutionality of state law. This dispute undoubtedly has a First Amendment overlay, but for a direct appeal, constitutionality must exist not just in the ether, but in the order.

As the trial court did not determine " the constitutionality of a statute of this state," its injunction could hardly be issued " on the ground of the constitutionality of a statute of this state." Accordingly, we lack jurisdiction. As I have underscored before (albeit, like today, in a dissent):

Ultimately, it falls to us, the courts, to police our own jurisdiction. It is a responsibility rooted in renunciation, a refusal to exert power over disputes not properly before us. Rare is a government official who disclaims power, but liberties are often secured best by studied inaction rather than hurried action.[2]

The merits in this case are unquestionably important--and thankfully they are resolved today in a companion case[3]--but here the Court can only reach them by overreaching. We have no jurisdiction to decide this case as a direct appeal. I would dismiss for want of jurisdiction, and because the Court does otherwise, I respectfully dissent.

### I. Background

The trial court in this case issued two injunctions, requiring the defendants (now styling themselves as the Episcopal Diocese of Fort Worth):

1. " to surrender all Diocesan property, as well as control of the Diocesan Corporation" to the Episcopal Church and other plaintiffs; and 2. " to desist from holding themselves out as leaders of the Diocese."

The court's reasons for granting the injunctions are laid out in paragraphs one through three of its order:

1. The Episcopal Church (the " Church" ) is a hierarchical church as a matter of law, and since its formation in 1983 the Episcopal Diocese of Fort Worth (the " Diocese" ) has been a constituent part of the Church. Because the Church is hierarchical, the Court follows Texas precedent governing hierarchical church property disputes, which holds that in the event of a dispute among its members, a constituent part of a hierarchical church consists of those individuals remaining loyal to the hierarchical church body. Under the

**Page 655**

law articulated by Texas courts, those are the individuals who remain entitled to the use and control of the church property.

2. As a further result of the principles set out by the Supreme Court in *Brown* and applied in Texas to hierarchical church property disputes since 1909, the Court also declares that, because The Episcopal Church is hierarchical, all property held by or for the Diocese may be used only for the mission of the Church, subject to the Church's Constitution and canons.

3. Applying those same cases and their recognition that a local faction of a hierarchical church may not avoid the local church's obligations to the larger church by amending corporate documents or otherwise invoking nonprofit corporations law, the Court further declares that the changes made by the Defendants to the articles and bylaws of the Diocesan Corporation are *ultra vires* and void.

(citations omitted).

There are no findings of fact or conclusions of law attached. The order does not mention the United States Constitution, the Texas Constitution, or any particular state statute. The only possible allusion to a statute is to " nonprofit corporations law," which the trial court found the defendants could not " invok[e]" to " avoid [their] obligations to the larger church." The trial court's legal support for this conclusion was a string citation to a number of cases, not a citation to any constitutional provision.

What is more, the defendants asked the trial court to amend the order to specify that the court had held a statute unconstitutional. The court declined to do so, orally stating that its ruling was based not on constitutionality, but rather on its application of *Brown v. Clark* [4]:

I still can't just craft something to make it go to the Supreme Court. I mean, it -- my understanding was that the -- the trust laws that you were talking about don't apply in this situation because of *Brown*, not because they're not constitutional.

Our decision in *Brown* relied heavily on *Watson v. Jones* .[5] *Watson*, in turn, " appl[ied] not the Constitution but a 'broad and sound view of the relations of church and state under our system of laws.'" [6]

Nonetheless, the defendants filed a direct appeal. We noted probable jurisdiction and heard oral argument. But jurisdictional defects do not heal with age, no matter how novel, pressing, or consequential the issues at stake or how many judicial and party resources have been expended. The most fundamental restraint on judicial power is jurisdiction--our very authority to decide cases in the first place--and if we lack it, we lack it.

## II. Discussion

### A. History of Direct Appellate Jurisdiction

A 1940 constitutional amendment gave the Legislature power to grant direct appeals to this Court.[7] Not until 1944, though, did the Legislature do so.[8] The original conferral allowed direct appeals from injunctions based on two grounds,

**Page 656**

either (1) the constitutionality or unconstitutionality of a state statute, or (2) the validity or invalidity of certain state administrative orders.[9] Today, the statutory grant of direct-appeal jurisdiction covers just one situation: " [A]n order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." [10]

I have found only forty-three cases where we have exercised direct-appeal jurisdiction. That is, while such jurisdiction has existed for nearly seventy years, we have exercised it stintingly. In twenty-four of the forty-three cases, our opinion made clear that the trial court either made a direct holding about a statute's constitutionality or issued declaratory relief that a statute was or was not constitutional.[11] In eleven other cases, the trial court's order clearly must have been based on constitutional grounds, either because the opinion implies that only constitutional issues were raised to the trial court[12] or because the trial court granted an injunction enforcing a statute over constitutional objection, thus implicitly upholding the statute against

**Page 657**

constitutional attack.[13] In two other cases, we summarily stated that the trial court granted or denied the injunction on the ground of a statute's constitutionality.[14] But in at least six direct-appeal cases, we did not make it clear why we thought the trial court's injunction was based on constitutional grounds.[15] These cases address jurisdiction rather cursorily, and only one of the opinions garnered a dissent on the jurisdictional issue,[16] to which the majority opinion declined to respond.[17]

But in the vast majority of cases where we have exercised direct-appeal jurisdiction, it has been abundantly clear that the trial court issued or denied an injunction on the ground of a statute's constitutionality.

We have also issued at least eleven opinions in which we *dismissed* attempted direct appeals for want of jurisdiction because the statutory test was not met.[18] We have variously explained that our direct-appeal jurisdiction " is a limited one," [19] that we have been " strict in applying" or have " strictly applied" direct-appeal jurisdictional requirements,[20] and that " [w]e have strictly construed our direct appeal jurisdiction." [21]

Therefore, we have held that to meet the jurisdictional prerequisites, a trial court must actually " pass upon the constitutionality of [a] statute," [22] " determin[e]" a statute's constitutionality,[23] or " base its decision" on constitutional grounds.[24] Indeed, " [i]t is not enough that a question of the constitutionality of a statute may have been raised in order for our direct appeal jurisdiction to attach in injunction cases; in addition the trial court must have made a holding on the question based *on the grounds* of the constitutionality or unconstitutionality of the statute." [25]

**Page 658**

A close examination of the eleven cases where we dismissed for want of jurisdiction reveals strict adherence to the Legislature's restricted framework. For example, we held " no jurisdiction" where the trial court made the injunction decision based on res judicata[26] or where the trial court was directed to do so by a writ of prohibition by the court of civil appeals.[27] That is, because the trial court did not decide the merits of the constitutional issue, we lacked direct-appeal jurisdiction.[28] Similarly, we held that we did not have such jurisdiction where the trial court denied an injunction because the plaintiffs lacked " the necessary justiciable interest" to sue.[29] We even held that we lacked jurisdiction over a direct appeal of a temporary injunction involving a " serious question" of the constitutionality of a statute, because the real purpose of the temporary injunction was merely to preserve the status quo, and the trial court did not make any holdings finally determining the constitutional issue.[30]

### B. Application

Given our long, consistent history of cautiously and narrowly construing our direct-appeal jurisdiction, the outcome of this case seems essentially predetermined: We lack jurisdiction. The Legislature allows parties to skip the court of appeals in one extraordinarily limited circumstance: where the trial court's injunction turned " on the ground of the constitutionality of a [state] statute." [31] The crux and rationale of the trial court's order is dispositive. Here, the trial court did not " pass upon the constitutionality of a statute," [32] " determin[e]" a statute's constitutionality,[33] or " base its decision" on constitutional grounds.[34] While the constitutional issues may have been raised in the trial court, that alone is " not enough." [35]

At most, the trial court's order only vaguely alludes to nonprofit-related statutes, and there is certainly no indication in the order that the trial court was making a constitutional determination. The trial court order refers generally to nonprofit law and says the defendants cannot rely on this law to escape the deference principle, providing a string citation as support. But only one of the cases in the string citation even refers to constitutional principles, and that case does not hold that only the deference approach is constitutional.[36] Moreover, that

case was decided two years before the United States Supreme Court clarified in *Jones v. Wolf* that the " deference" rule is not mandated by the First Amendment.[37]

A diaphanous hint that a statute was viewed through a constitutional prism is not enough to justify exercising our " limited" [38] and " strictly construed" [39] direct-appeal

**Page 659**

jurisdiction. And here, the trial judge orally eschewed such a ruling, making it doubly clear that its order was not based on constitutional grounds. In light of *Jones* (that the deference approach is not constitutionally required) and the trial court's comments (that it was holding the statutes inapplicable but *not* unconstitutional), it seems an impressive stretch to transform the trial court's citation to an ambiguous pre-*Jones* case into a constitutional holding striking down state law.

Perhaps the order's silence and the judge's disavowal are beside the point if unconstitutionality was the inescapable basis for the trial court's ruling, as the majority concludes. Indeed, the defendants contend the order makes no sense unless it turned on a constitutional holding. As the defendants interpret the order, the trial court effectively held certain statutes unconstitutional if applied to local churches of hierarchical religions. In their Statement of Jurisdiction, the defendants argue that a court can only reject statutes like this on " constitutional grounds." This assertion rests on the faulty premise that any time a court deems a statute inapplicable, it's because the statute would be unconstitutional if applied. Not true.

A court can refuse to apply a statute for various non-constitutional reasons. For example, if a statute purports to change long-standing common law, a court closely examines whether the Legislature truly intended to supplant the settled rule.[40] The trial court in this case may have applied (or misapplied) this kind of analysis, finding that pertinent statutes did not indicate legislative intent to abandon the common-law deference principle that we declared in *Brown* . Perhaps the trial court looked at a century of legislative inaction after *Brown* and took it as legislative acquiescence. There are other non-constitutional reasons to deem a statute ineffective, like the absurdity doctrine.[41] So even if a trial court implicitly invalidates a statute or finds it inapplicable, its reason for doing so is not necessarily because the Constitution demands it.

Thus, it cannot be true that by following *Brown v. Clark*, the trial court implicitly held that any statute that might apply under neutral principles is necessarily unconstitutional if applied to a church-property dispute in a hierarchical setting. This argument is foreclosed by *Jones v. Wolf* . If states are free, consistent with the First

Amendment, to choose either approach, then choosing the deference test cannot equate to an implicit holding that applying statutes relevant under neutral principles would be unconstitutional. Nobody can argue that Texas courts are *required* to adopt neutral principles-- *Jones* precludes that argument.

Tellingly, the defendants do not attempt to analogize this case to any other in which the Court has exercised direct-appeal jurisdiction. None is comparable. No constitutional question was presented (or decided) in the trial court, and none is presented (or decided) here.[42]

**Page 660**

Undoubtedly, we have already noted probable jurisdiction, heard argument on the merits, and committed substantial judicial resources to resolving the issues--to say nothing of the effort and cost expended by the parties. But to assert jurisdiction simply because it would be inconvenient to do otherwise betrays the deeply rooted constitutional principle that our jurisdiction is conferred ultimately from the People, directly through our Constitution and indirectly through our elected representatives.

Dismissing this case for want of jurisdiction would be sure to furrow brows, but there is no more principled reason to dismiss a case than to decide, even belatedly, that you lack the power to decide. Besides, and this is some consolation, the core merits issue presented--deciding which legal test should govern church-property disputes--is squarely resolved in today's companion case,[43] so a dismissal here would not unduly delay authoritative resolution or work any irreparable harm.

### III. Conclusion

Our characterizations of direct-appeal jurisdiction, something we have " strictly construed," are not ambiguous:

o " rare"

o " restricted"

o " very limited"

In light of this consistent clarity, the Court's exercise of jurisdiction has an unfortunate *ipse dixit* quality to it. The statutory test for direct-appeal jurisdiction is whether the trial court made its decision " on the ground of the constitutionality of a [state] statute." A statute, for example, must be invalidated, not just implicated. Direct-appeal jurisdiction is a rare (as it should be) short-circuiting of the usual rules, and I respectfully take exception to broadening the exception.

The power of judicial review--the authority to declare laws unconstitutional--is a genuinely stunning one, and one that judges exercise with surpassing trepidation. Given the stakes, it is difficult to imagine a judge striking down a legislative enactment stealthily, using gauzy language that requires reading between the lines. This judge certainly didn't believe he had declared anything unconstitutional, and he said as much--on the record and unequivocally.

Today marks the second time this Court has stretched our direct-appeal jurisdiction beyond its statutory bounds.[44] The objective in both cases has apparently been to let the Court fast-forward to the merits of an important case. But an issue's importance and our commendable desire to resolve it swiftly does not give us license to enlarge our jurisdictional powers by fiat. In language that could have been written with today's case in mind, Chief Justice Phillips wrote in dissent over a decade ago:

Dismissing a case on jurisdictional grounds may be frustrating to judges

**Page 661**

and litigants alike, particularly when issues of statewide import are involved . . . . However, the Legislature has chosen to make direct appeal an uncommon remedy, available only in rare and specific situations. Regardless of the day's exigencies, our highest and only duty is to respect the appropriate limits of our power . . . . I fear that our Court has allowed a hard case to make bad law today.[45]

The Court may come to rue its decision to assert direct-appeal jurisdiction in this case. Our rules seem to *mandate* our exercise of such jurisdiction in cases where a *permanent* injunction is based on the constitutionality of a statute (because our rules make direct-appeal jurisdiction discretionary only in **temporary** injunction cases).[46] Therefore, in addition to encroaching on the Legislature's constitutional prerogative to define our direct-appeal jurisdiction, the Court's decision may perversely *require* this Court to immediately hear all direct appeals of permanent injunctions that even vaguely implicate a statute's constitutionality.

I would dismiss this case for want of jurisdiction, and because the Court does otherwise, I respectfully dissent.

---------

Notes:

[1]Three parishes in the Diocese did not agree with the actions and withdrew from the Diocese. The Fort Worth Corporation transferred property used by the withdrawing parishes to them.

[2]The defendants sought mandamus in the court of

appeals regarding whether the attorneys for TEC had authority to file suit on behalf of the Corporation and the Diocese. *See In re Salazar*, 315 S.W.3d 279 (Tex. App.--Fort Worth 2010, orig. proceeding). The court of appeals conditionally granted mandamus relief, holding they did not. *Id*. at 285-86.

[3]The Diocese also asserts that we should dismiss certain tort claims TEC brought against individual defendants. The Diocese moved for summary judgment to dismiss these claims and argues that if we conclude the trial court erred in determining who was entitled to the property at issue, we should render the judgment the trial court should have rendered and dismiss the tort claims. Because of our disposition of the issue regarding who is entitled to the property, we do not address those claims.

[4]Tex. Rev. Civ. Stat. arts. 1396-1.01 to 1396-11.02

[5]Tex. Rev. Civ. Stat. art. 1396-70.01

[6]Deeds filed after the trial court granted summary judgment were dated both before and after the 1984 judgment transferring properties from the Dallas Diocese. The deeds dated after the judgment reflect various grantees. Some properties were deeded to the Fort Worth Corporation or local entities, while others were deeded in trust to the Corporation, local entities, or various other persons and entities.

[1]Tex. Gov't Code § 22.001(c).

[2] *In re Allcat Claims Serv., L.P*., 356 S.W.3d 455, 474 (Tex. 2011) (Willett, J., concurring in part and dissenting in part).

[3] *Masterson v. Diocese of N.W. Tex.*, __ S.W.3d __, (Tex. 2013).

[4]102 Tex. 323, 116 S.W. 360 (Tex. 1909).

[5]80 U.S. 679, 20 L.Ed. 666 (1871).

[6] *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C*., __ U.S. __, 132 S.Ct. 694, 704, 181 L.Ed.2d 650 (2012) (quoting *Watson*, 80 U.S. at 727).

[7] *See R.R. Comm'n of Tex. v. Shell Oil Co*., 146 Tex. 286, 206 S.W.2d 235, 238 (Tex. 1947).

[8] *Id*.

[9] *Id*.

[10]Tex. Gov't Code § 22.001(c). The Constitution still allows the Legislature to provide for direct appeal from injunctions based on the validity of administrative orders, however. Tex. Const. art. V, § 3-b. But the express constitutional grant of direct-appeal jurisdiction in Article 5, Section 3-b of the Constitution is arguably now unnecessary given the broadened wording of the general jurisdictional provision in Article 5, Section 3. *See Perry*

*v. Del Rio*, 67 S.W.3d 85, 98 n.4 (Tex. 2001) (Phillips, C.J., dissenting) (" Since 1981, the Court's appellate jurisdiction has extended to all civil cases 'as . . . provided . . . by law,' Tex. Const. art. V, § 3, so that the Legislature could now provide for direct appeals without a specific constitutional grant of authority." ). Accordingly, the Legislature has now provided for direct appeal from certain trial court rulings that involve Public Utility Commission financing orders. Tex. Util. Code § 39.303(f).

[11] *See Neeley v. West Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 753-54 (Tex. 2005); *State v. Hodges*, 92 S.W.3d 489, 493 (Tex. 2002); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000); *Owens Corning v. Carter*, 997 S.W.2d 560, 567-68 (Tex. 1999); *Maple Run at Austin Mun. Util. Dist. v. Monaghan*, 931 S.W.2d 941, 945 (Tex. 1996); *Barshop v. Medina Cnty. Underground Water Conservation Dist*., 925 S.W.2d 618, 623, 625 (Tex. 1996); *Edgewood Indep. Sch. Dist. v. Meno*, 917 S.W.2d 717, 727 (Tex. 1995); *Richards v. League of United Latin Am. Citizens*, 868 S.W.2d 306, 308 (Tex. 1993); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 442 (Tex. 1993); *Orange Cnty. v. Ware*, 819 S.W.2d 472, 473 (Tex. 1991); *O'Quinn v. State Bar of Tex*., 763 S.W.2d 397, 398 (Tex. 1988); *LeCroy v. Hanlon*, 713 S.W.2d 335, 336 (Tex. 1986); *Wilson v. Galveston Cnty. Cent. Appraisal Dist*., 713 S.W.2d 98, 99 (Tex. 1986); *Spring Branch Indep. Sch. Dist. v. Stamos*, 695 S.W.2d 556, 558 (Tex. 1985); *Shaw v. Phillips Crane & Rigging of San Antonio, Inc*., 636 S.W.2d 186, 187 (Tex. 1982); *Gibson Distrib. Co. v. Downtown Dev. Ass'n of El Paso, Inc*., 572 S.W.2d 334, 334 (Tex. 1978); *Tex. Antiquities Comm. v. Dallas Cnty. Cmty. Coll. Dist*., 554 S.W.2d 924, 925-27 (Tex. 1977) (plurality opinion); *Smith v. Craddick*, 471 S.W.2d 375, 375-76 (Tex. 1971); *State v. Scott*, 460 S.W.2d 103, 105 (Tex. 1970); *State v. Spartan's Indus., Inc*., 447 S.W.2d 407, 409 (Tex. 1969); *Jordan v. State Bd. of Ins*., 160 Tex. 506, 334 S.W.2d 278, 278-80 (Tex. 1960); *Smith v. Decker*, 158 Tex. 416, 312 S.W.2d 632, 633 (Tex. 1958); *Rodriguez v. Gonzales*, 148 Tex. 537, 227 S.W.2d 791, 792-93 (Tex. 1950); *Dodgen v. Depuglio*, 146 Tex. 538, 209 S.W.2d 588, 591-92 (Tex. 1948).

[12] *See Conlen Grain & Mercantile, Inc. v. Tex. Grain Sorghum Producers Bd.*, 519 S.W.2d 620, 621-22 (Tex. 1975); *Robinson v. Hill*, 507 S.W.2d 521, 523 (Tex. 1974); *Itz v. Penick*, 493 S.W.2d 506, 508 (Tex. 1973); *Smith v. Davis*, 426 S.W.2d 827, 829 (Tex. 1968); *Shepherd v. San Jacinto Junior Coll. Dist*., 363 S.W.2d 742, 742-43 (Tex. 1962); *King v. Carlton Indep. School Dist.*, 156 Tex. 365, 295 S.W.2d 408, 409 (Tex. 1956); *Dallas Cnty. Water Control & Improvement Dist. No. 3 v. City of Dallas*, 149 Tex. 362, 233 S.W.2d 291, 292 (Tex. 1950).

[13] *See Gibson Prods. Co. v. State*, 545 S.W.2d 128, 129 (Tex. 1976); *Dancetown, U.S.A., Inc. v. State*, 439 S.W.2d 333, 334 (Tex. 1969); *Schlichting v. Tex. State*

*Bd. of Med. Exam'rs*, 158 Tex. 279, 310 S.W.2d 557, 558-59 (Tex. 1958); *H. Rouw Co. v. Tex. Citrus Comm'n*, 151 Tex. 182, 247 S.W.2d 231, 231-32 (Tex. 1952).

[14] *See State v. Project Principle, Inc.*, 724 S.W.2d 387, 389 (Tex. 1987); *Duncan v. Gabler*, 147 Tex. 229, 215 S.W.2d 155, 156-57 (Tex. 1948).

[15] *See Del Rio*, 67 S.W.3d 85 (majority opinion); *Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454 (Tex. 1997); *Carrollton-Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.*, 826 S.W.2d 489 (Tex. 1992); *Ass'n of Tex. Prof'l Educators v. Kirby*, 788 S.W.2d 827 (Tex. 1990); *Parker v. Nobles*, 496 S.W.2d 921 (Tex. 1973); *Dobard v. State*, 149 Tex. 332, 233 S.W.2d 435 (Tex. 1950).

[16] *Del Rio*, 67 S.W.3d at 98-100 (Phillips, C.J., dissenting).

[17] *Id*. at 89, 95 (majority opinion).

[18] *See Tex. Workers' Comp. Comm'n v. Garcia*, 817 S.W.2d 60 (Tex. 1991); *Querner Truck Lines, Inc. v. State*, 652 S.W.2d 367, 368 (Tex. 1983); *Mitchell v. Purolator Sec., Inc.*, 515 S.W.2d 101 (Tex. 1974); *Holmes v. Steger*, 161 Tex. 242, 339 S.W.2d 663 (Tex. 1960); *Standard Sec. Serv. Corp. v. King*, 161 Tex. 448, 341 S.W.2d 423 (Tex. 1960); *Gardner v. R.R. Comm'n of Tex.*, 160 Tex. 467, 333 S.W.2d 585 (Tex. 1960); *Bryson v. High Plains Underground Water Conservation Dist. No. 1*, 156 Tex. 405, 297 S.W.2d 117 (Tex. 1956); *Corona v. Garrison*, 154 Tex. 124, 274 S.W.2d 541 (Tex. 1955); *Lipscomb v. Flaherty*, 153 Tex. 151, 264 S.W.2d 691 (Tex. 1954); *Boston v. Garrison*, 152 Tex. 253, 256 S.W.2d 67 (Tex. 1953); *McGraw v. Teichman*, 147 Tex. 142, 214 S.W.2d 282 (Tex. 1948).

[19] *Gardner*, 333 S.W.2d at 588.

[20] *Querner Truck*, 652 S.W.2d at 368; *Mitchell*, 515 S.W.2d at 103.

[21] *Garcia*, 817 S.W.2d at 61.

[22] *Corona*, 274 S.W.2d at 541-42.

[23] *King*, 341 S.W.2d at 425; *Bryson*, 297 S.W.2d at 119.

[24] *Holmes*, 339 S.W.2d at 663-64.

[25] *Mitchell*, 515 S.W.2d at 103 (emphasis in original).

[26] *Lipscomb*, 264 S.W.2d at 691-92.

[27] *Gardner*, 333 S.W.2d at 589.

[28] *Corona*, 274 S.W.2d at 541-42.

[29] *Holmes*, 339 S.W.2d at 664.

[30] *Mitchell*, 515 S.W.2d at 103-04.

[31]Tex. Gov't Code § 22.001(c).

[32] *Corona*, 274 S.W.2d at 541-42.

[33] *King*, 341 S.W.2d at 425; *Bryson*, 297 S.W.2d at 119.

[34] *Holmes*, 339 S.W.2d at 663-64.

[35] *Mitchell*, 515 S.W.2d at 103.

[36] *See Presbytery of the Covenant v. First Presbyterian Church of Paris, Inc.*, 552 S.W.2d 865, 870-71 (Tex.Civ.App.--Texarkana 1977, no writ).

[37]443 U.S. 595, 605, 99 S.Ct. 3020, 61 L.Ed.2d 775 (1979).

[38] *Gardner*, 333 S.W.2d at 588.

[39] *Garcia*, 817 S.W.2d at 61.

[40] *See Energy Serv. Co. of Bowie v. Superior Snubbing Servs., Inc.*, 236 S.W.3d 190, 194 (Tex. 2007) (" Of course, statutes can modify common law rules, but before we construe one to do so, we must look carefully to be sure that was what the Legislature intended." ).

[41] *See, e.g., TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011).

[42]The Rules of Civil Procedure previously specified that we could not accept such jurisdiction unless the case presented a constitutional question to *this* Court. *Lipscomb*, 264 S.W.2d at 691-92, quotes the former rule (Tex. R. Civ. P. 499a(b)) as providing (emphasis added):

An appeal to the Supreme Court directly from such a trial court may present only the constitutionality or unconstitutionality of a statute of this State, or the validity or invalidity of an administrative order issued by a state board or commission under a statute of this State, *when the same shall have arisen by reason of the order of a trial court granting or denying an interlocutory or permanent injunction* .

Accordingly, we said that one of the prerequisites for direct-appeal jurisdiction was that a constitutional " question is presented to this Court for decision." *Bryson*, 297 S.W.2d at 119. Admittedly, our Rules (which have since migrated to the Rules of Appellate Procedure) no longer specify that a direct appeal must present an actual constitutional question to this Court. Tex. R. App. P. 57; *see also Del Rio*, 67 S.W.3d at 98-99 (Phillips, C.J., dissenting). But the Legislature's limited grant of such jurisdiction has not wavered, and we simply cannot accept a direct appeal unless a statute has been declared constitutional or unconstitutional. That did not happen here.

[43] *Masterson*, __ S.W.3d __.

[44] *See Del Rio*, 67 S.W.3d at 89 (majority opinion).

[45] *Id.* at 100 (Phillips, C.J., dissenting).

[46] *See* Tex. R. App. P. 57.2.

---------

**576 S.W.2d 99 (Tex.Civ.App.—Houston [1 Dist.] 1978)**

**John P. PARSONS, Credit Union Commissioner of Texas, Appellant,**

**v.**

**GALVESTON COUNTY EMPLOYEES CREDIT UNION, Appellee.**

**No. 17297.**

**Court of Civil Appeals of Texas, First District, Houston**

**September 1, 1978**

John L. Hill, Atty. Gen. of Texas, Thomas M. Pollan, Thomas A. Rutledge, Asst. Atty. Gen., Austin, for appellant.

Richard Thornton, Galveston, for appellee.

PEDEN, Justice.

The Credit Union Commissioner of Texas (Commissioner) has petitioned us for a stay during the pendency of an appeal from the granting of a temporary mandatory injunction ordering the Commissioner to surrender to the Galveston County Employees Credit Union all its records, properties and funds in his possession and authorizing the Credit Union to resume operations. The trial judge's order, entered on August 21, 1978, (and apparently signed the same day) declared the Texas Credit Union Act unconstitutional, required no bond as a condition for issuance of the injunction, denied the motion to disqualify himself, and overruled the Commissioner's plea of privilege to be sued in Travis County. We grant the stay.

Article 1823 of Vernon's Texas Civil Statutes provides that courts of civil appeals may issue "writs necessary to enforce the jurisdiction of said courts." Under this statute we have no power to issue original writs solely to protect a party from damage pending appeal, but we may grant them to preserve the subject matter pending appeal and prevent the case from becoming moot. *General Telephone Co. of the Southwest v.*

City of Garland, 522 S.W.2d 732 (Tex.Civ.App.1975, no writ).

After the Commissioner had initiated other procedures under the Texas Credit Union Act, Article 2461-5.09, and the Administrative Procedure Act, Article 6252-13a, he executed orders on June 30, 1978, suspending the business operations of the Credit Union and removing its president from office. The suspension order stated that it was issued because it had been determined that the affairs of the Credit Union were being conducted in an unauthorized, unsafe, and unlawful manner. This court has no information as to the accuracy or inaccuracy of these charges. The Commissioner took possession of the business, records, assets, and property of the Credit Union (he asserts that he still holds them) and set further proceedings under the Administrative Procedure Act for a hearing on July 11.

On July 3, Judge Ed Harris issued a temporary restraining order enjoining the Commissioner from proceeding with his suspension and removal orders, and on August 21, after a hearing, entered an order converting the temporary restraining order into the temporary injunction in question. As we have noted, the August 21 order permits the Credit Union to take possession of its business and assets and to resume full business operations. Clearly, this would result in changes in condition of the accounts in the Credit Union, since it will, in carrying out its operations, allow withdrawals, incur liabilities, declare dividends and complete other transactions in the course of its business. Such transactions will change or destroy the subject matter of this appeal, making it likely to become at least partially moot by the time its final disposition is reached. Therefore, we grant the stay to preserve the jurisdiction of this court.

One other matter must be noticed.

On August 28, 1978, after the Commissioner had perfected an appeal to this court from the trial court's August 21 order by giving notice of appeal on the same day, the trial judge entered another order. It supplemented and amended his August 21 order so as to place supervision over operation of the Credit Union in the trial court. Unfortunately, it came too late. The perfection of an appeal from an order granting a temporary injunction terminates the jurisdiction of the trial court insofar as the temporary injunction is concerned. 4 Tex.Jur.2d Rev. Part 1, 168, Appeal & Error Civil Cases § 323, citing *Caldwell v. Meyers,* 446 S.W.2d 709 (Tex.Civ.App.1969, no writ); *Hyatt v. Mercury Life & Health Co.,* 202 S.W.2d 325 (Tex.Civ.App.1947, no writ). An amended temporary injunction entered after appeal has been perfected will be stricken. *City of Corpus Christi v. Lone Star Fish and Oyster Co.,* 335 S.W.2d 621 (Tex.Civ.App.1960, no writ).

The temporary injunction granted by the trial court on August 21 is stayed pending this appeal.

Page 334

24 S.W.3d 334 (Tex. 2000)

43 Tex. S.Ct. J. 600

QWEST COMMUNICATIONS CORPORATION and Qwest Communications International, Inc., Petitioners,

v.

AT & T CORPORATION and AT & T Communications of the Southwest, Inc., Respondents.

No. 99-0306.

Supreme Court of Texas

April 6, 2000

Rehearing Overruled June 8, 2000.

Page 335

Claude E. Ducloux, Austin, P. Michael Jung, Dallas, Delno J. Grosenheider, J. Stephen Ravel, Michael Shaunessy, Diane Barlow-Sparkman, Austin, Bruce A. Featherstone, Nancy C. Shea, Denver, CO, for Petitioner.

Joseph Latting, John K. Schwartz, G. Alan Waldrop, C. W." Rocky" Rhodes, Barbara M. Ellis, Kamela Bridges, Austin, for Respondent.

PER CURIAM.

The single issue in this petition is whether the trial court's interlocutory order is a temporary injunction and thus appealable under Texas Civil Practice and Remedies Code section 51.014(a)(4). The court of appeals held that the order was not an appealable temporary injunction and dismissed the appeal for want of jurisdiction. 983 S.W.2d 885. Because we hold that the trial court's order grants a temporary injunction, we grant the petition and remand the case to the court of appeals to consider the merits of the appeal.

In 1997, AT & T Corporation and AT & T Communications of the Southwest, Inc. (collectively "AT & T") sued Qwest Communications Corporation, Qwest Communications International, Inc. (collectively "Qwest"), and others for damages to AT & T's fiber optic cables. In addition, AT & T sought a temporary restraining order, a temporary injunction, and a permanent injunction. On the same day that the petition was filed, the trial court issued an ex parte temporary restraining order.

At the temporary injunction hearing, the parties informed the trial court that they had resolved the matters set for the temporary injunction hearing, and then read the agreement into the record. Among other restrictions applicable to all activities within the United States, the agreement required Qwest to notify AT & T of any construction operations within thirty feet of an AT & T underground facility, and to electronically monitor the location of the drill borehead used during boring and pullback operations. Further, the agreement dissolved the previous temporary restraining order bond, left open any claims for damages, and expired three years from the date it became effective unless extended or modified in a signed writing by the parties. At the conclusion of this hearing, the judge stated that "[w]ith respect to the plaintiff's application for temporary injunction, judgment is rendered" and told counsel for AT & T to prepare a written order, deliver it to Qwest's counsel for comment, and then submit it to the trial court. Ultimately, the parties could not agree to the terms of the written order to be submitted to the trial court. The trial court, after a "clarification" hearing, signed an order following the terms recited into the record at the temporary injunction hearing.

Qwest appealed. But the court of appeals dismissed the appeal for want of jurisdiction, holding that the order did not grant a temporary injunction. The court concluded that the order did not meet the "traditional requirements" of a temporary injunction because the order did not preserve the status quo, require a bond, set a trial date, require the clerk to issue a writ of injunction, nor was the order's duration limited until final judgment or further order of the court. 983 S.W.2d at 888. Qwest then petitioned this Court for review.

This Court has jurisdiction to determine whether a court of appeals correctly decided its jurisdiction over an interlocutory

Page 336

appeal. See *Lesikar v. Rappeport,* 899 S.W.2d 654, 655 (Tex.1995) (determining whether interlocutory order being appealed was temporary injunction). An appellate court lacks jurisdiction to review an interlocutory order unless a statute specifically authorizes an exception to the general rule, which is that appeals may only be taken from final judgments. See *Stary v. DeBord,* 967 S.W.2d 352, 352-53 (Tex.1998) ; *Jack B. Anglin Co., Inc. v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992). In this case, Texas Civil Practice and Remedies Code section 51.014(a) states: "[a] person may appeal from an interlocutory order of a district court, county court at law, or county court that: ... (4) grants or refuses a temporary injunction...." TEX. CIV. PRAC. & REM.CODE § 51.014(a)(4).

An injunction is a remedial writ that depends on the issuing court's equity jurisdiction. See *State v.*

*Morales,* 869 S.W.2d 941, 947 (Tex.1994). One function of injunctive relief is to restrain motion and to enforce inaction. See *Boston v. Garrison,* 152 Tex. 253, 256 S.W.2d 67, 70 (1953). The trial court's order here commands Qwest to undertake certain monitoring and notice provisions when conducting certain boring operations. Thus, the order is an injunction.

AT & T argues, however, that the order cannot be a temporary injunction because it lacks the defining characteristics of a temporary injunction. First, it contends that the order goes beyond what is necessary to preserve the status quo because it applies to all of Qwest's operations in the United States. Second, AT & T asserts that one of the hallmarks of a temporary injunction is that it is effective for an indefinite period, operating only until dissolved by another interlocutory order or until final hearing. Here, the order governs Qwest's conduct for a period of three years, until December 2000, a period well beyond the original scheduled trial date of July 6, 1998. Finally, AT & T notes that the order did not set a bond or trial date and did not order issuance of a writ of injunction.

The order's features that AT & T identifies do not necessarily control the classification of this order as a temporary injunction. In Del Valle Independent School District v. Lopez, we rejected the notion that "matters of form control the nature of the order itself--it is the character and function of an order that determine its classification." 845 S.W.2d 808, 809 (Tex.1992). We reasoned that if errors in the form of the order determined the order's status, then those errors would deny review of the very defects that render the order void. See Del Valle, 845 S.W.2d at 809-10; *Brines v. McIlhaney,* 596 S.W.2d 519, 523 (Tex.1980).

Here, AT & T requested and received a court order restricting Qwest's conduct. The order recites that it is effective for a set three-year period from the date it was rendered unless it is extended or modified in writing signed by the parties. AT & T notes that this Court has previously stated that a temporary injunction "operates until dissolved by an interlocutory order or until the final hearing." Brines, 596 S.W.2d at 523; see also *J.C. Matlock v. Data Processing Sec., Inc.,* 618 S.W.2d 327, 328 (Tex.1981) (stating the purpose of a temporary injunction is to preserve the status quo pending trial on the merits). Thus, we must decide whether the fixed three-year term precludes the order's classification as a temporary injunction.

Some courts of appeals' opinions have held an order was a temporary injunction even when it granted the maximum duration of relief to which the plaintiff would be entitled at a trial on the merits. See *Glenn Advertising, Inc. v. Black,* 454 S.W.2d 841, 844 (Tex.Civ.App.--Houston [14 th Dist.] 1970, writ ref'd n.r.e.). In Glenn Advertising, the court of appeals noted that the order should correctly provide that the temporary injunction should remain in effect only until final hearing or until further order of the court. Id. Yet, the court did not dismiss the appeal for

**Page 337**

want of jurisdiction, but instead simply modified the order to remain in full force and effect until final judgment was entered. Other courts of appeals have followed this reasoning and exercised jurisdiction over appeals from orders that were not made effective until final judgment or further action by the trial court. See *Hailey v. Texas-New Mexico Power Co.,* 757 S.W.2d 833, 835 (Tex.App.--Waco 1988, writ dism'd w.o.j.); *Owens v. Texaco Inc.,* 368 S.W.2d 780, 783 (Tex.Civ.App.--Beaumont 1963, no writ).

But other courts of appeals have held that when an injunction is effective for a fixed period of time it is a permanent rather than a temporary injunction. See *Aloe Vera of America, Inc. v. CIC Cosmetics Int'l Corp.,* 517 S.W.2d 433, 436 (Tex.Civ.App.--Dallas 1974, no writ). In Aloe Vera, the trial court signed an order styled "Permanent Injunction" and directed the clerk to issue a "Writ of Injunction permanently enjoining until January 1, 1975." The court of appeals held that limiting the restraint to the period ending January 1, 1975, precluded the order from being a temporary injunction. "Whether the restraint continues for six months or six years has no bearing on the question of permanency. No more permanent order could be made with respect to this particular claim for injunctive relief." Id. at 436 . The court therefore held that the order was an interlocutory permanent injunction rather than a temporary injunction and thus was not appealable. See id. Other courts of appeals have adopted the reasoning of Aloe Vera. See *James v. Hubbard,* 985 S.W.2d 516, 518 (Tex.App.--San Antonio 1998, no writ); *Brelsford v. Old Bridge Lake Community Service Corp.,* 784 S.W.2d 700, 702 (Tex.App.--Houston [14 th Dist.] 1989, no writ); *Kelso v. Thorne,* 710 S.W.2d 735, 736 (Tex.App.--Corpus Christi 1986, no writ); *Zoning Bd. of Adjustment v. Graham,* 664 S.W.2d 430, 434 (Tex.App.--Amarillo 1983, no writ); *Gensco, Inc. v. Thomas,* 609 S.W.2d 650, 651 (Tex.Civ.App.--San Antonio 1980, no writ).

The approach taken by Aloe Vera and the line of cases that follow it is problematic in that a burdensome interlocutory order that has the same effect as a temporary injunction could be shielded from appellate review by the very defect that makes it erroneous. See Del Valle, 845 S.W.2d at 809-10. Whether an injunction is effective for a fixed period of time or is made effective only until further order of the court or final judgment is only one of the factors in determining the character and nature of the order. Because the trial court's order places restrictions on Qwest and is made effective immediately so that it operates during the pendency of the suit, it functions as a temporary injunction.

Finally, AT & T argues that the order is not a temporary injunction because it does not set the case for trial on the merits or set a bond. The Texas Rules of Civil Procedure require that an order granting a temporary injunction set the cause for trial on the merits and fix the amount of security to be given by the applicant. See TEX.R. CIV. P. 683, 684. These procedural requirements are mandatory, and an order granting a temporary injunction that does not meet them is subject to being declared void and dissolved. See *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986) (stating that requirements of Rule 683 are mandatory and must be strictly followed). In InterFirst Bank, however, the order failed to set the case for trial on the merits. Id. at 641. Yet rather than dismissing the appeal for want of jurisdiction, we declared the temporary injunction void and ordered it dissolved. See id. We have also held that a temporary injunction was void when there was no bond. See *Lancaster v. Lancaster,* 155 Tex. 528, 291 S.W.2d 303, 308 (1956) (holding that bond provisions of Rule 684 are mandatory). Here, these procedural requirements may render the trial court's order void but they do not change the order's character and function defining its classification.

**Page 338**

We hold that, in character and function, the trial court's order grants a temporary injunction and is appealable under Texas Civil Practice and Remedies Code section 51.014(a)(4). We do not express any opinion, however, on the merits of the appeal. Accordingly, the Court grants petitioner's petition for review and, without hearing oral argument, reverses the judgment of the court of appeals and remands the case to that court for consideration of the merits of the appeal. TEX.R. APP. P. 59.1

**68 S.W.3d 58 (Tex.App. —Dallas 2001)**

**Jordan D. REEVES, Appellant,**

**v.**

**CITY OF DALLAS, Appellee.**

**No. 05-01-00356-CV.**

**Court of Appeals of Texas, Fifth District, Dallas**

**May 7, 2001**

Rehearing Overruled June 26, 2001.

Russell Wilson, Dallas, for appellant.

John Lomax Anderson, Asst. City Atty., Dallas, for appellee.

Before Chief Justice THOMAS, and Justices MORRIS and O'NEILL.

## OPINION

Opinion By Chief Justice THOMAS.

The City of Dallas filed a petition against Jordan D. Reeves [1] alleging he habitually uses certain real property located in Dallas, Texas for the delivery or use of controlled substances, making the property a public and common nuisance. The City requested relief under chapter 125 of the Texas Civil Practice & Remedies Code, including a temporary restraining order, temporary injunction, and permanent injunction.

On January 31, 2001, the trial court issued a temporary restraining order against Reeves's use of the property and set a hearing for the temporary injunction. On February 12, 2001, after hearing the evidence and argument of counsel, Judge

M. Kent Sims [2] signed a temporary injunction against Reeves's use of the property (the February injunction). Reeves filed a notice of appeal of the February injunction.

While the February injunction appeal was pending, Judge Margaret Keliher [3] signed a new temporary injunction on March 21, 2001(the March injunction). Although the March injunction vacates the February injunction, it grants essentially the same relief. Additionally, the March injunction changed the date for

Reeves to file his bond and added a setting for a trial on the merits. [4] On April 10, Judge Keliher also signed an order allowing Reeves to make monthly payments to satisfy the bond requirement of the March injunction (the April order).

Reeves asserts the trial court erred in entering the February and March injunctions because (1) the judge who signed the March injunction is not the judge who heard the evidence in February and (2) the March injunction does not sufficiently state the facts on which it is based as required by rule 683 of the Texas Rules of Civil Procedure.

A temporary injunction is an appealable interlocutory order. TEX.CIV.PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon 2001). While an interlocutory appeal is pending, the trial court retains jurisdiction to dissolve the order appealed and to proceed to trial on the merits. TEX.R.APP.P. 29.5. But a trial court cannot make any order which "interferes with or impairs the jurisdiction of the appellate court or the effectiveness of any relief sought or that may be granted on appeal" while the interlocutory appeal is pending. TEX.R.APP.P. 29.5(b).

After Reeves appealed the February injunction, the trial court entered the March injunction, the first paragraph of which vacates the previous injunction. We conclude the trial court was permitted under rule 29.5 of the Texas Rules of Appellate Procedure to take this action. The vacating of the February injunction renders the appeal of it moot. Consequently, we conclude any error asserted as to the February order is moot.

The remainder of the March injunction issues a new temporary injunction, and the April order alters the bond payment required by the March injunction. The appeal of a temporary injunction terminates the jurisdiction of the trial court as to the merits of the temporary injunction. See *Parsons v. Galveston County Employees Credit Union,* 576 S.W.2d 99, 100 (Tex.Civ.App.--Houston [1st Dist.] 1978, no writ). "An amended temporary injunction entered after an appeal has been perfected will be stricken." Id. In this case, the trial court entered the March injunction and the April order while this appeal was pending. We conclude the March injunction, except for the first paragraph, and the April order are determinations of the merits of the temporary injunction while the February injunction was pending on appeal. Thus, we conclude the March injunction, except for the first paragraph that vacated the February injunction, and the April order were issued without authority and must be stricken. Additionally, we conclude the March injunction again, except for the first paragraph, and the April order interferes

with or impairs our jurisdiction and the effectiveness of any relief sought from, or that may be granted, by this Court. See *Childers v. Pettengill,* 696 S.W.2d 206, 208 (Tex.App.--Dallas 1985, no writ).

Accordingly, except for the first paragraph, we **VACATE** the March 21, 2001 temporary injunction, and the April 10, 2001 order. And, we **DISMISS** the appeal as moot on all issues pertaining to the February 12, 2001 temporary injunction.

---------

Notes:

[1] Frederick B. Reeves is also named in the petition; however, he is not a party to this appeal.

[2] Judge Sims was a visiting judge sitting by assignment in the 44th District Court.

[3] Judge Keliher is the sitting judge of the 44th District Court.

[4] The February injunction did not include a setting for trial on the merits.

---------

Page 851

259 S.W.3d 851 (Tex.App.-Houston [1 Dist.] 2008)

Philippe TANGUY, Appellant,

v.

David LAUX, Appellee.

No. 01-07-00765-CV.

Court of Appeals of Texas, First District, Houston.

April 3, 2008

Rehearing Overruled June 24, 2008.

Page 852

[Copyrighted Material Omitted]

Page 853

Joe A. Izen, Jr., Bellaire, for appellant.

Alice Oliver-Parrott, Justin David Burrow, Burrow & Parrott, L.L.P., Houston, for appellee.

Panel consists of Justices TAFT, KEYES, and ALCALA.

## OPINION

ELSA ALCALA, Justice.

In this interlocutory appeal, appellant, Philippe Tanguy, appeals from the trial court's order granting a temporary injunction on behalf of appellee, David Laux. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(4) (Vernon Supp.2007). Laux filed suit against Tanguy asserting that a judgment debtor of Laux's, Richard Davis, had violated the Texas Uniform Fraudulent Transfer Act [1] by transferring a 1986 Twin Otter aircraft to Tanguy. The trial court issued a temporary injunction prohibiting Tanguy from " selling, encumbering, transferring and/or relocating from the county" the aircraft. In four issues, Tanguy asserts that (1) the temporary injunction order is void on its face; (2) Laux had no present right of recovery because he did not have a lien on his judgment debtor's personal property; (3) Laux was not entitled to injunctive relief because he did not record his alleged judgment lien in the records of the Federal Aviation Administration (" FAA" ) registry for aircraft; and (4) Laux had no greater right in the aircraft than his alleged judgment debtor. We conclude that the temporary injunction is not void and that the trial court did not abuse its discretion in issuing a temporary injunction. We therefore affirm.

## Background

In 2004, Laux filed suit against Richard Davis in district court in Harris County, seeking damages for breach of contract in connection with a partnership dispute. After a jury trial, the trial court, on or about August 11, 2006, rendered a final judgment in favor of Laux and against Davis for $384,126.94. Since that time, Laux has been attempting to collect on his judgment.

The instant suit was filed against Tanguy, alleging that the transfer of the Twin Otter aircraft from Davis to Tanguy violated the Texas Uniform Fraudulent Transfer Act. After a temporary restraining order was initially issued in favor of Laux, the trial court held a hearing and issued the temporary injunction against Tanguy on August 16, 2007 (" the August Order" ). The August Order did not set the underlying case for trial.

Tanguy timely filed a notice of appeal on September 4, 2007. Tanguy filed his initial brief in this Court on November 20, 2007, asserting four issues, including a challenge that asserted that the August Order was void since it did not set the underlying case for trial.

While the appeal of the August Order was pending in this Court, Laux filed with the trial court, on December 4, 2007, a Motion for Temporary Injunction Nunc Pro Tunc to add a trial setting to the temporary injunction. In his Motion for Temporary Injunction Nunc Pro Tunc, Laux specifically prayed that the trial court " vacate the judgment previously signed, and enter judgment in accordance with the proposed form [the December Order] which is attached to this motion." The trial court granted Laux's motion and ordered that " the clerk will enter judgment in accordance with the judgment as

Page 854

rendered and signed at this time." The trial court then signed a temporary injunction on December 6, 2007 (" the December Order" ). The December Order contains the same language as the August Order, except that it has an additional sentence not in the August Order that states, " It is further ORDERED, ADJUDGED, and DECREED this matter is scheduled to begin trial on May 26, 2008."

After the trial court signed the December Order, Laux filed his appellee's brief with our Court on December 10, 2007. In the brief, in response to the assertion that the August Order was void because it failed to set the underlying case for trial, Laux relies on the trial court's grant of the nunc pro tunc order to contend that the failure to set the case for trial was a clerical error that was remedied by the December Order.

### Failure to Set Case for Trial on the Merits

In his first issue, Tanguy contends that the

temporary injunction is void because it fails to comply with the Texas Rules of Civil Procedure that require that the case be set for a trial on the merits.[2] In his brief, Laux asserts that (1) the failure of the August Order to include the statement that the underlying case was set for trial was a clerical error that could be remedied by a nunc pro tunc order and (2) the December Order that was rendered pursuant to the nunc pro tunc order set the case for trial and therefore complied with the requirements for temporary injunctions. In his reply brief, Tanguy asserts that the trial court's failure to include a trial setting is a judicial error, not a clerical one, and that a nunc pro tunc order may not be used to correct a judicial error.[3]

Although the parties refer to the December Order as a nunc pro tunc order, it is a temporary injunction that is identical to the August Order, except that it adds a trial setting for the case. In his Motion for Temporary Injunction Nunc Pro Tunc, Laux specifically prayed that the trial court " vacate the judgment previously

**Page 855**

signed, and enter judgment in accordance with the proposed form [the December Order] which is attached to this motion." The trial court granted Laux's motion and ordered that " the clerk will enter judgment in accordance with the judgment as rendered and signed at this time."

" While an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and may make further orders, including one dissolving the order appealed from...." TEX.R.APP. P. 29.5. " But the [trial] court must not make an order that ... interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought or that may be granted on appeal." TEX.R.APP. P. 29.5(b). " While an appeal from an interlocutory order is pending, ... the appellate court may review ... a further appealable interlocutory order concerning the same subject matter." TEX.R.APP. P. 29.6(a)(1); *see Ahmed v. Shimi Ventures, L.P.,* 99 S.W.3d 682, 688-89 (Tex.App.-Houston [1st Dist.] 2003, no pet.).

We have jurisdiction to address the December Order because it is a further appealable interlocutory order that concerns the same subject matter. *See* TEX.R.APP. P. 29.5; *Ahmed,* 99 S.W.3d at 689. Further, the trial court had jurisdiction to dissolve the August Order and to replace it with the December Order that concerned exactly the same subject matter but with the addition of the trial date, if those actions did not interfere with or impair our jurisdiction or the effectiveness of the relief sought in the appeal. *See* TEX.R.APP. P. 29.5; *see Ahmed,* 99 S.W.3d at 688-89. We conclude that the trial court's actions in dissolving the August Order and replacing it with the December Order do not interfere with or impair our jurisdiction or the effectiveness of the relief sought in the appeal because Tanguy's appellate challenges concerning the substance of the injunction

remain alive, despite the trial court's orders, because the two injunctions are substantively the same. *See* TEX.R.APP. P. 29.5. For example, if we agreed with Tanguy's challenges to the merits of the injunction, we could reverse the injunction and give him the relief he seeks in the appeal. *See id.* Therefore, the trial court's actions in dissolving the August Order and issuing the December Order on the same subject do not diminish the effectiveness of the substantive challenges asserted by Tanguy in the appeal, which we address in issues two through four. *See id.*

Although the substantive challenges by Tanguy are not affected by the trial court's orders, Tanguy also made a procedural challenge to the injunction. Tanguy's procedural challenge asserts that the August Order was void on its face because it failed to set the case for trial. Tanguy wanted the August Order dissolved due to its lack of the trial setting, and the trial court agreed with him by dissolving the order and issuing a new injunction in the December Order that included a trial date. We conclude that the dissolution of the August Order does not interfere with or impair the *effectiveness* of the relief sought because the trial court gave Tanguy all the relief he sought from us. *See* TEX.R.APP. P. 29.5(b). When we addressed an almost identical situation, we said,

A trial court should not be allowed to frustrate a party's right to appellate review. However, that has not happened in this case. The amended order merely sets a trial date for a hearing on the permanent injunction, as required.... The appellant should not be able to complain both that the order is void because no trial date is set and also that a trial date has been set. The reason for requiring that a temporary injunction set a date for trial on the merits is to prevent the temporary injunction from becoming effectively permanent, without a trial having occurred. That purpose was accomplished

**Page 856**

here by the setting of the trial date. The trial court's amended order accomplishes the purpose of rule 683 by preventing the temporary injunction from becoming " permanent" while the appellant waits indefinitely for a trial on the merits. Moreover, it does not interfere with our power to grant relief on appeal. It is unnecessary to vacate this injunction in order to protect either appellant's right to a speedy trial or to effective appellate review of the temporary injunction.

*Eastern Energy, Inc. v. SBY P'ship,* 750 S.W.2d 5, 6 (Tex.App.-Houston [1st Dist.] 1988, no writ).[4]

We conclude the trial court had jurisdiction to dissolve the August Order and to issue the December Order that set the case for trial. *See* TEX.R.APP. P. 29.5; *Ahmed,* 99 S.W.3d at 689. We hold that the December Order granting the injunction was not void. We overrule Tanguy's first issue.

## Merits of the Temporary Injunction

Tanguy's three remaining issues contend that Laux has not met his burden to establish the temporary injunction.

### A. Standard of Review for the Temporary Injunction

The decision to grant or deny a temporary injunction lies in the sound discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of discretion. *TMC Worldwide, L.P. v. Gray,* 178 S.W.3d 29, 36 (Tex.App.-Houston [1st Dist.] 2005, no pet.)(citing *Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993)). We must not substitute our judgment for the trial court's judgment unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* (citing *Johnson v. Fourth Ct.App.,* 700 S.W.2d 916, 918 (Tex.1985)). In reviewing an order granting or denying a temporary injunction, we draw all legitimate inferences from the evidence in a manner most favorable to the trial court's judgment. *Id.* (citing *CRC-Evans Pipeline Int'l v. Myers,* 927 S.W.2d 259, 262 (Tex.App.-Houston [1st Dist.] 1996, no writ)). Abuse of discretion does not exist if the trial court heard conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Id.* (citing *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *Myers,* 927 S.W.2d at 262).

### B. Elements of Temporary Injunction

A temporary injunction's purpose is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *TMC Worldwide,* 178 S.W.3d at 36 (citing *Walling,* 863 S.W.2d at 57). A temporary injunction is an extraordinary

**Page 857**

remedy and does not issue as a matter of right. *Id.* To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim. *Id.* (citing *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002)). An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Id.*

Tanguy does not address any of the elements of a temporary injunction in his brief. In his second, third, and fourth issues, Tanguy contends that (1) Laux had no present right of recovery because he did not have a lien on his judgment debtor's personal property; (2) Laux was not entitled to injunctive relief because he did not record his alleged judgment lien in the records of the FAA registry for aircraft; and (3) Laux had no greater right in the aircraft than his alleged judgment debtor. We construe these as an attack on the second element necessary for a temporary injunction-" a probable right to the relief sought." [5]

### C. The Second Element: A Probable Right to the Relief Sought

A probable right to the relief sought is shown by alleging a cause of action and presenting evidence that tends to sustain it. *Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 607 (Tex.App.-Houston [1st Dist.] 2002, no pet.). Laux filed suit against Tanguy asserting a cause of action under the Texas Uniform Fraudulent Transfer Act. The Texas Uniform Fraudulent Transfer Act provides,

A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the transfer was made ..., if the debtor made the transfer ...:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer ..., and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM.CODE ANN. § 24.005(a) (Vernon 2002). The allegations of Laux's petition track these statutory provisions. In addition, the Texas Uniform Fraudulent Transfer Act provides that as a remedy a creditor may seek " avoidance of the transfer ... to the extent necessary to satisfy the creditor's claim." *Id.* § 24.008(a)(1). The statute also specifically provides that " subject to applicable principles of equity and in accordance with applicable rules of civil procedure," a creditor may obtain " an injunction against further disposition by

**Page 858**

the debtor or a transferee, or both, of the asset transferred." *Id.* § 24.008(a)(3)(A).

Under the Texas Uniform Fraudulent Transfer Act, a temporary injunction may be sustained if the trial court was presented with evidence of intent to defraud the creditor. *Tel. Equip. Network,* 80 S.W.3d at 609. The Texas Uniform Fraudulent Transfer Act lists several nonexclusive factors to consider in determining intent:

(1) the transfer or obligation was to an insider;

(2) the debtor retained possession or control of the property transferred after the transfer;

(3) the transfer or obligation was concealed;

(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

(5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

TEX. BUS. & COM.CODE ANN. § 24.005(b)(1)-(11).

None of Tanguy's contentions undermine Laux's showing of a probable right to recover under the Texas Uniform Fraudulent Transfer Act.

### 1. Lack of Proof of Lien

Tanguy's challenges in his second and third issues do not pertain to the proof required to establish a violation of Texas Uniform Fraudulent Transfer Act.

In his second issue, Tanguy contends,

Appellee Laux had no present right to injunctive relief since the mere recovery of a judgment or filing of an abstract of judgment does not create a lien on a judgment debtor's personal property.

Under this issue, Tanguy contends that Laux has not established any type of lien against the personal property of Davis, the judgment debtor. However, Tanguy does not assert that the existence of a lien is a prerequisite to injunctive relief and he does not cite any authority that stands for the proposition that failing to establish a lien against Davis precludes Laux from obtaining injunctive relief.

Similarly, in his third issue, Tanguy asserts,

Laux's failure to prove recordation of his alleged judgment lien in the records of the F.A.A. registry for aircraft was fatal to his right to recover injunctive relief.

Under this issue, Tanguy contends, " A judgment creditor who wants to impose a judgment lien on an aircraft must timely record his writ of execution or attachment in the FAA registry **BEFORE** the judgment Debtor sells the aircraft." Assuming that Tanguy's legal contention concerning the imposition of a lien on an aircraft is correct, he makes no argument and cites to no authority that the existence of a lien is necessary before a temporary injunction may be issued or that the existence of a lien has any relation to Laux's cause of action asserted under the Texas Uniform Fraudulent Transfer Act.

### Page 859

We conclude that the lack of proof of the existence of a lien does not undermine Tanguy's showing of a probable right to recovery under the Texas Uniform Fraudulent Transfer Act, which allows a creditor to obtain " an injunction against further disposition by the debtor or a transferee, or both, of the asset transferred." *Id.* § 24.008(a)(3)(A). The express language of Texas Uniform Fraudulent Transfer Act, which Laux followed in his petition seeking relief against Tanguy, provides that a transfer made by a debtor is fraudulent as to a creditor if the debtor made the transfer " with actual intent to hinder, delay, or defraud any creditor of the debtor." *Id.* § 24.005(1). The statute does not require that a creditor have a lien against the debtor's property in order to pursue relief under the Texas Uniform Fraudulent Transfer Act. Because the existence of a lien is not a prerequisite to Laux's cause of action under the Texas Uniform Fraudulent Transfer Act, Tanguy's assertions in his second and third issues do not tend to establish that Laux did not have a probable right to the relief sought.

We overrule Tanguy's second and third issues.

### 2. Greater Right of Ownership

In his fourth issue, Tanguy asserts,

Laux, as a judgment creditor, had no greater right in the aircraft than his alleged judgment debtor Davis even if Davis (not an L.L.C.) sold the aircraft to appellant Tanguy.

Tanguy contends that the FAA records reflect that 13,500 Air Express, L.L.C. was the owner of the disputed aircraft, not Davis. Tanguy asserts that, even if Davis was the owner, when Davis sold the aircraft to Tanguy, there was " no restriction by judicial lien or otherwise preventing him from transferring the aircraft to Tanguy." The factual basis of this contention is that the documents that memorialize the sale of the aircraft are dated January 5, 2006, approximately seven months before the date that

Laux obtained a judgment against Davis.

Although Tanguy presented evidence that indicated that the sale of the aircraft occurred on January 5, 2006, which was before Laux obtained a judgment against Davis, the standard of review dictates that we must view the evidence in favor of the trial court's judgment. *See TMC Worldwide,* 178 S.W.3d at 36. The bill of sale for the aircraft was not dated until May 3, 2007, approximately 9 months *after* the judgment against Davis and only six weeks before Davis filed for bankruptcy. Additionally, Laux filed suit against Davis in April 2004. Viewing the evidence in a light most favorable to the trial court's order, the court could have inferred that (1) Davis or Tanguy attempted to conceal the transfer by waiting 16 months before filing the bill of sale with the FAA, *see* TEX. BUS. & COM.CODE ANN. § 24.005(b)(3); (2) Davis became insolvent shortly after the transfer, *see id.* § 24.005(b)(9); and (3) Davis had been sued before the transfer occurred, *see id.* § 24.005(b)(4). *See also Tel. Equip. Network,* 80 S.W.3d at 609 (finding that trial court did not abuse discretion by issuing temporary injunction under Texas Uniform Fraudulent Transfer Act when evidence tended to support finding of factors listed in section 24.005(b), including that transfer had been concealed and that debtor had been sued before the transfer). Although Tanguy asserts that there is evidence that weighs against the trial court's decision to issue a temporary injunction, we cannot conclude that the trial court abused its discretion when the record contains conflicting evidence. *See TMC Worldwide,* 178 S.W.3d at 36.

We overrule Tanguy's fourth issue.

**Page 860**

### Conclusion

We affirm the trial court's order granting a temporary injunction. All pending motions are dismissed as moot.

---------

Notes:

[1] *See* TEX. BUS. & COM.CODE ANN. § § 24.001-.013 (Vernon 2002 & Supp.2007).

[2] In pertinent part, rule 683 of the Texas Rules of Civil Procedure provides, " Every order granting a temporary injunction shall include an order setting the cause for trial on the merits with respect to the ultimate relief sought." TEX.R. CIV. P. 683. " The requirements of Rule 683 are mandatory and must be strictly followed." *InterFirst Bank San Felipe v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986); *see also Qwest Commc'ns Corp. v. AT& T Corp.,* 24 S.W.3d 334, 337 (Tex.2000) (citing *InterFirst,* 715 S.W.2d at 641). A temporary injunction is void and should be dissolved when it does not include an order

setting the matter for trial. *InterFirst Bank,* 715 S.W.2d at 640-41; *see also Tex. Tech Univ. v. Finley,* 223 S.W.3d 510, 515 (Tex.App.-Amarillo 2006, no pet.)(declaring temporary injunction void and dissolving it for failure to include setting for trial on merits); *City of Sherman v. Eiras,* 157 S.W.3d 931, 931 (Tex.App.-Dallas 2005, no pet.)(same); *Kaufmann v. Morales,* 93 S.W.3d 650, 656-57 (Tex.App.-Houston [14th Dist.] 2002, no pet.)(same).

[3] A judgment nunc pro tunc may be used to correct a clerical error in the trial court's judgment after the court's plenary power has expired, but cannot be used to correct a judicial error. *LaGoye v. Victoria Wood Condo. Ass'n,* 112 S.W.3d 777, 783-84 (Tex.App.-Houston [14th Dist.] 2003, no pet.)(citing *Escobar v. Escobar,* 711 S.W.2d 230, 231 (Tex.1986) and *In re Fuselier,* 56 S.W.3d 265, 268 (Tex.App.-Houston [1st Dist.] 2001, orig. proceeding)); *see also* TEX.R. CIV. P. 316, 329b(f). Having determined that the trial court did not lose jurisdiction to change the original temporary injunction, we conclude it was a misnomer for Laux to file a motion that called the request for the new injunction a request for a nunc pro tunc. *See* TEX.R.APP. P. 29.5. The trial court did not change the August Order by use of the nunc pro tunc procedure, but rather issued a new injunction in the December Order that replaced the dissolved August Order.

[4] In *Reeves v. City of Dallas,* the Dallas court held that the remainder of the second temporary injunction order-which apparently added a trial date that the first order did not have-interfered with its appellate jurisdiction and the relief that it could grant and so violated rule 29.5(b). 68 S.W.3d 58, 60 (Tex.App.-Dallas 2001, pet. denied). We agreed with that premise in footnote 13 in *Ahmed. Ahmed v. Shimi Ventures, L.P.,* 99 S.W.3d 682, 691 n. 13 (Tex.App.-Houston [1st Dist.] 2003, no pet.). The appellate issues in *Reeves* were that " (1) the judge who signed the March injunction is not the judge who heard the evidence in February, and (2) the March injunction does not sufficiently state the facts on which it is based as required...." *Reeves,* 68 S.W.3d at 60. The *Reeves* court determined that the March injunction issued to replace the February injunction interfered with the appellate jurisdiction and the effectiveness of any relief sought in the appeal of the February order. *Id.* We distinguish *Reeves* on the basis that the court determined that under the facts of that case the trial court's later order interfered with the appellate court's jurisdiction and relief for the earlier order. *See id.* Unlike *Reeves,* the close analysis of the appellate issues presented show none of those concerns. *See id.*

[5] Tanguy does not challenge the first or third elements. Concerning the first element, Tanguy does not contend that a cause of action seeking, among other things, injunctive relief was not brought against him. Although Tanguy does not challenge the third element, we note that proof of an inadequate remedy at law may be shown by

evidence that the debtor is insolvent, and here it is undisputed that Davis was in bankruptcy at the time the temporary injunction issued. *See Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd.,* 80 S.W.3d 601, 611 (Tex.App.-Houston [1st Dist.] 2002, no pet.).

---------

399 S.W.3d 615 (Tex.App.-Austin 2013)

TEXAS HEALTH AND HUMAN SERVICES COMMISSION; Tom Suehs, in his official capacity as the Commissioner of Health and Human Services; and Billy Millwee, in his official capacity as the Texas State Medicaid Director, Appellants

v.

ADVOCATES FOR PATIENT ACCESS, INC.; John Doe A, by and through his next friend, Laura Garza; John Doe B, by and through his next friend, Nayeli Garza; and Jane Doe A, by and through her next friend, Isabel Tijerina, Appellees.

Texas Health and Human Services Commission; Tom Suehs, in his official capacity as the Executive Commissioner of Health and Human Services; and Billy Millwee, in his official capacity as the Texas Medicaid Director, Appellants

v.

Advocates for Patient Access, Inc.; John Doe A, by and through his next friend, Laura Garza; John Doe B, by and through his next friend, Nayeli Garza; and Jane Doe A, by and through her next friend, Isabel Tijerina, Appellees.

Nos. 03-12-00354-CV, 03-12-00606-CV.

Court of Appeals of Texas, Third District, Austin.

March 26, 2013

[Copyrighted Material Omitted]

[Copyrighted Material Omitted]

Thomas A. Albright, Assistant Attorney General, General Litigation Division, Austin, TX, for Appellants.

Thomas H. Watkins, Mark D. Chouteau, Elizabeth G. Bloch, Michael R. Crowe, Brown McCarroll, LLP, Austin, TX, for Appellees.

Before Chief Justice JONES, Justices GOODWIN and FIELD.

## OPINION

J. WOODFIN JONES, Chief Justice.

In these two interlocutory appeals, the Texas Health and Human Services Commission, Tom Suehs in his official capacity as the Commissioner of Health and Human Services, and Billy Millwee in his official capacity as the Texas State Medicaid Director (collectively, " HHSC" ) appeal (1) a temporary-injunction order issued on behalf of Advocates for Patient Access, Inc. and others [1] (collectively, " Advocates" )

and (2) a subsequent temporary-injunction order that expanded the scope of injunctive relief and corrected procedural defects in the original temporary-injunction order. We will dismiss the appeal of the first temporary-injunction order as moot and affirm the second order as modified.

### BACKGROUND

Advocates filed a declaratory-judgment action against HHSC, seeking a declaration that an HHSC Medical Transportation Program (MTP) rule is invalid and asking the trial court to permanently enjoin its enforcement. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001-.011 (West 2008) (Uniform Declaratory Judgment Act); Tex. Gov't Code Ann. § 2001.038 (West 2008) (authorizing declaratory-judgment action to determine validity or applicability of agency rule); *see also* 1 Tex. Admin. Code § 380.207(4) (2012) (Tex. Health & Human Servs. Comm'n, Program Limitations), *amended,* 37 Tex. Reg. 10192 (Dec. 28, 2012) (imposing requirement of accompaniment by parent or guardian for transportation to eligible recipients under age of 15). At the time of the proceedings below, the rule at issue-section 380.207(4) of the regulations governing the MTP-provided that transportation to Medicaid services would not be available to recipients under the age of 15 unless accompanied by a parent or guardian (subject to certain exceptions).[2]1 Tex. Admin. Code § 380.207(4) (2012), *amended,* 37 Tex. Reg. 10192 (Dec. 28, 2012).

Advocates challenged the validity of section 380.207(4) as applied to participants in the state's Early and Periodic Screening, Diagnosis, and Treatment (EPSDT) Program because children under the age of 15 are statutorily eligible for EPSDT services if they are accompanied at the services by a parent, guardian, *or* " another adult, including an adult related to the child, authorized by the child's parent or guardian to accompany the child." Tex. Human Res.Code Ann. § 32.024(s) (West Supp.2012). Because section 380.207(4) prescribed a more restrictive accompaniment requirement for transportation, Advocates asserted that the rule (1) deprived eligible Medicaid recipients of the opportunity

to participate in services mandated by federal and state law and (2) conflicted with federal regulations and state statutes requiring the provision of necessary transportation services to eligible Medicaid recipients. *See* 42 U.S.C. § 1396a(13) (governing contents of state plans for medical assistance); 42 U.S.C. § 1396d(a), (r)(5) (defining "medical assistance" and "early and periodic screening, diagnostic, and treatment services"); 42 C.F.R. § 431.53 ("A State plan must ... [s]pecify that the Medicaid agency will ensure necessary transportation for beneficiaries to and from providers."), 441.62(a) ("The agency must offer to the family ... [n]ecessary assistance with transportation as required under

**Page 620**

§ 431.53."); Tex. Gov't Code Ann. § 531.0057 (West 2012) ("The commission shall provide medical transportation services for clients of eligible health and human services programs."), .02414 (West 2012) (defining "medical transportation program"); Human Res.Code § 32.024(s) (authorizing reimbursement for EPSDT services for child under age 15 if accompanied by parent, guardian, or authorized adult to provider visit or screening). With respect to the individual defendants, Suehs and Millwee, Advocates further asserted that enforcement of the MTP rule is ultra vires because the rule conflicts with the express language of the state statutes governing the EPSDT program and the MTP.

Although section 380.207 of the MTP rules had been on the books for at least a decade and had previously been unchallenged, Advocates asserted that the rule was never enforced as a bar to eligibility for transportation to EPSDT services as long as a child under the age of 15 was accompanied by a parent or guardian *or any other adult authorized by a parent or guardian.* Consequently, although clearly contrary to section 380.207's terms, a practice developed whereby parents and guardians would authorize employees of EPSDT service providers to accompany their children during transportation services and at visits and screenings.

In March 2012, however, after discovering a perceived "overutilization" of MTP services in South Texas, HHSC sent EPSDT service providers a letter stating an intent to enforce the rule strictly. The letter also interpreted section 32.024(s)(2) of the human resources code as requiring that a child younger than age 15 be accompanied by the child's parent or guardian or another authorized adult *related to the child* at an EPSDT visit or screening. *Cf.* Human Res.Code § 32.024(s)(2) (providing that child can be accompanied at such services by "another adult, including adult related to the child, authorized by child's parent or guardian"). In response to the March 2012 letter, Advocates for Patient Access, Inc. was formed as an advocacy group for patients and providers, and the underlying lawsuit was filed by the group and the individual plaintiffs (at least one of whom

is a member of the group) to challenge HHSC's actions.

Ancillary to the declaratory-judgment and permanent-injunction actions, Advocates sought a temporary injunction prohibiting HHSC from enforcing section 380.207(4) and enjoining HHSC from applying a narrow interpretation of section 32.024(s)(2) pending a final disposition of the suit on the merits. Following an evidentiary hearing, the trial court signed a temporary-injunction order on May 17, 2012, that, in effect, precluded HHSC from applying the MTP rule and from deviating from the requirements of the EPSDT statute ("the May injunction order"). *See* Tex. Civ. Prac. & Rem.Code Ann. § 65.021 (West 2008) (district court's jurisdiction to grant injunctive relief). Specifically, the trial court enjoined HHSC from:

(a) denying eligibility of a Medicaid recipient under the age of 18 for medical transportation services because a parent or guardian does not accompany the Medicaid recipient during the provision of such transportation services, provided that the Medicaid recipient's parent or guardian authorizes any other adult to accompany the child; or

(b) requiring as a condition for eligibility for reimbursement for any visit or screening provided under the early and periodic screening, diagnosis and treatment program of the Medicaid program that a child younger than fifteen years of age be accompanied by the child's parent or

**Page 621**

guardian if the child's parent or guardian has authorized any other adult to accompany the child to the visit or screening.

But the May injunction order did not include provisions setting a bond or a trial date as required by Texas Rules of Civil Procedure 683 and 684. Accordingly, HHSC filed an interlocutory appeal contending that the May injunction order was void ab initio due to these procedural defects. That appeal was assigned Cause No. 03-12-00354-CV in this Court.

Although enforcement of the May injunction order was superseded upon HHSC's filing of the notice of appeal, *see* Tex. Civ. Prac. & Rem.Code Ann. § 6.001(a), (b) (West 2002) (state agencies exempt from appeal bond), HHSC voluntarily refrained from enforcing section 380.207(4)'s accompaniment requirement and instead instituted a process by which parents and guardians could designate another adult to accompany their children during transportation to services. HHSC also proposed amendments to the MTP accompaniment rule that would expand its scope to allow parents and guardians to designate another adult to accompany their children during transportation as long as such other adult was not employed by the medical-services provider.

Based on these developments, Advocates filed an "Application for Expanded Temporary Injunction," seeking to expand the prior injunction to preclude HHSC from employing what it called an "overly burdensome" process for EPSDT participants to receive authorization for transportation services. Advocates alleged that the procedures HHSC implemented-including requiring use of a specified authorization form that identified the authorized adult and provided his or her contact information and requiring that a phone call be generated to obtain authorization for transportation for each child and each EPSDT session-were too onerous and resulted in eligible recipients not being provided EPSDT services. Advocates also complained about the proposed amendments to section 380.207(4) and asked that HHSC be enjoined from enforcing any new rule that limited the persons authorized to accompany a Medicaid child to an EPSDT visit or during transportation to such visit. Finally, Advocates requested that the court enjoin HHSC from enforcing administrative penalties against certain providers based on claims that those providers had violated unrelated rules prohibiting providers from offering inducements designed to influence a Medicaid recipient's decision regarding the selection of a provider or the receipt of a good or service under Medicaid. *See* 1 Tex. Admin. Code § 371.27 (2012) (Tex. Health & Human Servs. Comm'n, Office of Inspector General). Despite obvious procedural defects in the May injunction order, however, Advocates did not request that the May injunction order be dissolved.

After another evidentiary hearing, the trial court signed a "Modified Temporary Injunction" on August 31, 2012, ("the August injunction order") that included the same relief granted in the May injunction order- parts (a) and (b) quoted above- and also set a bond amount and a trial date as required by the rules of civil procedure. The August injunction order further expanded the scope of injunctive relief by enjoining HHSC from engaging in the following conduct:

(c) requiring the use of any particular written authorization form for MTP transportation services that was not regularly used before May 3, 2012, which is the date of the Court's temporary restraining order; and

(d) requiring any person acting on behalf of a Medicaid-eligible child from

**Page 622**

having to contact any person, prior to the provision of transportation services, in order to designate an authorized adult.

The trial court denied all other temporary relief requested by Advocates. Although it did not expressly dissolve the prior injunction, the August injunction order manifested an intent to correct the procedural defects in the May injunction order, to carry forward the substantive provisions of the May injunction order, and to expand the scope of injunctive relief to include the new authorization processes adopted following issuance of the May injunction order.

HHSC perfected a separate interlocutory appeal from the August injunction order, which was assigned Cause No. 03-12-00606-CV in this Court and was consolidated with the earlier appeal for purposes of oral argument due to the overlapping issues. *Cf. generally* Tex.R.App. P. ("TRAP") 27.3 ("After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment ... the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment."), 29.6 ("While an appeal from an interlocutory order is pending, on a party's motion or on the appellate court's own initiative, the appellate court may review ... a further appealable interlocutory order concerning the same subject matter....").

## DISCUSSION

On appeal, HHSC challenges the validity of the August injunction order on substantive and procedural grounds, arguing that (1) pursuant to TRAP Rule 29.5, the trial court lacked authority to modify the May injunction order while it was on appeal, (2) the August injunction order is void because it was issued while the May injunction order was on appeal and had been superseded by virtue of section 6.001 of the civil practice and remedies code, (3) the August injunction order is void because it lacks the specificity required by Civil Procedure Rule 683, (4) the trial court abused its discretion in granting the modified temporary injunction because there is insufficient evidence of probable, imminent, and irreparable harm, (5) the trial court abused its discretion in issuing the modified temporary injunction because Advocates failed to meet its burden of establishing a probable right to recovery, and (6) parts (c) and (d) of the modified injunction improperly attempt to control state action, which is precluded by the doctrine of sovereign immunity. Also at issue on appeal is what effect the August injunction order has on the merits of the pending appeal of the May injunction order. Advocates contends that the trial court was authorized to correct the procedural defects in the May injunction order and that, when it did so, the modified order superseded the original order, mooting the appeal from that order. HHSC argues that it is still entitled to a determination that the May injunction order was void ab initio because the trial court's August injunction order did not expressly dissolve that order- nor was the court asked to dissolve it. HHSC contends that, without an adjudication on the merits of the appeal from the May injunction order, there remains a question about whether it was subject to the terms of that injunction between May 17, 2012, and August 31,

2012.[3]

**Page 623**

We will consider the procedural challenges before addressing HHSC's challenges to the merits of injunctive relief.

*Procedural Challenges*

**1.** *Does the August Injunction Order Violate TRAP Rule 29.5 or HHSC's Supersedeas Rights?*

As a threshold matter, HHSC contends that the August injunction order is void because it was issued after the May injunction order was appealed, did not dissolve or vacate the prior injunction order, and included at least some relief that was substantively identical to the relief granted in the prior injunction order, which was superseded pending resolution of the previously filed appeal. Under these circumstances, HHSC argues, the August injunction order is void because it violates TRAP Rule 29.5 and HHSC's duly-invoked supersedeas rights in the appeal from the May injunction order.

TRAP Rule 29.5 affirms the trial court's continuing jurisdiction over a case while an appeal from an interlocutory order is pending. *See* Tex.R.App. P. 29.5. The rule expressly authorizes the trial court to make further orders, including one dissolving the order complained of on appeal, and to proceed with a trial on the merits, unless otherwise prohibited by law. *Id.* The trial court is prohibited, however, from " mak[ing] an order that ... interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought or that may be granted on appeal." *Id.* HHSC argues that the August injunction order violates TRAP Rule 29.5 by granting at least some of the same relief as the prior order and requiring it to challenge the validity of the same relief in serial appeals.

In accordance with TRAP Rule 29.5, the trial court had authority to modify or amend the May injunction order to (1) grant identical substantive relief, (2) grant additional substantive relief, and (3) bring the injunction into compliance with Civil Procedure Rules 683 and 684 as long as those actions did not interfere with or impair this Court's jurisdiction or the effectiveness of the relief HHSC seeks on appeal from the May injunction order. *See id.* We conclude that the trial court's August injunction order did not violate TRAP Rule 29.5. *See Tanguy v. Laux,* 259 S.W.3d 851, 855 (Tex.App.-Houston [1st Dist.] 2008, no pet.) (trial court's actions in dissolving prior injunction order and amending order did not violate TRAP Rule 29.5 because substantive relief was identical so substantive claims remained alive and dissolution of prior order did not

**Page 624**

interfere with effectiveness of relief sought for

procedural deficiencies because dissolution gave appellant all relief he sought on appeal); *Ahmed v. Shimi Ventures, L.P.,* 99 S.W.3d 682, 690 (Tex.App.-Houston [1st Dist.] 2003, no pet.) (holding that " the fact that the modified order implicitly supplanted the earlier, appealed order [did not] in itself interfere with [court's] interlocutory jurisdiction in violation of rule 29.5," provisions that were substantively similar presented same issues on appeal and provided same opportunity for relief, and new provisions did not adversely affect relief that could be granted). There were no substantive challenges to the May injunction order, but even if there had been, those issues would remain alive in the appeal of the August injunction order. As to the addition of a trial setting and a bond requirement, it is difficult to conceive how those modifications could interfere with our jurisdiction or deprive HHSC of effective relief given that their absence was the sole basis for the first appeal, and the modification gave HHSC the relief it sought- a bond and a trial setting as required by rules 683 and 684. Logic and reason preclude us from construing TRAP Rule 29.5 as hamstringing trial courts from correcting procedural defects while an interlocutory appeal is pending based on those defects. As our sister court said in substantially similar circumstances:

A trial court should not be allowed to frustrate a party's right to appellate review. However, that has not happened in this case. The amended order merely sets a trial date for a hearing on the permanent injunction, as required by Tex.R. Civ. P. 683. The appellant should not be able to complain both that the order is void because no trial date is set and also that a trial date has been set. The reason for requiring that a temporary injunction set a date for trial on the merits is to prevent the temporary injunction from becoming effectively permanent, without a trial having occurred. That purpose was accomplished here by the setting of the trial date. The trial court's amended order accomplishes the purpose of rule 683 by preventing the temporary injunction from becoming " permanent" while the appellant waits indefinitely for a trial on the merits. Moreover, it does not interfere with our power to grant relief on appeal.

It is unnecessary to vacate this injunction in order to protect either appellant's right to a speedy trial or to effective appellate review of the temporary injunction.

*Eastern Energy, Inc. v. SBY P'ship,* 750 S.W.2d 5, 6 (Tex.App.-Houston [1st Dist.] 1988, no writ).

We also reject HHSC's suggestion that TRAP Rule 29.5 categorically prohibits a trial court from issuing an order when a prior order that includes the same substantive relief is already on appeal. While the prior version of TRAP Rule 29.5- former TRAP Rule 43(d)- expressly prohibited trial courts from making an order " granting substantially the same relief as that granted by the order appealed from," *see id.* (quoting former TRAP Rule 43(d)), that restriction was not carried forward in the

1997 appellate rules revision and instead was repealed " as being too broad." *Texas Rules of Court,* Tex.R.App. P. 29.5, Comment to 1997 Rule Change (West 2012). The revision embodied in the current version of TRAP Rule 29.5 emphasizes that there is no per se restriction on a trial court's ability to modify or amend orders that have been appealed; rather, the principal concern of Rule 29.5 is to clarify that the trial court retains jurisdiction to proceed as long as it does not interfere with the jurisdiction of the appellate court or the ability of the appellate court to grant effective relief in interlocutory

**Page 625**

appeals. For the reasons previously stated, those concerns are not implicated in the circumstances of the present case.

To the extent HHSC is vexed about having to prosecute seriatim appeals from amended or modified orders, we note, parenthetically, that such a scenario appears to be adequately addressed and ameliorated by two other rules of appellate procedure. TRAP Rule 29.6 states that " [w]hile an appeal from an interlocutory order is pending, on a party's motion or on the appellate court's own initiative, the appellate court may review ... a further appealable interlocutory order concerning the same subject matter." Tex.R.App. P. 29.6(1). The phrase " same subject matter" is not defined and is probably broader than a modified or amended order, but at the very least it would appear to apply to such orders. *See Tanguy,* 259 S.W.3d at 855 (amended temporary injunction was further appealable interlocutory order that concerned same subject matter); *Ahmed,* 99 S.W.3d at 687 (determining that appellate court had authority to review modified temporary-injunction order entered while interlocutory appeal was pending because it concerned same subject matter as prior order). Even more on point, TRAP Rule 27.3, which expressly applies to appealed orders that have been modified while the appeal is pending, provides as follows:

After an order or judgment in a civil case has been appealed, if the trial court modifies the order or judgment ... the appellate court must treat the appeal as from the subsequent order or judgment and may treat actions relating to the appeal of the first order or judgment as relating to the appeal of the subsequent order or judgment. The subsequent order or judgment and actions relating to it may be included in the original or supplemental record. Any party may nonetheless appeal from the subsequent order or judgment.

Tex.R.App. P. 27.3. Thus, although HHSC *chose* to prosecute its appeals separately, its fears about being unfairly *required* to do so appear unjustified.

HHSC also contends that the August injunction order is void because by issuing the same substantive relief as the May injunction order, the modified order interferes with HHSC's supersedeas rights in the first appeal. It is undisputed that once HHSC filed its notice of appeal, the May injunction order was automatically superseded by virtue of section 6.001 of the civil practice and remedies code.[4] *See* Tex. Civ. Prac. & Rem.Code Ann. § 6.001 (relieving state agency of obligation to file appeal bond). From HHSC's perspective, the purpose of superseding the injunction was to ensure that the injunction was not enforced while the case was on appeal. HHSC was not deprived of the benefit of any supersedeas rights, however, because the May injunction order has continuously remained superseded and was not rendered enforceable by the August injunction order. To the extent the same substantive relief was included in both orders, we observe two circumstances that refute HHSC's claim that it was effectively deprived of its supersedeas rights. First, the rules of appellate procedure provided HHSC the opportunity to include the modified order within the pending appeal, thus extending the benefits of its supersedeas protection to that order. *See* Tex.R.App. P. 27.3, 29.6. That HHSC chose to prosecute the appeal separately does not render the August injunction order violative of its supersedeas rights. Second, in the first

**Page 626**

appeal, HHSC did not assert any challenges to the substantive relief granted in the May injunction order; accordingly, reissuing that relief with the procedural defects corrected could not reasonably be construed as interfering with its claims for relief in the first appeal. In light of the foregoing, we conclude that the August injunction order did not deprive HHSC of any supersedeas rights.

HHSC cites two cases to support its claim that the August injunction order is void because it impinges on duly invoked supersedeas rights- *Texas Liquor Control Bd. v. Jones,* 378 S.W.2d 898 (Tex.Civ.App.-Austin 1964, orig. proceeding), and *Railroad Comm'n of Tex. v. Roberts,* 332 S.W.2d 745 (Tex.Civ.App.-Austin 1960, orig. proceeding). Those cases, however, are distinguishable based on their procedural posture and the relevant law in place. In both cases, the trial courts had granted permanent injunctions that were superseded when appealed, but the trial courts also granted temporary injunctions to ensure that the substance of the permanent injunctions remained enforceable while the appeals were pending. In *Jones,* this Court relied on the earlier opinion in *Roberts* and held that " [w]hen final judgment was entered in this case the interlocutory injunction previously granted by the Trial Judge ceased to exist by operation of law, a result the Trial Court was powerless to prevent or resist. His attempt to do so is utterly void and of no force and effect." *Jones,* 378 S.W.2d at 902-03 (quoting and discussing *Roberts* extensively); *see also Mote Resources, Inc. v. Railroad Comm'n of Tex.,* 618 S.W.2d 877, 879-80 (Tex.Civ.App.-Austin 1981, orig. proceeding) (explaining holdings in *Jones* and *Roberts* as follows: " [O]nce the district court had rendered a final

judgment, it was powerless, thereafter, to enter ancillary orders restraining the agency from acting contrary to the district court's final judgment." ). Given the procedural posture of the present case, this rationale is inapplicable.

In addition, we note that *Jones* and *Roberts* (as well as *Mote Resources* ) were decided before former Civil Procedure Rule 364 (the predecessor to TRAP Rule 24.2(a)(3)) was amended in 1984 to provide that, when a judgment is for other than money, property, or foreclosure, a trial court " may decline to permit the judgment to be suspended on filing by the plaintiff of a bond or deposit to be fixed by the court in such an amount as will secure the defendant in any loss or damage occasioned by any relief granted if it is determined on final disposition that such relief was improper." *Texas Rules of Civil Procedure-Rules Effective September 1, 1941-: An Historical Project,* rule 364(f), *http:// www. stcl. edu/ library/ Texas Rules& 1 FProject/ Main Index. htm* (accessed Mar. 11, 2013) (current version at Tex.R.App. P. 24.2(a)(3)).

Based on the foregoing, we conclude that the August injunction order does not violate TRAP Rule 29.5 or HHSC's supersedeas rights.

**2.** *Is the Appeal from the May Injunction Order Moot?*

Having concluded that the trial court had the authority to issue the August injunction order modifying the May injunction order, we now consider whether the appeal of the May injunction order is moot. In the appeal of that order, HHSC contends the order is void because it does not comply with the bond and trial-setting requirements in Civil Procedure Rules 683 and 684. It is well established that these defects render the noncompliant injunction order void ab initio. *See, e.g., Qwest Comms. v. AT & T Corp.,* 24 S.W.3d 334, 337 (Tex.2000). Although Advocates contends that the appeal is moot because it was taken from a now-superseded injunction

**Page 627**

order, HHSC counters that it is entitled to a determination that the May injunction order was void ab initio, because the trial court never dissolved that order.

There is authority for the proposition that a subsequent order bringing a temporary injunction into compliance with the rules of civil procedure supersedes a prior defective injunction order and moots an appeal concerning those defects even if the defective injunction has not been expressly dissolved. *See Nexus Fuels, Inc. v. Hall,* No. 05-98-02147-CV, 1999 WL 993929, at *2 (Tex.App.-Dallas Nov. 1, 1999, no pet.) (not designated for publication) (noting that original temporary injunction did not comply with civil procedure rules that required trial setting but concluding that appeal from defective injunction was mooted by amended order that included

trial setting); *cf. Compass Bank, N.A. v. SanJeck, LLP,* No. 05-11-00913-CV, 2012 WL 601191, at *2 (Tex.App.-Dallas Feb. 23, 2012, no pet.) (mem. op.) (holding that appeal from first temporary-injunction order was rendered moot by amended injunction that afforded appellant all relief sought on appeal as to first injunction); *Tanguy,* 259 S.W.3d at 855 (appeal from defective temporary-injunction order mooted by amended order that corrected defects and dissolved prior injunction because trial court gave appellant all relief he had requested on appeal); *Ahmed,* 99 S.W.3d at 688-91 (holding that modified temporary injunction that did not expressly dissolve or vacate previous temporary injunction " implicitly" superseded prior injunction, did not violate rules of appellate procedure, and could be considered on its merits in pending appeal from superseded injunction).

We need not decide if the first appeal is moot on that basis, however, because we conclude that the appeal is moot due to the absence of a justiciable controversy as to the validity of the May injunction order. *Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 166-67 (Tex.2012) (observing that case is moot if there ceases to be " a justiciable controversy between the parties-that is, if the issues presented are no longer ' live,' or if the parties lack a legally cognizable interest in the outcome" ). Because Advocates concedes that the May injunction order is facially invalid, there is no live controversy concerning the validity of that order, and there is no claim that the August injunction order suffers the same procedural deficiencies. We therefore dismiss HHSC's appeal of the May injunction order for want of jurisdiction.

**3.** *Does the August Injunction Order Comply with Rule 683?*

Texas Rule of Civil Procedure 683 states in pertinent part: " Every order granting an injunction and every restraining order shall set forth the reasons for its issuance [and] shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought to be restrained...." Tex.R. Civ. P. 683. The rule's requirements are mandatory and must be strictly followed. *InterFirst Bank San Felipe, N.A. v. Paz Constr. Co.,* 715 S.W.2d 640, 641 (Tex.1986). When a temporary-injunction order does not adhere to Rule 683's requirements, the injunction order is subject to being declared void and dissolved. *Id.* HHSC contends that the August injunction order is void because it does not specifically set forth the reasons why Advocates is likely to succeed on the merits of its claims for a declaratory judgment and permanent injunctive relief. We conclude that the August injunction order is sufficiently specific as to the reasons for enjoining the conduct described in parts (a) and (b), but it does

**Page 628**

not comply with Rule 683 with regard to the conduct

enjoined in parts (c) and (d).

Part (a) of the injunction order enjoins conduct that is otherwise authorized by section 380.207(4) of the MTP rules. Part (b) of the injunction essentially restates the terms of the statute governing the EPSDT program- section 32.024(s)(2) of the human resources code- and enjoins conduct that would be contrary to the statutory language. Although the August injunction order addresses probable right of recovery only broadly, there is but a singular legal theory in the pleadings concerning the validity of the challenged MTP rule- specifically, that it conflicts with state and federal laws requiring the state to provide transportation to Medicaid services for eligible recipients because it imposes a more stringent accompaniment requirement than is statutorily required to obtain EPSDT services. Likewise, Advocates requested that the trial court enjoin HHSC from applying a narrow interpretation of section 32.024 on the sole basis that such an interpretation conflicts with the statute's express language.

" [T]he obvious purpose of [Rule 683] is to adequately inform a party of what he is enjoined from doing and the reason why he is so enjoined." *El Tacaso, Inc. v. Jireh Star, Inc.,* 356 S.W.3d 740, 744 (Tex.App.-Dallas 2011, no pet.) (quoting *Schulz v. Schulz,* 478 S.W.2d 239, 244-45 (Tex.Civ.App.-Dallas 1972, no writ)) (alteration in original). That purpose is satisfied with respect to parts (a) and (b) of the August injunction order because (1) there is little doubt as to the legal basis for granting relief, (2) the court fully explained the reasons why the applicants will suffer imminent, irreparable injury, and (3) the conduct enjoined is stated with specificity.

On the other hand, the legal basis for the relief provided in parts (c) and (d) of the August injunction order is not readily ascertainable by reference to the terms of the order, nor from the applications for injunctive and expanded injunctive relief. On appeal, Advocates explains that the authorization process enjoined in the modified order (1) conflicts with the transportation-authorization processes established by HHSC's existing rules 380.203 and 380.205 and was employed without formal adoption of an amended rule, (2) makes it harder for authorized Medicaid recipients to receive EPSDT services and thus is contrary to section 32.024(s)(2) of the Texas Human Resources Code, and (3) conflicts with section 531.003(2)(B) of the Texas Government Code, which states that one of HHSC's goals is to provide prompt, comprehensive, and effective services to the people of Texas by " eliminating ... programmatic and transportation barriers." Gov't Code § 531.003; Human Res.Code § 32.024(s)(2); 1 Tex. Admin. Code §§ 380.23 (2012) (Tex. Health & Human Res. Comm'n, Program Processes), .25 (2012) (Tex. Health & Human Res. Comm'n, Program Services). However, none of this authority or legal argument was presented to the trial court in Advocates' " Application for Expanded

Temporary Injunction" (or any other pleading) as a legal basis for challenging the transportation-authorization process referenced in the August injunction order. Even if it had been, the sheer number of legal theories asserted would leave doubt as to the trial court's basis for concluding that Advocates had a probable right to recover. In addition to being unclear as to the legal basis supporting a right to relief, we also note that parts (c) and (d) are vague and overly broad with regard to the acts restrained and thus do not comply with the requirement that the injunction " describe in reasonable detail ... the act or acts sought to be restrained."

Tex.R. Civ. P. 683. " An injunction must be definite, clear, and concise, leaving the person enjoined no doubt about his duties, and should not be such as would call on him for interpretations, inferences or conclusions." *Vaughn v. Drennon,* 202 S.W.3d 308, 316 (Tex.App.-Tyler 2006, pet. denied). Because parts (c) and (d) of the August injunction order do not comply with rule 683's requirements, those provisions must be vacated.

### *Merits of Temporary Injunctive Relief*

A temporary injunction is an extraordinary remedy and does not issue as a matter of right. *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993). The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). The status quo is " the last actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton,* 146 S.W.3d 648, 651 (Tex.2004) (quoting *Janus Films, Inc. v. City of Fort Worth,* 163 Tex. 616, 358 S.W.2d 589, 589 (1962) (per curiam)). To obtain a temporary injunction, the applicant must ordinarily plead and prove three specific elements: (1) a cause of action against the defendant, (2) a probable right to the relief sought, and (3) a probable, imminent, and irreparable injury in the interim. *Butnaru,* 84 S.W.3d at 204. The applicant is not required to establish that he will prevail on final trial; rather, the only question before the trial court is whether the applicant is entitled to preservation of the status quo pending trial on the merits. *Walling,* 863 S.W.2d at 58.

Our review is confined to the validity of the order that grants or denies injunctive relief. *Id.* The decision to grant or deny a temporary injunction lies in the discretion of the trial court, and the court's ruling is subject to reversal only for a clear abuse of that discretion. *Id.* This Court may neither substitute its judgment for that of the trial court nor consider the merits of the lawsuit. *Id.* We may not reverse a trial court's order if the court was presented with conflicting evidence and the record includes evidence that reasonably supports the court's decision. *Brammer v. KB Home Lone Star, L.P.,* 114

S.W.3d 101, 105 (Tex.App.-Austin 2003, no pet.). Rather, we view the evidence in the light most favorable to the trial court's order, indulging every reasonable inference in its favor, and determine whether the order was so arbitrary as to exceed the bounds of reasonable discretion. *Id.* We will reverse the order if the trial court misapplies the law to established facts or if it concludes that the applicant has demonstrated a probable injury or a probable right to recover and such conclusion is not reasonably supported by the evidence. *Id.* at 106.

HHSC challenges the August injunction order on the basis that Advocates failed to establish probable, imminent, and irreparable injury and probable right to the relief sought in the underlying lawsuit. We consider these matters in turn, but only as they pertain to the relief granted in parts (a) and (b) of the August injunction order because we have already determined that parts (c) and (d) of the order must be vacated on other grounds.

**1.** *Probable, Imminent, Irreparable Injury:*

" Probable injury" includes the elements of imminent harm, irreparable injury, and no adequate remedy at law. *Univ. of Tex. Med. School v. Than,* 834 S.W.2d 425, 428 (Tex.App.-Houston [1st Dist.] 1992, no writ). For purposes of a temporary injunction, an injury is irreparable if the injured party cannot be adequately compensated in damages or if the

**Page 630**

damages cannot be measured by any certain pecuniary standard. *Butnaru,* 84 S.W.3d at 204; *see also Tex. Indus. Gas v. Phoenix Metallurgical Corp.,* 828 S.W.2d 529, 533 (Tex.App.-Houston [1st Dist.] 1992, no writ) (applicant for injunctive relief must establish that damages are incapable of calculation or party sought to be enjoined is incapable of responding in damages). " The general rule at equity is that before injunctive relief can be obtained, it must appear that there does not exist an adequate remedy at law." *Butnaru,* 84 S.W.3d at 210.

HHSC contends that there is no *direct* evidence that any child was actually deprived of EPSDT services due to the threat in the March 2012 letter that section 380.207(4) would be enforced or that a parent, guardian, or relative was required to be in attendance at the EPSDT services. While that may be true, there is sufficient evidence from which the trial court could have reasonably inferred that at least one of the plaintiff children was deprived of at least some EPSDT services as a result of the threatened enforcement of the MTP accompaniment rule, that the child regressed in his progress due to a lack of therapy, that he would not be able to regularly receive EPSDT services if the MTP accompaniment rule were enforced or section 32.024(s) were narrowly construed, and that the harm from delayed or denied EPSDT services would be irreparable. *See Lozano v. Lozano,* 52 S.W.3d 141, 149 (Tex.2001)

(circumstantial evidence may be used to establish any material fact if inference is reasonable and more than mere suspicion).

At the evidentiary hearing, Mario Garza, an administrator for a pediatric rehabilitation company, testified that following the March 2012 letter, " as many as 90 percent of the children were not able to receive their therapeutic services." He also testified that, " [i]f the parents are not allowed to authorize the monitor to transport their kids back and forth and provide supervision of them at the clinic, then the vast majority of kids would not receive the therapeutic rehab services that they so desperately require." This, he said, would result in regression and deterioration in their medical condition. The regional manager of an MTP service provider similarly testified about the drastic impact of the March 2012 letter, stating that 7,742 trips had been authorized in February 2012 and 6,121 trips in March 2012, but only 2,515 trips were made in April 2012. Although there is no direct testimony linking the dramatic reduction in children receiving transportation services to the dramatic reduction in the children receiving services at Garza's facility, the trial court could have reasonably inferred a connection between the two.

These circumstances were also elaborated on by Nayeli Garza with respect to one of the individual plaintiffs, her son, John Doe B. Garza testified that John Doe B regularly received speech-therapy services prior to March 2012 and was usually accompanied by a monitor employed by the speech-therapy provider and authorized by Garza to accompany him during transportation and while at therapy. However, sometime in March 2012, the transportation provider contacted her and informed her that they would not be able to pick her son up and take him to his therapy sessions. Although Garza did not provide a reason why transportation was denied, the trial court could reasonably have inferred from her testimony that it was because she was not available to accompany him. Indeed, she testified that because she was unable to accompany him herself or find relatives to assist her, there was a period of time during which her son was not able to receive speech therapy, and during that time she noticed a decline in his condition

**Page 631**

and progress. Although he later resumed speech-therapy services, all the evidence taken together is sufficient to support the trial court's finding that at least one plaintiff would probably suffer imminent, irreparable harm if the status quo were not maintained. [5]

**2.** *Probable Right of Recovery*

From an examination of the cited statutes and regulations, we conclude that the statutory scheme may reasonably be subject to a construction that would be consistent with Advocates' legal challenge to the MTP

rule's validity and HHSC's narrow construction of the accompaniment requirement in the EPSDT statute. In this interlocutory appeal, we cannot fairly conclude that the trial court abused its discretion in determining that Advocates met its burden to show a probable right of recovery on its claims in the underlying lawsuit.

**CONCLUSION**

Because there is no dispute that the May injunction order does not comply with Civil Procedure Rules 683 and 684 and is therefore void, the appeal from that order is moot. Furthermore, the procedural defects were corrected in the August injunction order, and there is no further complaint of procedural defect in that regard. Accordingly, we dismiss the appeal of cause number 03-12-00354-CV as moot. In cause number 03-12-00606-CV, we modify the August modified temporary-injunction order by vacating parts (c) and (d) due to noncompliance with Rule 683; as so modified, we affirm that order.

---------

Notes:

[1] Other plaintiffs are John Doe A, by and through his next friend, Laura Garza; John Doe B, by and through his next friend, Nayeli Garza; and Jane Doe A, by and through her next friend, Isabel Tijerina.

[2] The relevant portion of section 380.207 provided:

Recipients are not eligible to receive medical transportation services under the following circumstances:

....

(4) The recipient is under 18 years of age and not accompanied by a parent or legal guardian, unless one of the following conditions exists:

(A) the recipient is aged 15 through 17 years of age and presents the parent's or legal guardian's signed, written consent for the transportation services to the Regional MTP office or the transportation contractor; and/or

(B) the treatment to which the minor is being transported is such that the law extends confidentiality to the minor for treatment. 1 Tex. Admin. Code § 380.207(4) (2012) (Tex. Health & Human Servs. Comm'n, Program Limitations),*amended,* 37 Tex. Reg. 10192 (Dec. 28, 2012).

[3] An additional mootness issue was raised at oral argument based on amendments to section 380.207(4) that became effective January 1, 2013. As of that date, section 380.207 was amended to expand the categories of persons who are eligible to accompany children under 15 years of age while they are being transported to receive

medical services and now includes " another adult authorized by the parent or guardian" as long as that person is not affiliated with the medical-services provider. *See* 1 Tex. Admin. Code § 380.207(4) (adopted December 28, 2012) (Tex. Health & Human Servs. Comm'n, Program Limitations) (citing 1 Tex. Admin. Code § 354.1133, which also became effective January 1, 2013, and governs parental accompaniment for minors receiving services under state's EPSDT Program). Because the amended rule became effective while these appeals were pending-and Advocates subsequently amended its pleadings to assert claims under the amended rule-HHSC argues that both the May and August injunctions should be dissolved because they were issued based on a rule that no longer exists. Advocates contends, however, that the appeals are not moot based on the rule change because the injunctions enjoin conduct that would otherwise be permitted even under the amended rules. Because the injunction orders at issue in the consolidated appeals enjoin HHSC from engaging in conduct that would be permitted under the amended rules, we agree with Advocates that the appeals are not moot based on the rule change. However, the trial court is free to reconsider the continued propriety of injunctive relief in light of the rule change.

[4] Advocates made no request to the trial court to avoid or undo this supersedeas, nor did it offer to post a bond for that purpose. *See In re Long,* 984 S.W.2d 623, 626 (Tex.1999); *In re Dallas Area Rapid Transit,* 967 S.W.2d 358, 360 (Tex.1998).

[5] HHSC complains that the findings of fact in the August injunction order either exceed the scope of the evidence or are wholly unsupported by the evidence. While we share HHSC's concerns about the disparity between the evidentiary record and some of the trial court's fact findings, the unsupported findings are not essential for the injunctive relief granted and there is at least some evidence to support the relevant portions of the findings.

---------

**Page 60**

817 S.W.2d 60 (Tex. 1991)

TEXAS WORKERS' COMPENSATION COMMISSION, et al., Appellants,

 v.

 Hector GARCIA, Jr., et al., Appellees.

No. D-1516.

Supreme Court of Texas.

October 16, 1991

**Page 61**

Joe Pitner, Shannon H. Ratliff, Dan Morales, Delmar L. Cain, Harry G. Potter, III, Frank Oliver and Scott Moore, Austin, for appellants.

Robert Serna, Crystal City, Bill Whitehurst, David R. Richards, Austin, Robert R. Puente, San Antonio, for appellees.

PER CURIAM.

This is a direct appeal from a judgment of the district court declaring the Texas Workers' Compensation Act [1] void as violative of various provisions of the Texas Constitution. Appellants have filed a statement of jurisdiction; appellees have responded. See TEX.R.APP.P. 140(c).

"An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state." TEX.GOV'T CODE § 22.001(c); see TEX. CONST. art. V, § 3-b. The only injunctive relief sought in this case was by appellees against three parties: the Texas Workers Compensation Commission, its executive director, and a private employer. At trial, appellees orally withdrew their injunctive claims against two of those parties, the Commission and director. Accordingly, the district court never granted or denied injunctive relief against the Commission and its director. Appellees' remaining claim for injunctive relief against the private employer was not addressed specifically in the district court's judgment but effectively disposed of by its general provision "that all relief requested and not otherwise granted is hereby DENIED." The private employer has not appealed. Only the Commission and its director have appealed.

We have strictly construed our direct appeal jurisdiction, requiring that the trial court's ruling on the temporary or permanent injunction be "on the ground" of the statute's constitutionality or unconstitutionality. See *Mitchell v. Purolater Security, Inc.,* 515 S.W.2d 101 (Tex.1974); *Gibraltar Sav. Ass'n v. Falkner,* 162 Tex. 633, 351 S.W.2d 534 (1961); cf. *Martinez v. Rodriguez,* 608 S.W.2d 162, 163-64 (Tex.1980). It is far from clear in this case that the district court's general denial of injunctive relief against the private employer was related to its determination that the Act is unconstitutional. Assuming that it was, however, that denial may not be used to invoke direct appeal jurisdiction when the private employer has not perfected its own appeal.

Appellants argue that a grant of declaratory relief against a state agency, which is the relief granted against the Commission in this case, is akin to an injunction. Whatever the similarities in effect, however, the simple granting of declaratory relief against a state agency is not sufficient to invoke our direct appeal jurisdiction. *Cf. Boston v. Garrison,* 152 Tex. 253, 256 S.W.2d 67 (1953).

Appellants also argue that appellees orally withdrew their claims for injunctive relief against the Commission and its director for the purpose of precluding a direct appeal to this Court. This argument, assuming it is correct, is irrelevant. The effect of the trial court's order, not the parties' litigation strategies, is what determines

**Page 62**

this Court's direct appeal jurisdiction.

For these reasons, a majority of the Court, without hearing oral argument, dismisses this appeal for want of jurisdiction. TEX.R.APP.P. 140(d), 170.

---------

Notes:

[1] TEX.REV.CIV.STAT.ANN. art. 8308-1.01 et seq. (Vernon Supp.1991). The judgment refers to "Ch. 1, 1989 Tex.Sess.Law.Serv.2d C.S.1", which includes additional provisions. Act of Dec. 12, 1989, 71st Leg., 2d C.S., ch 1, 1989 Tex.Gen.Laws 1.

---------

adoption of Rule of Civil Procedure 168, which governs the procedure for obtaining permission to appeal from the trial court.

New Rule 283 applies only to appeals in cases that were filed in the trial court on or after September 1, 2011. Rule 28.2 applies only to appeals in cases that were filed in the trial court before September 1, 2011.

Rule of Civil Procedure 168 clarifies that the trial court's permission to appeal should be included in the order to be appealed rather than in a separate order. As stated in Rule 28.3(c), if a prior order containing the trial court's ruling is amended to include such permission, the time for appeal runs from the amended order. Rule 28.3(k) further clarifies that if the petition is granted, appeal is thereby perfected, and the appeal proceeds as an accelerated appeal, with all deadlines - including deadlines and obligations for preparing the record - running from the date the petition was granted. A separate notice of appeal need not be filed. The petition procedure in Rule 28.3 is intended to be similar to the Rule 53 procedure governing petitions for review in the Supreme Court.

## Rule 29. Orders Pending Interlocutory Appeal in Civil Cases

### 29.1. Effect of Appeal

Perfecting an appeal from an order granting interlocutory relief does not suspend the order appealed from unless:

(a) the order is superseded in accordance with 29.2; or

(b) the appellant is entitled to supersede the order without security by filing a notice of appeal.

### 29.2. Security

The trial court may permit an order granting interlocutory relief to be superseded pending an appeal from the order, in which event the appellant may supersede the order in accordance with Rule 24. If the trial court refuses to permit the appellant to supersede the order, the appellant may move the appellate court to review that decision for abuse of discretion.

### 29.3. Temporary Orders of Appellate Court

When an appeal from an interlocutory order is perfected, the appellate court may make any temporary orders necessary to preserve the parties' rights until disposition of the appeal and may require appropriate security. But the appellate court must not suspend the trial court's order if the appellant's rights would be adequately protected by supersedeas or another order made under Rule 24.

### 29.4. Enforcement of Temporary Orders

While an appeal from an interlocutory order is pending, only the appellate court in which the appeal is pending may enforce the order. But the appellate court may refer any enforcement proceeding to the trial court with instructions to:

(a) hear evidence and grant appropriate relief; or

(b) make findings and recommendations and report them to the appellate court.

### 29.5. Further Proceedings in Trial Court

While an appeal from an interlocutory order is pending, the trial court retains jurisdiction of the case and unless prohibited by statute may make further orders, including one dissolving the order complained of on appeal. If permitted by law, the trial court may proceed with a trial on the merits. But the court must not make an order that:

(a) is inconsistent with any appellate court temporary order; or

(b) interferes with or impairs the jurisdiction of the appellate court or effectiveness of any relief sought or that may be granted on appeal.

### 29.6. Review of Further Orders

(a) *Motion to Review Further Orders.* While an appeal from an interlocutory order is pending, on a party's motion or on the appellate court's own initiative, the appellate court may review the following:

    (1) a further appealable interlocutory order concerning the same subject matter; and

    (2) any interlocutory order that interferes with or impairs the effectiveness of the relief sought or that may be granted on appeal.

(b) *Record.* The party filing the motion may rely on the original record or may file a supplemental record with the motion.

#### Notes and Comments

Comment to 1997 change: This is former Rule 43. The provision in the former rule that an appeal from an order certifying a class suspends the order is repealed. The provision in the former rule that an order denying interlocutory relief cannot be suspended is omitted as unnecessary because the rule provides for superseding only orders granting relief. No substantive change is intended. The provision in former Rule 43(d) prohibiting the trial court from making an order granting substantially the same relief as the order appealed is repealed as being too broad. The provisions of former Rule 43(g) regarding

the mandate are moved to Rule 18.6 and 18.7. The provision of former Rule 43(h) regarding rehearings is moved to Rule 49.4.

Comment to 2002 change: Rule 29.5 is amended to acknowledge that a trial court may be prohibited by law from proceeding to trial during the pendency of an interlocutory appeal, as for example by section 51.014(b) of the Texas Civil Practice and Remedies Code.

Comment to 2008 change: Rule 29.5 is amended to be consistent with Section 51.014(b) of the Civil Practice and Remedies Code, as amended in 2003, staying all proceedings in the trial court pending resolution of interlocutory appeals of class certification orders, denials of summary judgments based on assertions of immunity by governmental officers or employees, and orders granting or denying a governmental unit's plea to the jurisdiction.

## Rule 30. Restricted Appeals to Court of Appeals in Civil Cases

A party who did not participate—either in person or through counsel—in the hearing that resulted in the judgment complained of and who did not timely file a postjudgment motion or request for findings of fact and conclusions of law, or a notice of appeal within the time permitted by Rule 26.1(a), may file a notice of appeal within the time permitted by Rule 26.1(c). Restricted appeals replace writ of error appeals to the court of appeals. Statutes pertaining to writ of error appeals to the court of appeals apply equally to restricted appeals.

### Notes and Comments

Comment to 1997 change: This is former Rule 45. The appeal by writ of error procedure is repealed. A procedure for an appeal filed within 6 months — called a restricted appeal — is substituted. This rule sets out who may take a restricted appeal. Rules 25.1 and 26.1 set out the method of perfection and the time for perfecting the appeal.

## Rule 31. Appeals in Habeas Corpus, Bail, and Extradition Proceedings in Criminal Cases

### 31.1. Filing the Record; Submission

When written notice of appeal from a judgment or order in a habeas corpus or bail proceeding is filed, the trial court clerk must prepare and certify the clerk's record and, if the appellant requests, the court reporter must prepare and certify a reporter's record. The clerk must send the clerk's record and the court reporter must send the reporter's record to the appellate court within 15 days after the notice of appeal is filed. On reasonable explanation, the appellate court may shorten or extend the time to file the record. When the appellate court receives the record, the court will — if it desires briefs — set the time for filing briefs, and will set the appeal for submission.

### 31.2. Hearing

An appeal in a habeas corpus or bail proceeding will be heard at the earliest practicable time. The applicant need not personally appear, and the appeal will be heard and determined upon the law and the facts shown by the record. The appellate court will not review any incidental question that might have arisen on the hearing of the application before the trial court. The sole purpose of the appeal is to do substantial justice to the parties.

### 31.3. Orders on Appeal

The appellate court will render whatever judgment and make whatever orders the law and the nature of the case require. The court may make an appropriate order relating to costs, whether allowing costs and fixing the amount, or allowing no costs.

### 31.4. Stay of Mandate

(a) *When Motion for Stay Required.* Despite Rule 18 or any other of these rules, in the following circumstances a party who in good faith intends to seek discretionary review must — within 15 days after the court of appeals renders judgment — file with the court of appeals clerk a motion for stay of mandate, to which is appended the party's petition for discretionary review showing reasons why the Court of Criminal Appeals should review the appellate court judgment:

   (1) when a court of appeals affirms the judgment of the trial court in an extradition matter and thereby sanctions a defendant's extradition; or

   (2) when a court of appeals reverses the trial court's judgment in a bail matter — including bail pending appeal under Code of Criminal Procedure article 44.04(g) — and thereby grants or reduces the amount of bail.

(b) *Determination of the Motion.* The clerk must promptly submit the motion and appendix to the court of appeals, or to one or more judges as the court deems appropriate, for immediate consideration and determination.

   (1) If the motion for stay is granted, the clerk will immediately forward the petition for discretionary review to the clerk of the Court of Criminal Appeals.